IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOHN W. COMRIE, )<br> )<br> Plaintiff, )<br> )<br> v. ) No.<br> )<br>IPSCO INC., a Canadian Corporation; )<br>IPSCO ENTERPRISES INC. a Delaware )<br>Corporation; SSAB SVENSKT STAL )<br>AB, a Swedish Corporation; and IPSCO Inc )<br>Benefits Committee, )<br> )<br> Defendants. ) | FILED: MAY 27, 2008<br>08CV3060      LI<br>JUDGE  DARRAH<br>MAGISTRATE  JUDGE ASHMAN |

**COMPLAINT**

Plaintiff John Comrie, through his attorneys, complains against the Defendants as follows:

**OVERVIEW**

1. In this Complaint, Plaintiff John W. Comrie, an ex-employee of Defendants IPSCO Inc. and IPSCO Enterprises, Inc. ("IE, Inc."), collectively "IPSCO," seeks legal redress against them and their parent corporation, SSAB SVENSKT STAL AB ("SSAB") for their failure to fulfill their obligations to him in connection with his move to the United States. Those obligations included pension benefits, severance pay, and other compensation due Comrie for his years of loyal employment service.

1

## PARTIES

2.      Plaintiff John Comrie was a citizen and resident of Canada from birth until May 24, 1999. Since that date he has been a resident of the United States. Plaintiff Comrie became a United States citizen in October 2006. He is now a citizen of the State of Kentucky.

3.      Defendant IPSCO Inc. is a Canadian corporation with its principal place of business in Lisle, Illinois. IPSCO Inc was a public company for more than fifty years. Its shares were traded in Canada on the Toronto Stock Exchange and since 1996 in New York on the New York Stock Exchange. On July 18, 2007 SSAB completed the purchase of all the shares of IPSCO Inc, which is now owned and controlled directly or indirectly by SSAB.

4.      IE Inc. is a Delaware corporation, with its former principal place of business in Lisle, Illinois. Until July 18, 2007 it was the main holding company for all the United States assets of IPSCO Inc. Since that date IE Inc has become a wholly owned subsidiary controlled directly or indirectly by SSAB. It has withdrawn from Illinois for business purposes and, on information and belief, it is currently inactive.

5.      Defendant SSAB is a Swedish corporation, having its principal place of business in Sweden. SSAB maintains an office in Lisle, Illinois. Since acquiring IPSCO Inc in July, 2007, the two companies have had interlocking officerships. On information and belief, all significant decisions made since then regarding the business of IPSCO Inc, including those concerning Comrie, have been made or controlled by SSAB.

6.      Defendant IPSCO Inc Benefits Committee and its members("PBC") administer the IPSCO Enterprises US Supplental Executive Retirement Plan dated as of January 1,2005 and

2

as amended to August 1, 2007. On information and belief, the Committee and all of its members are citizens of Illinois.

## JURISDICTION AND VENUE

7. This Court has original jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. 1332(a)(1) and (2) in that this is an action between citizens of different states and subjects of a foreign state and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs. This Court also has federal question jurisdiction under 28 U.S.C. 1331 to the extent claims are brought herein pursuant to the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 et seq.

8. Venue in this District is proper under 28 U.S.C.1391(a)(2) in that a substantial part of the events or omissions giving rise to the claims occurred in this judicial district. Venue is also proper here under sec 502(e)(2) of ERISA, 29 U.S.C. 1132(e)(2) in that Plaintiff was employed by Defendants in this district.

## FACTS COMMON TO ALL COUNTS

9. Comrie began working for IPSCO Inc on July 15, 1980 at its then corporate headquarters in Saskatchewan, Canada as an attorney hired to establish that company's first legal department. He worked continuously for IPSCO, serving in several different capacities. He was also an officer of IPSCO Inc. from 1985 until his involuntary retirement on July 31, 2007.

10. From 1981 through 1999 and beyond, IPSCO actively moved employees back and forth between Canada and the United States. To induce officers to relocate to the United States, IPSCO developed a custom and practice of promising those officers that the design of

their United States pension plan would not result in a material reduction of the pension benefits they would have received had they remained in Canada.

11. Early in 1998, the Board of Directors decided to move the operational headquarters of IPSCO Inc to the western suburbs of Chicago during the summer of 2000.

12. On December 6, 1998 Comrie was appointed by the IPSCO Inc Board of Directors to the position of Vice President, Chief Legal Officer and Secretary and he was asked to make plans to move his wife and family to the United States. Having been a citizen of Canada for fifty years, the decision to relocate was a very difficult one for Comrie and his family. Nonetheless, they decided that they would accede to this request, assuming IPSCO Inc met certain conditions relating to his compensation and benefits.

13. Early in 1999 Comrie and his wife started making plans to move to Chicago. His wife was gainfully employed in Canada as a professor at the University of Regina; replacing her income after the move was an important consideration. By April 1999 she was able to identify and secure an offer of employment from a small private university in Aurora, Illinois where she would be required to take a 40% pay reduction to accept a one-year contract without any tenure or any defined benefit pension, both of which she had in Canada.

14. During this same time frame from January to May 1999, Comrie was working with the appropriate IPSCO officers (Edwin Tiefenbach, the then Chief Financial Officer of IPSCO Inc and IE Inc, as well as Alan Harris, the then Director of Compensation and Benefits for IPCSO Inc and IE Inc) to agree on compensation details of Comrie's impending transfer to the United States, particularly including details of how Comrie's pension plan would continue to operate once he had moved.

15. During the week prior to the IPSCO Inc Annual General Meeting in Regina on Friday, April 23, 1999, Comrie had several extensive discussions with Tiefenbach and Harris regarding his compensation. During those discussions, both Tiefenbach and Harris made repeated representations to Comrie, consistent with IPSCO's custom and practice for Company Officers, that if he moved to the United States, the design of his pension plan in the United States would not result in a material reduction of the pension benefit he would have received had he remained in Canada.

16. Specifically, on Monday, April 19, 1999, Tiefenbach and Harris both told Comrie that if he moved to the United States:

a) he would get full credit for all his years of service regardless whether he earned them in Canada or in the United States;

b) he would become a participant in IPSCO's United States Supplementary Retirement Benefit Plan (the "Original SRBP") which would provide him with defined benefit retirement benefits using and calculating "years of service" in the same manner used under his Canadian pension plan; and

c) there would be no other material differences from his Canadian plan, including in regard to the security of his pension benefits.

17. On Friday, April 23, 1999 the IPSCO Inc Board of Directors reviewed a report from an outside consulting attorney regarding a potential major legal problem at the Company (the "Legal Problem"). The report attributed 20% of the responsibility for the problem to Comrie.

18. In a meeting later that same day in the office of Roger Phillips, the President of IPSCO Inc and the Chairman of IE Inc., Comrie was advised that the other attorneys responsible for the Legal Problem were being terminated, but that the company wanted Comrie:

a) to continue working for IPSCO Inc, particularly on a resolution of the Legal Problem,

b) to implement his plans to immigrate to the United States with his wife, and

c) to agree to suspend the public use of the title "Chief Legal Officer" and refer to himself as Vice-President and Corporate Secretary, pending the resolution of the Legal Problem.

19. Comrie had serious concerns that the consultant's report, attributing to him partial responsibility for the Legal Problem, would permanently mark him as a substandard performer in the minds of IPSCO's Board of Directors, prevent him from returning to any senior executive position at IPSCO after he moved to the United States, and generally prejudice his career. He expressed those concerns to Roger Phillips. He also told Phillips that the move to the United States was a major disruption in the careers of both him and his wife and that he would not make the move unless the following promises were made to him:

> If Comrie agreed to move his family to the United States, serve in this demoted position and devote his efforts to solving the Legal Problem, the representations made to him by Tiefenbach and Harris regarding his United States pension (described above) would be honored by IPSCO and he would also receive all other benefits and employment terms typically provided to corporate officers being moved to the United States. In addition, if Comrie performed well managing the Legal Problem and providing legal services to IPSCO reporting directly to the President (and the Board of Directors where required), then Comrie would be permitted to reassume the title of Chief Legal Officer of IPSCO, and not be prejudiced or prohibited from advancement in a senior executive role at IPSCO.

Phillips then told Comrie, acting on behalf or both IPSCO Inc and IE Inc, that IPSCO would make those assurances. Phillips also suggested that Comrie take the weekend to consider the matter with his family, which Comrie decided to do.

6

20. On Monday, April 26, 1999 Comrie again met with Roger Phillips and advised him that based on the foregoing promises to him by IPSCO, he and his wife would proceed to immigrate to the United States.(the "April 26th Agreement"). Comrie would not have agreed to relocate to the United States but for the April 26th Agreement.

21. Comrie and his wife immigrated to the United States on May 24th, 1999 and made their home in Illinois. In August 2007, they moved to Kentucky.

22. The Original Supplemental Executive Retirement Plan ("Original Canadian SERP") was developed essentially as an addendum to the Canadian SERP to provide a pension for a few IPSCO executives transferred to the United States in the nineties. It became the primary pension scheme for all IPSCO executives who moved to the United States when IPSCO moved its operational headquarters to Lisle, Illinois.

23. On November 8, 2005, Ray Rarey, the IPSCO Vice President and Chief Human Resources Officer, gave Comrie a memo (the "Rarey Memo")attaching a new and completely restated pension plan, including several changes from the Original Canadian SERP, called the "IPSCO ENTERPRISES INC. U.S.SUPPLEMENTAL EXECUTIVE RETIREMENT PLAN" (As Amended and Restated Effective as of January 1, 2005) (hereafter called the "Original US SERP"). This Original US SERP established IPSCO Inc as the main obligor under the plan and is executed by IPSCO Inc., apparently as the agent of IE Inc. Among other things, the Rarey Memo confirmed Comrie's participation in the Original US SERP and stated as follows:

> "At retirement you will receive a pension benefit based on the average of your earnings (as defined in Appendix A) during the five consecutive calendar years of continuous service in which your earnings were highest multiplied by 2% for each year of service with the Company…"

7

This statement was essentially the same undertaking and promise made to Comrie to induce him to move to the United States during discussions held between him and Mssrs Tiefenbach and Harris between January and May 1999 when Comrie was told what pension he would be entitled to after his transfer to the United States. The basic promises made to Comrie were described in paragraphs 15 and 16 above. The Rarey Memo reconfirmed that Comrie's pension benefit would include a payment calculated as 2% of his average earnings *for each year of service*.

24.     Subsequently, IPSCO amended and restated the Original US SERP to August 1, 2007 ("Current US SERP"). The Current US SERP is a trust for the benefit of the participants under the trust and Comrie is one of the named participants. The trustees of the trust are IPSCO Inc and IE Inc. The PBC administers the Current US SERP. Under the terms of the trust, Comrie's pension benefits are to be calculated in part by first determining his average "Final Earnings" as defined in paragraph 2 of Appendix A of the Current US SERP. That paragraph refers back to the definition of "Earnings" in section 1.09 of the Current US SERP which provides as follows:

> ".1.09 'Earnings' means the 'Compensation' for the calendar year...as defined under the IPSCO Enterprises Inc Retirement Savings and Profit Sharing Plan..."

The "IPSCO Enterprises Inc Retirement Savings and Profit Sharing Plan" is IPSCO's 401(k) plan. The current Summary Plan Description for that Plan provides as follows:

### Contributions to the Plan

> "For purposes of calculating contributions to the plan, your compensation includes the total pay you received from IPSCO during the plan year in which you were a participant.

> "Total Pay includes your base salary, bonuses, incentive pay, overtime and commissions..."

In addition to the Summary Plan Description referred to above, the underlying plan documents for the 401K Plan consist of a document entitled "Defined Contribution Retirement Plan Basic Plan #01" and the Adoption Agreement executed by Ray Rarey on December 21, 2006. The former defines "compensation" to mean "... for each type of contribution.... as elected by the Sponsoring Employer in the Adoption Agreement." The Adoption Agreement signed by Ray Rarey on December 21, 2006 (and effective on the date of Comrie's involuntary retirement) leaves open the definition of "compensation."

25. Sometime in August 1999, after Comrie had moved himself and his family to the United States in reliance on IPSCO's promises and undertakings regarding his pension and future career, he was informed by IPSCO's Chief Financial Officer that he would be required to sign another document relating to his pension. This document was described as a "waiver" and was designed to inform Comrie regarding an aspect of his US pension which had never been told to him prior to his immigration to the United States: the Original Canadian SERP was to be secured by an Executive Compensation Trust ("ECT") in the United States, which prior to his retirement and unlike his Canadian pension, would afford him no protection from the creditors of IPSCO in the event of a bankruptcy. This was the first time Comrie was told of this. This waiver represented a material change from his Canadian pension plan, which had been fully secured by a Letter of Credit provided by a Canadian Chartered Bank. However, Comrie was also reassured at the same time that upon a change of control in the ownership of IPSCO Inc., the ECT would provide the same protection as the Canadian pension plan because it was required to be fully funded. He was never told until June 2007 that, unlike the Canadian

pension, the "full funding" of the ECT in the United States did not now and would not in the future ever protect Comrie's pension monies from creditors of IPSCO in a bankruptcy situation. As a consequence, to obtain a pension protected from claims of future IPSCO creditors (equivalent to the security he would have had in his Canadian pension) when Comrie left the company in July 2007, he was forced to take a lump sum distribution of his pension; that had significant adverse tax consequences to Comrie, resulting in a reduction of almost 40% in his pension benefit.

26.     From and after May, 1999, Comrie continued to devote his full time and effort to the affairs of IPSCO in reliance upon the promises and assurances given him regarding his future with the company as agreed to in the April 26th Agreement. He and the outside legal counsel he retained successfully solved the Legal Problem and settled the litigation in April 2001. Comrie continued to provide legal services to IPSCO both, within and without the legal department, and also provided other significant services in trade and government relations and public relations, reporting directly to IPSCO's President and Chief Executive Officer until immediately prior to his involuntary retirement in July, 2007. However, in late July, 2007, notwithstanding Comrie's excellent performance for more than eight years, the new President and CEO of both IPSCO Inc and IE Inc. told Comrie that, effective upon the closing or the purchase of IPSCO by SSAB, Comrie would no longer report to the President, but would now report to a new and junior Vice President, and that his job responsibilities were being reduced. That demotion constituted an "involuntary retirement" as defined under the Current US SERP. Having no alternative, Comrie involuntarily retired effective July 31, 2007.

27.     After his forced retirement, Comrie came to believe for the first time that when IPSCO assured him in 1999 that he could regain his position as Chief Legal Officer by performing well, IPSCO had no intention of keeping that promise. In fact, Comrie believes that Burt Joyce, in his capacities as Chairman and President of Terra Industries and Chairman of the Board of IPSCO Inc, was then planning to use his influence to replace Comrie as Chief Legal Officer with George Valentine, his General Counsel at Terra, notwithstanding the April 26th Agreement.

28.     Comrie provided IPSCO on August 21, 2007 with a letter outlining his entitlements under the Current US SERP, requesting a process be established to negotiate a final settlement of the various matters outlined in Comrie's letter. He subsequently met with IPSCO representatives on October 4, 2007 to further outline his entitlement. Among other things, Comrie recounted the promises made to him by the company regarding his pension benefits in order to induce him to move to the United States in April and May 1999 as described above.

29.     On October 30, 2007 Comrie received a letter (the "PBC Decision") from Ray Rarey written in his capacity as Chair of the IPSCO Pension Benefits Committee (the "PBC") in which IPSCO rejected Comrie's calculations and advised him that, among other things, IPSCO did not recognize any of the promises made to him generally described in Comrie's letter of August 21, 2007 and the meeting with IPSCO on October 4, 2007. The PBC Decision also advised Comrie that he could appeal the PBC Decision by giving IPSCO notice of same within 90 days.

30.     On January 25, 2008 Comrie formally advised IPSCO that he was appealing the PBC Decision and also indicated that such appeal was without prejudice to his claim that he was not bound to accept the appeal process outlined in the PBC Decision.

31. On January 28, 2008 Comrie received a letter from Michele Klebuc-Simes, IPSCO's Vice-President, General Counsel and Secretary, denying the specific severance benefit entitlements Comrie had outlined in his August 21st letter and the meeting with IPSCO on October 4, 2007.

32. On March 24, 2008 Comrie submitted a letter and documents summarizing all his pension entitlements for the purpose of allowing the PBC to assess Comrie's appeal. Among other arguments, Comrie pointed out that the process itself was flawed, because the very same individuals who comprised the PBC that had already rejected his plea would also decide the merits of his appeal. On April 9, 2008 Comrie submitted a second summary letter summarizing his severance entitlement. No response to this letter has been received.

33. On May 23, 2008 Comrie received a letter from the PBC (the "PBC Appeal Decision") which, unsurprisingly, denies the relief requested by Comrie and does not credit any of the promises made to Comrie as outlined in his March 24, 2008 letter.

## COUNT I

### (Breach of Fiduciary Duty)

34. Comrie adopts and realleges paragraphs 1-33 inclusive as paragraph 34 of Count I as though fully set forth herein.

35. The trustees of the Current US SERP, Defendants IPSCO Inc and IE Inc, and the PBC have a fiduciary duty to administer Comrie's pension plan in a manner that fulfills all their fiduciary obligations and honors the terms of the plan as described above, providing the beneficiaries of the trust, such as Comrie, all benefits to which they were entitled when the

beneficiaries' rights vested under the trust. Comrie's rights under the trust vested when he retired effective July 31, 2007.

36. Notwithstanding the foregoing and the clear language of the Current US SERP, IPSCO, as trustee under the plan, and the PBC through the PBC Decision and again in the PBC Appeal Decision, breached their fiduciary duties to Comrie by limiting his Final Earnings for the purposes of calculating his lump sum benefit to his base salary received during the last 5 years of his employment, rather than using the definition of Final Earnings outlined in paragraph 24 above, which would include all Comrie's W-2 income for his last 5 years of employment. As a result, Comrie has been damaged in an amount in excess of $3,000,000.

WHEREFORE , Comrie respectfully prays for the entry of judgment in his favor and against all Defendants, jointly and severally, in an amount to be established by the evidence, plus interest and costs.

## COUNT II

### (ERISA-Breach of Fiduciary Duty)

37. Comrie adopts and realleges paragraphs 1-35 inclusive as paragraph 37 of this Count II.

38. Count II is brought in the alternative to Count I to the extent that any element of damage pleaded therein is deemed preempted by ERISA, 29 U.S.C. 1001, et seq.

39. ERISA provides comprehensive federal legislation to protect the interests of employees and their beneficiaries in employee benefit plans. IPSCO's employee benefit plans described above are "employee benefit plans" within the meaning of ERISA. 29 U.S.C. 1002(1) – (3).

40. Defendants IPSCO Inc, IE Inc and the PBC are plan fiduciaries within the meaning of 29 U.S.C. 1002(21)(A) in that they exercise discretionary authority respecting the management and administration of the Current US SERP  These Defendants breached their fiduciary duties by limiting Comrie's Final Earnings for the purposes of calculating his lump sum benefit to his base salary received during the last 5 years of his employment, rather than using the definition of Final Earnings outlined above, which would include all Comrie's W-2 income for his last five years of employment. As a result, he has been damaged in an amount in excess of $3,000,000.

WHEREFORE, Comrie pray that this Court enter judgment in his favor and against those Defendants, jointly and severally, in an amount to be determined by the evidence, plus itnerst, costs and attorneys' fees.

## **COUNT III**

## **(Breach of Contract)**

41. Comrie adopts and realleges paragraphs 1 through 33 inclusive of Count I as paragraph 41 of this Count III.

42. Defendants IPSCO and IE Inc formed a contract with Comrie in April, 1999 under which Comrie for his part, agreed to stay employed with those companies, uproot himself and his family from Canada, move to the United States and work diligently to solve the Legal Problem and generally provide legal and other services to the company based on his extensive knowledge of the company and its business.  In exchange the Defendants agreed that if he performed well in resolving the Legal problem and providing other services to them, Comrie would be permitted to reassume the title of Chief Legal Officer of IPSCO, and his return to

senior executive status would not be prejudiced by the events surrounding the Legal Problem. IPSCO also agreed to pay him an increased base salary competitive with salaries for his position in a company the size of IPSCO in the Chicago area, continue to compensate him as they had in the past under its incentive plans and profit sharing plan or bonus plans and provide him pension benefits as described above.

43. Comrie substantially performed all his obligations under the contract. Defendants breached the contract in multiple respects, including the following

a) They failed to pay him the pension benefits to which he became entitled when his rights under the Current US SRBP vested in July 31, 2007, including:

i) refusing to use the proper definition of Final Earnings as provided in the Current US SRBP;

ii) refusing to calculate his pension using his full 27 years of service as had been promised to him in the April 26th Agreement;

iii) refusing to secure his pension and to "fully fund" his pension plan to account for the tax consequences to him on a lump sum payment.

b) They failed to allow him to resume his position as Chief Legal Officer; and

c) They were, in fact, prejudiced against Comrie as a result of the events surrounding the Legal Problem, and Comrie was never again able to seriously contemplate being promoted to a Vice President position and achieve all the compensation and other benefits that would come with such appointment.

As a result of these breaches, Comrie has been damaged in an amount in excess of $6,000.000.

WHEREFORE, Comrie prays that this Court enter judgment in his favor and against those Defendants, jointly and severally, in an amount to be established by the evidence, plus interest and costs.

## COUNT IV

### (Breach of Implied Contract – Severance Pay)

44. Comrie adopts and realleges paragraphs 1 through 33 inclusive of Count I as paragraph 44 of this Count IV.

45. For many years prior to Comrie's move to the United States, IPSCO maintained a custom and practice of paying Canadian and American employees terminated without cause severance pay according to a formula developed in accordance with Canadian employment law. Essentially, Canadian law provides that all employees are entitled to reasonable notice of impending termination and if it is not provided, the employee must be paid money in lieu of that notice period upon termination. The length of notice or the amount of severance pay increases commensurate with the difficulty in finding comparable employment, the degree of specialization of the position, the level of responsibility, the years of service, the age of the employee, the need to relocate and the need to retool for the job market and includes all base pay, benefits and incentive pay payments.

46. Comrie was employed in Canada by IPSCO for 19 years before moving to the United States in reliance on the assurances described above. Comrie continued to be employed by IPSCO for another eight years before being involuntarily terminated.

47. Comrie's "involuntary retirement" as defined under the Current US SERP, constitutes what was known under IPSCO practice and Canadian law as "constructive dismissal"

entitling Comrie to payment in lieu of notice of 30 months. It was an implied term of Comrie's employment contract with each of IPSCO Inc and IE Inc. that upon an "involuntary retirement", or upon constructive dismissal he would be provided such notice or compensation in lieu of such notice. Approximately 75% of Comrie's employment career with IPSCO was spent in Canada. In essence, after Comrie was asked to relocate to the United States, his employment status and the terms of his employment contract with each of IPSCO Inc and IE Inc. did not change in this respect and could not be changed without notifying Comrie of such a change, which was never done. Comrie continued to work for both ISPCO Inc and IE Inc. until his involuntary retirement on July 31, 2007.

48. Thus, Comrie's length of service for IPSCO requires a notice period of approximately 30 months.

49. Comrie has substantially performed all the conditions of his employment contract that would entitle him to receive this length of notice or severance pay in lieu of notice. The defendants, IPSCO Inc and IE Inc., have breached this contract by failing and refusing to pay Comrie this payment in lieu of notice. As a result, Comrie has been damaged by an amount in excess of $1 million dollars.

WHEREFORE, Comrie prays that this Court enter judgment in his favor and against those Defendants, jointly and severally, in an amount to be established by the evidence, plus interest and costs.

## COUNT V

### (Promissory Estoppel)

50. Comrie adopts and realleges paragraphs 1 through 43 inclusive of Count III as paragraph 50 of this Count V.

51. The promises made to Comrie by IPSCO Inc and IE Inc, adopted by SSAB, regarding his compensation and job future upon his moving to the United States were clear and unambiguous. As IPSCO foresaw and intended, Comrie reasonably relied upon those promises in deciding to leave his homeland and move himself and his family to the United States. As a result of this reliance and his move to the United States, Comrie was damaged in an amount in excess of $7,000,000.

WHEREFORE, Comrie prays that this Court enter judgment in his favor and against those Defendants, jointly and severally, in an amount to be established by the evidence, plus interest and costs.

## COUNT VI

### (Promissory Estoppel – ERISA)

52. Comrie adopts and realleges paragraphs 1 through 43 inclusive of Count III as paragraph 52 of this Count VI.

53. Count VI is brought in the alternative to Count V to the extent that any element of damage pleaded above is deemed to be preempted by ERISA, 29 U.S.C. 1001 et seq.

54. ERISA provides comprehensive federal legislation to protect the interests of employees and their beneficiaries in employee benefit plans. IPSCO's employee benefit plans, including not only the Current US SERP but all manner of compensation and benefits due

Comrie, including notice or severance pay, are "employee benefit plans" within the meaning of ERISA. 29 U.S.C. 1002(1) –(3).

55. The assurances given Comrie by IPSCO Inc and IE Inc to induce him to move to the United States were knowing misrepresentations, verbally and in writing, upon which Comrie reasonably relied to his detriment. As a result thereof, Comrie has been damaged in an amount in excess of $7,000,000.

WHEREFORE, Comrie prays that this Court enter judgment in his favor and against those Defendants, jointly and severally, in an amount to be established by the evidence, plus interests, costs and attorneys' fees.

JOHN W. COMRIE

By /s/ Randall L. Mitchell

Randall L. Mitchell
Paul E. Lehner
Adducci, Dorf, Lehner, Mitchell
  & Blankenship, P.C.
150 N. Michigan Avenue, Suite 2130
Chicago, Illinois 60601
312/781-2800

**JURY DEMAND**

Plaintiff demands trial by jury on all issues triable by a jury.

JOHN W. COMRIE

By /s/ Randall L. Mitchell