IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JOHN W. COMRIE, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Case No. 08 CV 3060 |
| | ) | |
| IPSCO INC., a Canadian Corporation; | ) | Hon. John W. Darrah |
| IPSCO ENTERPRISES INC., a Delaware | ) | Mag. Judge Martin C. Ashman |
| Corporation; SSAB SVENSKT STAL | ) | |
| AB, a Swedish Corporation; and IPSCO INC. | ) | |
| BENEFITS COMMITTEE, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS BY DEFENDANTS IPSCO, INC., IPSCO ENTERPRISES, INC.,[1] SSAB SVENSKT STAL ABB, AND IPSCO INC. BENEFITS COMMITTEE

Plaintiff John W. Comrie claims that his former employer owes him certain benefits under ERISA governed pension and severance benefit plans. In addition, Comrie asserts that Defendants orally promised him "other compensation" in 1999, which it now refuses to provide; Comrie does not allege the existence of any written contracts. Accepting as true all of Comrie's factual allegations, none of the six Counts alleged state a claim upon which relief can be granted. Counts I, III, IV, V and VI, which purport to assert breach of contract and tort theories, are preempted by ERISA, while Count II, which purports to assert a breach of fiduciary duty under ERISA, fails to state a cognizable claim under ERISA §502. Similarly, to the extent Comrie alleges that an oral contract existed between him and Defendants to provide him certain compensation or other terms, such claims also fail as a matter of law because Comrie fails to allege the essential elements for an enforceable contract. Consequently, the Complaint fails as a matter of law, and should be dismissed in its entirety pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Separately, SSAB Svenskt Stal AB ("SSAB AB"), a Swedish

---

[1] As explained in detail at page 13 below and the Declaration attached as Exhibit A, IPSCO Enterprises, Inc. no longer exists. Its successor is SSAB Enterprises LLC, yet for purposes of this Motion, Defendants will refer to the parties named in the Complaint.

corporation that has its principal place of business in Stockholm, neither transacts business in Illinois nor maintains any office in the State.  Accordingly, the Court does not have personal jurisdiction over SSAB AB, and it should be dismissed pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure.

## I.     MATERIAL FACTS ALLEGED BY COMRIE

All the facts are drawn from Comrie's Complaint, and for the limited purposes of this Motion are taken as true.  Comrie was a citizen and resident of Canada until May 24, 1999, when he relocated to the Chicago area.  Comrie became a citizen of the United States in October, 2006, and he now makes his home in Kentucky.  Complaint ¶2.  From July 15, 1980 until July 31, 2007, Comrie was an attorney with IPSCO Inc.  Complaint ¶ 9.  IPSCO's stock was purchased in July 2007 by SSAB Svenskt Stal AB ("SSAB").  Complaint ¶1, 9, 26.

At the time his employment terminated, Comrie was a participant in an ERISA benefit plan, known as the IPSCO Enterprises Inc. U.S. Supplemental Executive Retirement Plan ("U.S. SERP").  Complaint ¶ 23.  The U.S. SERP is administered by the Pension Benefit Committee ("PBC"), which has authority to interpret and apply the terms of the U.S. SERP.  Complaint ¶6, 23, 24.  Following SSAB's purchase of IPSCO's stock in July 2007, Comrie alleges that he was demoted, which constituted an "involuntary retirement," as defined under the terms of the U.S. SERP.  Complaint ¶26.  Thereafter, Comrie applied for and received benefits under the U.S. SERP.  Comrie disputed the amount of the benefit that he was provided under the U.S. SERP, claiming that certain terms of the plan were applied incorrectly and asserting a number of events and alleged promises that had been made to him in 1999 outside of the plan that should have been taken into account in determining his U.S. SERP benefit.  Complaint ¶27, 28.  Comrie appealed the issue in accordance with the U.S. SERP plan procedures.  The PBC considered Comrie's appeal, and on May 23, 2008, it issued its decision denying Comrie's appeal. Complaint ¶28-33.

Separately, Comrie alleges that certain IPSCO representatives made various promises to him between April 19, 1999 and November 8, 2005, concerning: 1) the retirement benefit that would be available to him upon retirement from IPSCO; 2) some indeterminate type of severance benefit; and 3) the ability to reclaim the title of Chief Legal Officer, which had been taken away in 1999.  Complaint ¶14 – 23.

## II.    ARGUMENT[2]

### A.    COUNT I (Common Law Breach of Fiduciary Duty), COUNT III (Breach of Contract), COUNT IV (Breach of Implied Contract – Severance Pay) and COUNT V (Common Law Promissory Estoppel) ARE EACH PREEMPTED BY ERISA.

Plaintiff's claims for common law breach of fiduciary duty, breach of contract, breach of implied contract for severance pay and common law promissory estoppel are each preempted by ERISA. In enacting ERISA, Congress sought to establish uniformity in the administration of employee benefits by federalizing the law regulating that field. To eliminate the threat of conflicting or inconsistent state regulation of employee benefit plans, Congress provided for a "deliberatively expansive" preemption of "all state laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. §1144(a); *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 47 (1987); *see also Tolle v. Carroll Touch, Inc.*, 977 F.2d 1129, 1136 (7th Cir. 1992) (noting that Congress "has blotted out (almost) all state law on the subject of pensions, so a complaint about pensions rests on federal law no matter what label its author attaches"). State law claims, including those based upon state common law, are therefore preempted by ERISA if such claim "relates to" an employee benefit plan governed by ERISA. *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 139 (1990); *Collins v. Ralston Purina Co.*, 147 F.3d 592, 595 (7th Cir. 1998); *Tolle*, 977 F.2d at 1136. A claim "relates to" an employee benefit plan if "it has a connection with or reference to such a plan." *Ingersoll Rand*, 498 U.S. at 139.

Plaintiff expressly alleges that the U.S. SERP and "all manner of compensation and benefits due Comrie, including notice or severance pay, are 'employee benefit plans' within the meaning of ERISA. 29 U.S.C. 1002(1) – (3)." Complaint ¶ 54; *see also* Complaint ¶ 39.

Applying these principles, the Seventh Circuit has established that common law breach of fiduciary duty claims are preempted by ERISA. *See Reilly v. Blue Cross & Blue Shield United of Wis.*, 846 F.2d 416, 426 (7th Cir. 1988). Here, adjudication of Count I necessarily requires reference to and application of the terms of the U.S. SERP, as well as the alleged severance pay plan; thus the common law breach of fiduciary duty claim "relates to" an ERISA-governed plan,

---

[2]    In order to survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "more than labels and conclusions." *Pugh v. Tribune Co.*, 521 F.3d 686, 699 (7th Cir. 2008). The complaint must contain factual allegations sufficient "to raise a right to relief above the speculative level." *Id.* (citation omitted). Further, a plaintiff can "plead himself out of court by alleging facts that show there is no viable claim." *Id.*

and is preempted by ERISA. Accordingly, Count I of the Complaint should be dismissed with prejudice.

Likewise, the Seventh Circuit has established that to the extent a breach of contract claim requires interpretation or application of the terms of an employee benefit plan, it is preempted by ERISA. *See Rud v. Liberty Life Assur. Co. of Boston*, 438 F.3d 772, 777 (7th Cir. 2006) (holding that breach of contract claim seeking recovery of benefits was preempted). As with Count I, the claims in Counts III and IV necessarily require reference to and application of the U.S. SERP and the alleged severance pay plan. Thus, Counts III and IV, which assert breach of contract theories of recovery, must both be dismissed with prejudice.

Last, consistent with the foregoing authority, the Seventh Circuit has held that a claim seeking plan benefits under a theory of common law promissory estoppel "relates to" an ERISA plan and is therefore preempted. *See Kannapien v. Quaker Oats Co.*, 507 F.3d 629, 640 (7th Cir. 2007) (concluding that claim for promissory estoppel under Illinois law "pursu[ing] benefits to be paid from the ERISA Retirement Plan" was preempted by ERISA); *Russo v. Health, Welfare & Pension Fund, Local 705,* 984 F.2d 762, 767 (7th Cir. 1993) (holding that state law claim that defendants were estopped from denying benefits under an ERISA plan was preempted by ERISA). Here, in Count V Plaintiff alleges that he relied on promises "regarding his compensation and job future" "in deciding to leave his homeland and move himself and his family to the United States." Complaint ¶ 51. To the extent that Plaintiff intends to include pension benefits, severance pay, or other benefits under an ERISA-governed plan within the term "compensation," the state law claim for promissory estoppel is preempted by ERISA. Adjudication of such a claim would necessarily require interpretation and application of the terms of an ERISA plan, and thus the claim would "relate to" an ERISA plan. Therefore, any claim for plan benefits under Count V is preempted by ERISA and must be dismissed.

## B.    COUNT II (Breach of Fiduciary Duty Under ERISA) FAILS TO STATE A CLAIM FOR WHICH RELIEF CAN BE GRANTED.

Plaintiff's claim for breach of fiduciary duty under ERISA fails to state a claim for which relief can be granted because Plaintiff impermissibly seeks to bootstrap a claim for denial of benefits into a breach of fiduciary duty claim. This Court has repeatedly rejected efforts by plaintiffs to recast a claim for denial of benefits, which is properly brought under § 502(a)(1)(B),

as a claim for a breach of fiduciary duty, dismissing such claims for failure to state a claim.  *See Benjamin v. Marshal P. Morris, Ltd. Profit Sharing Plan and Trust*, No. 97 C 6714, 1998 WL 299434, at *4 (N.D. Ill. May 20, 1998) ("Courts, therefore, have refused to permit a denial of benefits claim to be bootstrapped into a fiduciary duty claim under section 502(a)(2).");[3] *Sophie v. Lincoln Nat. Life Ins. Co.*, No. 95 C 2274, 1997 WL 603890, at *7 (N.D. Ill. Sep. 24, 1997) (dismissing plaintiffs' breach of fiduciary duty claim "because their claim amounts to impermissible 'bootstrapping' of a denial of benefits claim into a fiduciary duty claim); *Lister v. Stark*, No. 88 C 9801, 1989 WL 88241, at *6 (N.D. Ill. Aug. 1, 1989) (dismissing claim for breach of fiduciary duty where plaintiffs claimed that "because of an incorrect interpretation of a plan provision, they were denied benefits").[4]

This Court's reasoning in *Lister* is particularly instructive.  The court first noted that a claim for a breach of fiduciary duty is fundamentally different from a claim for a denial of benefits.  While the former seeks to repair harm to the plan, the latter seeks payments of benefits to the plaintiff.  *Lister*, 1989 WL 88241 at *5.  The Court reasoned that "[i]f a simple, but incorrect, denial of benefits constituted breach of fiduciary duties then there is no reason for Congress to have enacted a law which provides two very different remedies for the same wrongful act."  *Id.*  Noting that the plaintiff alleged only that the fiduciary incorrectly interpreted the plan, the court concluded by holding that "[t]o breach one's fiduciary duty, an ERISA trustee must do more (and worse) than wrongfully construing the plan provisions."  *Id.* at *6.

Here, as in *Lister*, Count II  attempts to bootstrap a claim for denial of benefits into a breach of fiduciary duty claim.  Plaintiff's sole allegation relating to the breach of fiduciary duty claim is that Defendants misinterpreted the ERISA plan and therefore denied him benefits under the terms of that ERISA plan.  Compl. ¶ 40.  As the court held in *Lister*, to plead a cognizable claim for breach of fiduciary duty under ERISA, Plaintiff must do more than simply allege that Defendants misconstrued plan provisions.  As Plaintiff has failed to allege anything beyond an incorrect interpretation of the plan, Count II should be dismissed for failure to state a claim.

---

[3]      A courtesy copy of all unreported opinions cited in this Memorandum are attached hereto in Exhibit B.

[4]      In a separate opinion, the district court dismissed the plaintiff's state law claims as preempted by ERISA and denied the plaintiff's motion to remand the action to state court.  *See Lister v. Stark*, No. 88 C 10616, 1989 WL 31056 (N.D. Ill. Mar. 27, 1989).  The plaintiff appealed the March 27th memorandum order, and the Seventh Circuit affirmed.  *See Lister v. Stark*, 890 F.2d 941 (7th Cir. 1989).  However, the plaintiff apparently did not appeal and, thus, the Seventh Circuit did not address the district court's August 1st memorandum order dismissing the plaintiff's breach of fiduciary duty claim, which is cited and discussed above.

**C.     COUNT III'S CLAIM FOR "OTHER RELIEF" FAILS TO STATE A CLAIM FOR SEPARATE AND INDEPENDENT GROUNDS.**

To the extent that Count III is not entirely preempted by ERISA, it fails to state a claim for which relief can be granted because the promises alleged are too indefinite to create a legally cognizable contract.  In Illinois, enforceable contracts will only arise from "a clear and definite promise." *Sembos v. Philips Components*, 376 F.3d 696, 704 (7th Cir. 2004).  A court may make this determination as a matter of law pursuant to a motion to dismiss under Rule 12(b)(6).  *See Tolmie*, 930 F.2d at 581; *Rand v. CF Indus.*, 797 F. Supp. 643, 648 n.2 (N.D. Ill. 1992).  Courts are careful to distinguish between such "clear and definite" promises, which may give rise to a contract, and mere "expressions of 'long continuing good will and hope for eternal association,'" which cannot give rise to a contract.  Our Circuit and this Court have previously found that alleged promises premised on vague or missing terms are too indefinite to be enforceable.  *See Sembos*, 376 F.3d at 704; *Krieger v. Adler, Kaplan & Begy*, No. 94 C 7809, 1997 WL 323827, at *9 (N.D. Ill. June 11, 1997).  In *Sembos*, the Seventh Circuit concluded that a promise relating to future employment was too indefinite to be enforceable where it failed to state "a position, a salary, or the duration of any employment."  *Sembos*, 376 F.3d at 704.  Similarly, this Court  held that a promise that the plaintiff "would be made a partner within a short period of time" was "too vague to be considered an offer."  *Krieger*, 1997 WL 323827, at *9.

The promises Comrie alleges are too indefinite to be enforceable.  Count III alleges that Defendants promised that "if he performed well in resolving the Legal Problem and providing other services to them, Comrie would be permitted to reassume the title of Chief Legal Officer of IPSCO, and his return to senior executive status would not be prejudiced by events surrounding the Legal Problem."  Complaint ¶ 42.  These promises are too vague to be enforced.  First, the promise does not establish any standards for determining whether Plaintiff "performed well" in "resolving the Legal Problem" or "providing other services."  Second, the promise does not indicate or otherwise clarify what is necessary to "resolv[e] the Legal Problem."  This could refer to any one of a number of outcomes, ranging from absolute success on the merits to settlement below a certain dollar amount.  Third, the promise to permit Plaintiff to reassume the title of Chief Legal Officer fails to identify definitely (or even vaguely, as in *Krieger*) when Plaintiff will acquire this right.  Finally, the entirety of the promise that Plaintiff would "not be prejudiced by the events surrounding the Legal Problem" is too vague for a court to determine either what

was actually promised or whether a breach occurred. Thus, the promises are too indefinite to be enforceable.

The alleged promises regarding Comrie's compensation are equally indefinite. The Complaint alleges that "IPSCO also agreed to pay him an increased base salary competitive with salaries for his position in a company the size of IPSCO in the Chicago area, continue to compensate him as they had in the past under its incentive plans and profit sharing plan or bonus plans and provide him pension benefits as described above." Complaint ¶ 42. The promise to pay the Plaintiff "an increased base salary competitive with salaries for his position in a company the size of IPSCO in the Chicago area" is vague and ambiguous on its face because it is impossible to determine what "competitive" means or when such increases were to be implemented. Even the qualification that the increase in compensation would be based on companies the size of IPSCO is ambiguous because it fails to identify whether "IPSCO" means IPSCO Inc., IPSCO Enterprises Inc., or both, among other vagaries. At best, all of these alleged statements are more accurately described as aspirations for the future, as distinctly opposed to concrete promises to be enforced. The statements proposed in the Complaint as binding promises are too indefinite to constitute enforceable promises. Thus, to the extent anything of Count III survives preemption under ERISA, Plaintiff's claim for breach of contract fails to state a claim for which relief can be granted for separate and independent reasons.

### D.　COUNT IV (Breach of Implied Contract – Severance Pay) ALSO FAILS FOR SEPARATE AND INDEPENDENT REASONS.

To the extent ERISA does not totally preempt Plaintiff's claim for breach of implied contract for severance benefits in Count IV, it independently fails to state a claim for which relief can be granted because Plaintiff has failed to plead the elements necessary for contract formation. To state a claim for implied contract, the plaintiff must establish "all elements of an express contract, and there must be a meeting of the minds." *Barefield v. Village of Winnetka*, 81 F.3d 704, 709 (7th Cir. 1996) (quoting *Foiles v. North Greene Unit Dist. No. 3*, 633 N.E.2d 24, 25 (Ill. App. Ct. 1994)). As with all contracts, this includes demonstrating an offer and an acceptance. *Brines v. XTRA Corp.*, 304 F.3d 699, 704 (7th Cir. 2002). The Complaint fails this test, too.

Both the Seventh Circuit and this Court have held that an employer's "custom or practice" of providing severance benefits, even if that practice is uniform, does not create an implied contract to do so in the future. *See Brines*, 304 F.3d at 703-04; *Hach v. Laidlaw Transit, Inc.*, No. 02 C 996, 2002 WL 31496240 (N.D. Ill. Nov. 7, 2002). In *Brines*, the Seventh Circuit rejected the plaintiff's attempt "to use the employer's practice of paying severance pay not to explicate a contract but to create one." *Brines*, 304 F.3d at 703. The court found that the employer's practice of providing severance benefits did not create an implied contract because the plaintiff could not demonstrate that he offered to work "in exchange for a promise of severance pay," just as the plaintiff could not demonstrate that the employer accepted his offer by paying severance benefits to other employees. *Id.* at 704. In the absence of such essential terms as offer and acceptance, the Seventh Circuit held that there is no claim for an implied contract. Similarly, this Court concluded that an employer's uniform practice of paying severance benefits to other executives could not, as a matter of law, create an implied contract to pay the plaintiff the same benefit. *See Hach*, 2002 WL 31496240, at *6-*7. The court reasoned that an allegation that the employer had a uniform practice for paying severance was insufficient, as a matter of law, to create an implied contract, and dismissed the count for failure to state a claim. *Id.* at *7.

Count IV fails to state a claim for which relief can be granted because, as in *Brines* and *Hach*, Plaintiff attempts to use a practice of paying severance benefits "not to explicate a contract, but to create one." *Brines*, 305 F.3d at 703**.** The Complaint alleges that IPSCO had a "custom and practice" of paying severance benefits. Complaint ¶ 45. Although Plaintiff alleges that IPSCO Inc. provided him with several oral assurances to induce him to move to the United States almost 10 years ago (Complaint ¶¶ 15, 16, 19, 20), none of these assurances reference payment of severance benefits. As in *Brines*, the Complaint is devoid of any words or conduct that could fairly be construed as an offer by Plaintiff to relocate in exchange for severance benefits. As the Seventh Circuit held in *Brines*, the Plaintiff's relocation by itself cannot constitute such an offer, just as IPSCO Inc.'s alleged practice of paying other employees severance benefits, even if true, could not constitute acceptance of any offer by Plaintiff. Thus, for reasons in addition to preemption under ERISA, Count IV should be dismissed for failure to state a claim.

### E.    COUNT V (Promissory Estoppel) ALSO FAILS FOR SEPARATE AND INDEPENDENT REASONS.

As with Plaintiff's breach of contract claim in Count III, to the extent that the common law claim for promissory estoppel in Count V is not entirely preempted by ERISA, for separate and independent reasons it fails to state a claim for which relief can be granted because the alleged promises are too vague and indefinite to give rise to liability for promissory estoppel. Seventh Circuit authority holds that a viable cause of action for promissory estoppel under Illinois law requires that a party establish "proof of the existence of an unambiguous promise; reliance on that promise; that the reliance be reasonable and foreseeable; and that the promisee actually rely on the promise to his detriment." *Sembos v. Philips Components*, 376 F.3d 696, 704 (7th Cir. 2004). The underlying promise must be clear, definite, and unambiguous. *See id.*; *Givon v. PPG Indus., Inc.*, 234 F.3d 1273, 2000 WL 1681081, at *3 (7th Cir. 2000). These elements are nowhere pled in the Complaint.

The Seventh Circuit and this Court have routinely rejected claims for promissory estoppel where the underlying promise was too indefinite to be enforceable. *See Sembos*, 376 F.3d at 704 (finding that promise of employment was too indefinite because the promise did not include a specific position, salary, or other terms of employment); *Czerska v. United Airlines, Inc.*, 292 F. Supp. 2d 1102, 1120 (N.D. Ill. 2003) (holding that employer's promise of "permanent residence" in Belgium was too ambiguous to be enforceable); *Giard v. Powers*, No. 00 C 5337, 2003 WL 1888758 (N.D. Ill. Apr. 15, 2003) (holding that promise to provide plaintiff with "20% of the proceeds from the sale" of the company was too indefinite to be enforceable because it failed to provide any duration of the promise, noting that in employment cases "where the duration of a promise is a matter of speculation, the promise is ambiguous and fails to satisfy the requirements of promissory estoppel").

So too, here, the promises on which Plaintiff allegedly relied are too indefinite to create a cause of action for promissory estoppel. As noted in Section D, the alleged promises related to Plaintiff's job future are too indefinite and conditional to be enforceable. The outcome is no different under the theory of promissory estoppel. The Complaint alleges that the "Defendants agreed that if he performed well in resolving the Legal Problem and providing other services to them, Comrie would be permitted to reassume the title of Chief Legal Officer of IPSCO, and his

return to senior executive status would not be prejudiced by the events surrounding the Legal Problem." Complaint ¶ 42. This alleged promise is vague and indefinite in that it does not establish any time frame for performance, does not indicate what is required to "resolv[e] the Legal Problem," and does not clarify what "perform[ing] well" entails. Stated simply, the statement on which Plaintiff allegedly relied does not permit a court to determine what was promised, whether there was performance or whether a party breached that promise.

The alleged statements concerning Plaintiff's compensation are equally indefinite and vague, and will not sustain a claim of promissory estoppel. As noted in Section D, the promise of increased compensation "competitive with salaries for his position in a company the size of IPSCO in the Chicago area" is vague and ambiguous. Complaint ¶ 42. "Competitive" is not a self-defining term, and "a company the size of IPSCO" is facially ambiguous in that it fails to indicate whether all IPSCO affiliates are to be included in that determination. As before, these statements are more akin to an expression of hope for a successful relationship, not a concrete and enforceable promise. Thus, the common law claim for promissory estoppel fails for indefiniteness, and Count V should be dismissed for this reason, too, to the extent that it is not entirely preempted by ERISA.

### F.    COUNT VI (Promissory Estoppel – ERISA) FAILS TO STATE A CLAIM FOR WHICH RELIEF CAN BE GRANTED.

Plaintiff's claim for promissory estoppel under ERISA fails to state a claim for which relief can be granted because Plaintiff has failed to allege reliance upon any written misrepresentation. The Seventh Circuit has unequivocally refused to recognize a cause of action for oral modification of an ERISA plan, even if styled as a promissory estoppel claim. *See Coker v. Trans World Airlines*, 165 F.3d 579, 585 (7th Cir. 1999) (noting that "the estoppel doctrine does not override the rule forbidding oral modifications to an ERISA plan"); *Pohl v. Nat'l Benefits Consultants, Inc.*, 956 F.2d 126, 128 (7th Cir. 1992) (noting that "[o]ne of ERISA's purposes is to protect the financial integrity of pension and welfare plans by confining benefits to the terms of the plans as written, thus ruling out oral modifications").

The Seventh Circuit has prescribed that in order to state a claim for estoppel under ERISA, whether styled as a claim for promissory estoppel or equitable estoppel, a plaintiff must allege and prove: "(1) a knowing misrepresentation; (2) made in writing; (3) with reasonable

reliance on that misrepresentation by the plaintiff; (4) to her detriment." *Downs v. World Color Press*, 214 F.3d 802, 805 (7th Cir. 2000); *Coker*, 165 F.3d at 585. The Seventh Circuit rejects any claim for promissory estoppel based on oral misrepresentations. *See Downs*, 214 F.3d at 805-06 (holding that plaintiff could not rely on oral misrepresentations by defendants "because the estoppel doctrine does not override the aforementioned rule proscribing oral modification of an ERISA plan").

Plaintiff's claim for promissory estoppel under ERISA in Count VI fails to state a claim for which relief can be granted because Plaintiff fails to allege that he relied on any written misrepresentation and will be unable to demonstrate reasonable reliance as a matter of law. In Count VI, Plaintiff only alleges that he relied, to his detriment, upon misrepresentations made by IPSCO Inc. and IPSCO Enterprises Inc. in deciding to move to the United States. Complaint ¶¶ 20, 55. Plaintiff moved to the United States on May 24, 1999, nine years before filing the instant Complaint. Complaint ¶ 21. Yet, the only representations that Plaintiff alleges were made prior to his move to the United States were oral, not written. Complaint ¶¶ 15, 16, 19, 20. Plaintiff alleges that he first received a written representation concerning his benefits on November 8, 2005, *more than six years after he moved to the United States*. Complaint ¶ 23. As a matter of simple logic, Plaintiff cannot allege that, in his decision to move, he relied upon a document that he received six years after he made that decision. Plaintiff's failure to allege that he relied on any written representation inducing his decision to move to the United States is fatal to his claim for estoppel under ERISA. Accordingly, Count VI of the Complaint must be dismissed, too.

## G.    THERE IS NO PERSONAL JURISDICTION OVER SSAB AB

This Court should dismiss the Complaint against SSAB AB pursuant to Rule 12(b)(2). Rule 12(b)(2) authorizes a court to dismiss a claim against a party when personal jurisdiction is lacking. *See* FED. R. CIV. P. 12(b)(2). Plaintiff bears the burden of demonstrating personal jurisdiction. *Central States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 939 (7th Cir. 2000). The plaintiff must establish the existence of either general or specific jurisdiction to justify the exercise of personal jurisdiction. *See Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 713 (7th Cir. 2002). In determining whether personal jurisdiction is proper, the Court is empowered to consider evidence outside the complaint, including

affidavits submitted by the parties. *See Kontos v. U.S. Dept. of Labor*, 826 F.2d 573, 576 (7th Cir. 1987).

"General" jurisdiction allows a court to exercise personal jurisdiction over a defendant even in cases not arising out of or related to that defendant's contact with the forum state. *See Hyatt Int'l*, 302 F.3d at 713. However, such jurisdiction is only proper where the plaintiff establishes that the defendant has "continuous and systematic" contacts with the forum. *Id.* Conversely, "specific" jurisdiction requires the plaintiff to establish that the defendant has such "minimum contacts" with the forum such that the exercise of personal jurisdiction does not offend traditional notions of "fair play and substantial justice." *Id.* at 716 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945)). A defendant must have "purposefully established minimum contacts within the forum State" and have "purposefully avail[ed] itself of the privileged of conducting activities" in the forum, such that the defendant "should reasonably anticipate being haled into court" in the forum. *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). However, unlike general jurisdiction, specific jurisdiction only permits the exercise of jurisdiction for suits that "arise out of" or are "related to" the defendant's contacts with the forum.

Of particular relevance in this case, courts have routinely held that "constitutional due process requires that personal jurisdiction cannot be premised on corporate affiliation or stock ownership alone where corporate formalities are substantially observed and the parent does not exercise an unusually high degree of control over the subsidiary." *Central States*, 230 F.3d at 943; *see also Sotelo v. DirectRevenue LLC*, 384 F. Supp. 2d 1219, 1226 ("[T]he jurisdictional contacts of a subsidiary corporation are not imputed to the parent."). The Seventh Circuit explained in *Central States*, "where corporate formalities are substantially observed and the parent does not dominate the subsidiary, a parent and a subsidiary are two separate entities and the acts of one cannot be attributed to the other." *Central States*, 230 F.3d at 944. Thus, "'[e]ach defendant's contacts with the forum State must be assessed individually.'" *Id.* (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 n.13 (1984)). The Seventh Circuit also held that where such formalities are observed, a company's owners "reasonably expect that they cannot be held liable for the faults of the company" and therefore "do not reasonably anticipate being hailed into a foreign forum to defend against liability for errors of the corporation." *Id.*

Plaintiff incorrectly alleges that: 1) SSAB "maintains an office in Lisle, Illinois;" 2) "[s]ince acquiring IPSCO, Inc. in July 2007, the two companies have had interlocking officerships;" and 3) "all significant decisions made since [July 2007] regarding the business of IPSCO, Inc., including those concerning Comrie, have been made or controlled by SSAB." *Id.*

SSAB AB, a manufacturer of high strength steel sheet and steel plate, is a Swedish Corporation with its principal place of business in Stockholm, Sweden. On July 18, 2007, SSAB AB, acquired all of the stock of IPSCO Inc. through a Canadian subsidiary corporation, SSAB Canada Inc., which was later amalgamated with IPSCO Inc. and no longer exists. On July 24, 2007, all of the shares of IPSCO Enterprises Inc., a Delaware corporation, were transferred from IPSCO Inc. to IPSCO Enterprises (US), LLC, a Delaware limited liability company. IPSCO Enterprises Inc. immediately thereafter merged with IPSCO Enterprises (US), LLC and no longer exists. In June 2008, IPSCO Enterprises (US), LLC changed its name to SSAB Enterprises, LLC. *See* Declaration of Marco Wirèn at ¶¶4-5, attached hereto as Exhibit A.

SSAB AB, IPSCO Inc., and SSAB Enterprises, LLC are separate and independent corporate entities. They are managed by separate and independent individuals, maintain their separate books and records, and they maintain separate corporate bank accounts. Both IPSCO Inc. and SSAB Enterprises, LLC have retained their corporate autonomy since SSAB AB's purchase of their corporate stock. SSAB AB did not dictate to either IPSCO Inc., IPSCO Enterprises (US), LLC or its successor, SSAB Enterprises, LLC the manner in which Mr. Comrie's employment, resignation, and subsequent claim for benefits should be handled, nor does it dictate to either company how to manage their other daily affairs. SSAB AB is not registered to do business in Illinois, does not maintain any offices, facilities, bank accounts or personnel in Illinois, and does not conduct regular business in Illinois. *See* Exhibit A at ¶6-7.

Insofar as SSAB AB lack contacts sufficient to establish either general or specific jurisdiction, this Court lacks personal jurisdiction over these defendants, and the complaint should be dismissed in its entirety as against them for lack of personal jurisdiction.

## III.    CONCLUSION

All six  Counts should be dismissed as a matter of law pursuant to Rule 12(b)(6) for failure to state claims upon which relief can be granted.   Separately, SSAB AB should be dismissed for lack of personal jurisdiction.

Respectfully submitted,

IPSCO ENTERPRISES INC.,
SSAB SVENSKT STAL AB, and
IPSCO INC. BENEFITS COMMITTEE                    IPSCO, INC.


By:    /s/ William G. Miossi                         By:    /s/ Mark E. Schmidtke
        One of Their Attorneys                              One of Its Attorneys

William G. Miossi                                     Mark E. Schmidtke
Jonathan E. Rosemeyer                                 Ogletree, Deakins, Nash, Smoak &
Winston & Strawn, LLP                                 Stewart, P.C.
35 West Wacker Drive                                  20 South Clark Street
Chicago, IL  60601-9703                               Chicago, IL  60603
Telephone:  (312) 558-5600                            Telephone:  (312) 558-1220
Facsimile:  (312) 588-5700                            Facsimile:  (312) 807-3619
wmiossi@winston.com                                   Mark.Schmidtke@ogletreedeakins.com


Dated: July 15, 2008

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JOHN W. COMRIE, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Case No. 08 CV 3060 |
| | ) | |
| IPSCO INC., a Canadian Corporation; | ) | Hon. John W. Darrah |
| IPSCO ENTERPRISES INC., a Delaware | ) | Mag. Judge Martin C. Ashman |
| Corporation; SSAB SVENSKT STAL | ) | |
| AB, a Swedish Corporation; and IPSCO INC. | ) | |
| BENEFITS COMMITTEE, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## <u>INDEX OF EXHIBITS</u>

Exhibit A contains the Declaration of Marco Wirèn.

Exhibit B contains all unpublished opinions cited in Defendants' Memorandum in Support of Their Motion to Dismiss.

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JOHN W. COMRIE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 08 CV 3060 |
| | ) | |
| IPSCO, INC., a Canadian Corporation; | ) | Hon. John W. Darrah |
| IPSCO ENTERPRISES, INC., a Delaware | ) | Mag. Judge Martin C. Ashman |
| Corporation; SSAB SVENSKT STAL | ) | |
| AB, a Swedish Corporation; and IPSCO INC. | ) | |
| BENEFITS COMMITTEE, | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF MARCO WIRÉN

I, Mr Marco Wirén, first being duly sworn, hereby depose and say upon my oath as follows:

1.     I am of legal age and under no disability.

2.     Since 1 September 2007 I have been employed by SSAB Svenskt Stål AB, ("SSAB AB") as the Company's VP of Business Control. It is in that capacity that I have personal knowledge of the following.

3.     SSAB AB is a Swedish Corporation with its principal place of business in Stockholm, Sweden. SSAB AB is manufacturer of high strength steel sheet and steel plate.

4.     On July 18, 2007, SSAB AB, acquired all of the stock of IPSCO Inc. through a Canadian subsidiary corporation, SSAB Canada Inc., which was later amalgamated with IPSCO Inc. and no longer exists. On July 24, 2007, all of the shares of IPSCO Enterprises Inc., a Delaware corporation, were transferred from IPSCO Inc. to IPSCO Enterprises (US), LLC, a Delaware limited liability company. IPSCO Enterprises Inc. immediately thereafter

1

merged with IPSCO Enterprises (US), LLC and no longer exists. In June 2008, IPSCO Enterprises (US), LLC changed its name to SSAB Enterprises, LLC.

5.   SSAB AB, IPSCO Inc., and SSAB Enterprises, LLC are separate and independent corporate entities. They are managed by separate and independent individuals, maintain their separate books and records, and they maintain separate corporate bank accounts.

6.   Both IPSCO Inc. and SSAB Enterprises, LLC have retained their corporate autonomy since SSAB AB's purchase of their corporate stock. SSAB AB did not dictate to either IPSCO Inc., IPSCO Enterprises (US), LLC or its successor, SSAB Enterprises, LLC the manner in which Mr. Comrie's employment, resignation, and subsequent claim for benefits should be handled, nor does it dictate to either company how to manage their other daily affairs.

7.   SSAB AB is not registered to do business in Illinois, does not maintain any offices, facilities, bank accounts or personnel in Illinois, and does not conduct regular business in Illinois.

Marco Wirén

Date: July 15 2008

2

# EXHIBIT B

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 299434 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1998 WL 299434 (N.D.Ill.))**

**C**
Benjamin v. Marshal P. Morris, Ltd. Profit Sharing
Plan and Trust
N.D.Ill.,1998.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois.
Marci BENJAMIN, Plaintiff,
v.
MARSHAL P. MORRIS, LTD. Profit, Sharing Plan
and Trust, Marshal P. Morris, Ltd. and Marshal P.
Morris, both individually and as Trustee, Plan Fidu-
ciary and Plan Administrator of Marshal P. Morris,
Ltd. Profit Sharing Plan and Trust, Defendants.
**No. 97 C 6714.**

May 20, 1998.

MEMORANDUM OPINION

KOCORAS, District J.
**\*1** This case is before the court on the defendants'
motion to dismiss the plaintiff's complaint, the de-
fendants' motion to strike the plaintiff's jury de-
mand and claim for punitive damages, and the
plaintiff's petition for attorney's fees. For the reas-
ons set forth below, the motion to dismiss is gran-
ted in part and denied in part, the motion to strike
the plaintiff's jury demand is granted, the motion to
strike the claim for punitive damages is granted,
and the plaintiff's petition for fees is denied.

BACKGROUND

The following allegations are taken primarily from
the plaintiff's complaint and are taken as true for
the purposes of this motion to dismiss. Plaintiff
Marci Benjamin brings this seven-count complaint
against defendants, Marshal P. Morris, Ltd. Profit
Sharing Plan and Trust (the "Plan"), Marshal P.
Morris, Ltd, and Marshal P. Morris, both individu-
ally and as Trustee, Plan Fiduciary and Plan Ad-
ministrator. Plaintiff seeks recovery of pension be-
nefits under the Employee Retirement Income Se-

curity Act of 1974 ("ERISA"), as amended, 29
U.S.C. § 1001, *et seq.,* and damages under state
common law.

Plaintiff worked for defendant Marshal P. Morris,
Ltd., from October 1, 1980 to June 30, 1991.
Plaintiff alleges that Marshal P. Morris, Ltd., estab-
lished the Plan in 1979. Defendant Marshal P. Mor-
ris was identified in the Plan as the Plan Adminis-
trator, Trustee and "Named Fiduciary." Plaintiff
claims that she was entitled to benefits under the
Plan when her employment terminated in 1991. At
that time, the plaintiff requested summary plan de-
scriptions, annual reports and participant statements
from the defendants in order to ascertain the
amount of benefits she was entitled to under the
Plan. The defendants denied that the Plan existed
and told the plaintiff that the Plan had been termin-
ated in 1981. Plaintiff, therefore, did not receive
any benefits under the Plan, nor did she receive the
information that she requested.

On September 24, 1997, plaintiff filed suit against
the defendants. In Count I, plaintiff seeks the recov-
ery of her benefits under the Plan. In Count II,
plaintiff alleges that the defendants breached their
fiduciary duty under ERISA to provide summary
plan descriptions, notice of plan modifications,
summary annual reports, an individual benefits
statement following termination of the plaintiff's
employment, and a current benefits statement with-
in 30 days after a request by the plaintiff, pursuant
to 29 U.S.C. §§ 1021, 1022, 1023, 1024 and 1025.
Plaintiff also alleges in Count II that the defendants
breached their duty to distribute benefits to the
plaintiff under the Plan. The plaintiff's remaining
claims arise under the state common law. In Count
III, plaintiff alleges that the defendants breached
their contract to provide benefits to the plaintiff un-
der the Plan. Count IV alleges that the Plan has
been unjustly enriched by the retention of benefits
owed to the plaintiff. Count V alleges that defend-
ant Morris tortiously interfered with the plaintiff's
right to benefits under the Plan and induced the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 299434 (N.D.Ill.)
(Cite as: Not Reported in F.Supp., 1998 WL 299434 (N.D.Ill.))

Plan to breach its duties to plaintiff. In Count VI, plaintiff claims that the defendants' retention of her pension benefits constitutes conversion under state law. Finally, in Count VII, plaintiff alleges that the defendants breached their fiduciary duties under state law to provide the documents requested by the plaintiff concerning the Plan and to distribute pension benefits to the plaintiff under the Plan.

**\*2** On November 10, 1997, this court dismissed the case for want of prosecution because the parties failed to appear for status hearing. In January, 1998, plaintiff moved to vacate the dismissal for want of prosecution and to extend time for service of process through March 20, 1998. The court granted the motion and the cause was reinstated. Defendants were served with a summons and the complaint on January 24, 1998. Plaintiff then filed a motion for default judgment on March 3, 1998. On March 11, 1990, defendants filed a motion to extend time to answer the complaint or otherwise plead, which was granted by this court. In addition, the defendants were granted leave to file their motion to dismiss. Plaintiff has filed a petition for attorney's fees for time expended in preparing the motion for default judgment and objection to the defendants' motion to extend time to answer or otherwise plead. The defendants objects to an award of attorney's fees.

In addition to the plaintiff's petition for fees, the defendants' motion to dismiss the complaint and motion to strike the plaintiff's jury demand and claim for punitive damages are before the court. The court will address each motion in turn.

### DISCUSSION

#### A. The Defendants' Motion to Dismiss

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the sufficiency of the complaint, not to decide the merits of the case. Defendants must meet a high standard to have a complaint dismissed because in ruling on a motion to dismiss,

the court must construe the complaint's allegations in the light most favorable to the plaintiff and all well-pleaded facts must be taken as true. *Ed Miniat, Inc. v. Globe Life Ins. Group, Inc.,* 805 F.2d 732, 733 (7th Cir.1986), *cert. denied,*482 U.S. 915, 107 S.Ct. 3188, 96 L.Ed.2d 676 (1987). Dismissal is improper "unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."*Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Nonetheless, to withstand a motion to dismiss, a complaint must allege facts sufficiently setting forth the essential elements of the cause of action. *Gray v. County of Dane,* 854 F.2d 179, 182 (7th Cir.1988).

In considering a Rule 12(b)(6) motion to dismiss for failure to state a claim, the court is limited to the allegations contained in the pleadings themselves. Documents incorporated by reference into the pleadings and documents attached to the pleadings as exhibits are considered part of the pleadings for all purposes. Fed.R.Civ.P. 10(c). In addition, "[d]ocuments that a defendant attaches to a motion to dismiss are considered a part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim."*Venture Associates Corp. v. Zenith Data Systems Corp.,* 987 F.2d 429, 431 (7th Cir.1993).

Defendants urge the court to dismiss Count I of the complaint as untimely. In Count I of the complaint, plaintiff seeks to recover benefits that she claims she is entitled to under the Plan. ERISA does not impose a statute of limitations for bringing civil actions for the recovery of benefits. In such cases, the court applies the most analogous state statute of limitations.*Lumpkin v. Envirodyne Industries, Inc.,* 933 F.2d 449, 464-465 (7th Cir.), *cert. denied,*502 U.S. 939, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991). The most analogous Illinois statute of limitations is the 10-year limitations period for suits pertaining to written contracts. *Id.* Although the court applies the state statute of limitations, the court looks to federal common law for purposes of determining when the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 299434 (N.D.Ill.)
(Cite as: Not Reported in F.Supp., 1998 WL 299434 (N.D.Ill.))

Page 3

cause of action accrued under ERISA. *Daill v. Sheet Metal Workers' Local 73 Pension Fund,* 100 F.3d 62, 65 (7th Cir.1996). The Seventh Circuit has held that causes of action accrue under section 502(a)(1)(B), when a claim for benefits is denied. *Id.* In this case, plaintiff alleges that the defendants denied the Plan's existence, and in turn, denied that she was a participant in the Plan, in November, 1991. The plaintiff filed her complaint in September, 1997, which is within the 10-year limitations period. As such, the court denies the defendants' motion to dismiss as to Count I.

*3 Defendants also seeks dismissal of Count II of the complaint as untimely and for failure to state a claim for breach of fiduciary duty. Defendants contend that plaintiff's breach of fiduciary duty claim is barred by the statute of limitations set forth in Section 413 of ERISA, 29 U.S.C. § 1113. Section 413 provides:

No action may be commenced under this title with respect to a fiduciary's breach of any responsibility, duty or obligation under this part, ... after the earlier of-

(1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission, the latest date on which the fiduciary could have cured the breach or violation; or

(2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;

except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

Defendants contend that plaintiff knew that she would not be a participant in the Plan as early as 1981. Defendant Morris claims that he had a verbal agreement with the plaintiff that she would receive cash benefits from defendant in lieu of retirement

benefits under the Plan. Plaintiff argues that the six-year statute of limitations for cases of fraud or concealment apply to this case. Plaintiff argues that her breach of fiduciary duty claim in Count II arises from the defendants' concealment of the Plan's existence and their failure to act solely in the interest of the Plan and in the interest of the plaintiff, a beneficiary. Plaintiff claims that she discovered the defendants' breach in November, 1991, within the six-year limitations period.

The facts alleged in the complaint establish that plaintiff inquired as to her medical insurance and retirement benefits under the Plan when her employment terminated in June, 1991. Plaintiff claims that Morris told her that the Plan had been terminated in 1981. Plaintiff made further inquiries, however, and determined that the Plan had not been terminated in 1981 as represented by Morris. Plaintiff's attorney wrote to the defendants on November 14, 1991, seeking information about the Plan and plaintiff's entitlement to benefits under the Plan for the years 1981 through 1991. Defendants did not respond and plaintiff filed this suit on September 24, 1997. Construing the allegations in the light most favorable to the plaintiff and assuming the facts alleged to be true, it is possible that plaintiff did not know of the Plan's existence or of any benefits to the plaintiff under the Plan until November, 1991. Thus, the complaint, filed on September 24, 1997, was brought within the six-year limitations period. Further factual development through discovery will enable the court to determine whether plaintiff discovered the defendants' alleged breach within the applicable limitations period. At this stage, the court is satisfied that plaintiff's claim was timely brought.

*4 Defendants also seek dismissal of Count II of the complaint because they claim that plaintiff cannot state a claim for breach of fiduciary duty under section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2), or section 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3). Defendants argue that sections 502(a)(2) and 502(a)(3) do not permit a plaintiff to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 299434 (N.D.Ill.)
(Cite as: Not Reported in F.Supp., 1998 WL 299434 (N.D.Ill.))

Page 4

bring suit for individual relief. Instead, defendants claim that section 502(a)(2) only authorizes relief on behalf of the Plan as a whole, and section 502(a)(3) only authorizes equitable relief in circumstances where the plaintiff cannot recover under section 502(a)(1)(B). Plaintiff responds that she is seeking relief on behalf of the Plan in Count II and therefore, her claim under 502(a)(2) is proper. With respect to section 502(a)(3), plaintiff argues that her claim under 502(a)(1)(B) may be unavailing because the Plan was liquidated in 1991. Accordingly, plaintiff asserts that a claim under 502(a)(3) is proper.

ERISA is a comprehensive statute designed to protect the interests of employees and their beneficiaries in pension and welfare benefit plans. *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 90, 103 S.Ct. 2890, 2896, 77 L.Ed.2d 490 (1983). ERISA establishes duties of loyalty and care for fiduciaries and obligates fiduciaries to act solely in the interest of the benefit plan and its participants and beneficiaries. *Anweiler v. American Electric Power Service Corp.,* 3 F.3d 986, 990 (7th Cir.1993). Claims for breach of fiduciary duty are generally brought under section 502(a)(2) or section 502(a)(3) of ERISA. Claims for recovery of benefits must be brought under 502(a)(1)(B).*See Varity Corp. v. Howe,* 516 U.S. 489, 116 S.Ct. 1065, 1077, 134 L.Ed.2d 130 (7th Cir.1996). However, the Supreme Court in *Massachusetts Mutual Life Insurance Co. v. Russell,* 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985), held that any recovery under section 502(a)(2) must be for the plan as whole rather than for individual beneficiaries. *See also Lister v. Stark,* No. 88 C 9801, 1989 WL 88241 at * 5 (N.D.Ill.1989) ("The fiduciary duty lawsuit seeks repair of harm to the plan by securing injunctive relief or damages to benefit the plan."). Courts, therefore, have refused to permit a denial of benefits claim to be bootstrapped into a fiduciary duty claim under section 502(a)(2).*See Lister,* 1989 WL 88241 at *6 (collecting cases).

In this case, plaintiff alleges that defendants

breached their fiduciary duty to provide certain information and documents, such as benefits statements, annual reports and summary plan descriptions. In addition, plaintiff alleges that defendants breached their fiduciary duty to the plaintiff by concealing the Plan's existence and refusing to distribute benefits to which she was entitled under the Plan. Plaintiff seeks unpaid benefits, penalties in the form of payment to the plaintiff for their failure to provide information, and punitive damages. Plaintiff also seeks an injunction requiring the defendants to return any assets removed from the Plan.

**\*5** Count II must be dismissed to the extent plaintiff seeks to recover benefits individually. Such a claim has been alleged in Count I of the complaint and cannot be realleged as a fiduciary duty claim. On the other hand, the facts alleged by the plaintiff in Count II regarding the defendants' failure to provide documents and information may give rise to a claim under section 502(a)(2). Such a claim may only be brought on behalf of the Plan and cannot be brought by the plaintiff to recover individually. Accordingly, the court must dismiss Count II to the extent plaintiff seeks to recover benefits under the Plan or seeks individual relief for breach of fiduciary duty pursuant to section 502(a)(2) of ERISA.

Plaintiff may be able to recover individually under section 502(a)(3), in the event that she cannot recover under 502(a)(1)(B). The Supreme Court in *Varity Corporation v. Howe,* distinguished fiduciary duty claims brought under section 502(a)(3) from claims brought under section 502(a)(2). The Court explained that section 502(a)(2) governs fiduciary obligations relating to the plan's financial integrity, while section 502(a)(3) is a "catchall" provision, authorizing "appropriate equitable relief for injuries caused by violations that § 502 does not elsewhere adequately remedy ."116 S.Ct. at 1078. Plaintiff contends that she may not be able to recover under section 502(a)(1)(B) because the defendants terminated the Plan in 1991. Thus, section

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 299434 (N.D.Ill.)
(Cite as: Not Reported in F.Supp., 1998 WL 299434 (N.D.Ill.))

502(a)(3) may be only the provision under which she can recover individually. It is too early for the court to determine whether plaintiff's claim for benefits under section 502(a)(1)(B) will be meritorious. The fiduciary duty claim brought pursuant to section 502(a)(3) withstands dismissal. We remind the plaintiff that "where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief ...." *Varity,* 116 S.Ct. at 1079.

Defendants also seek dismissal of the plaintiff's state law claims in Counts III through Counts VII of the complaint. The state law claims are for breach of contract, unjust enrichment, tortious interference with contract, conversion and breach of fiduciary duty. Defendants contend that these claims are preempted by ERISA. The court agrees. Section 514(a) of ERISA preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan ..."29 U.S.C. § 1144(a). A state law "relates to" an employee benefit plan, using the common meaning of the phrase, if it has any connection to such a plan. *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 96-97, 103 S.Ct. 2890, 2899-2900, 77 L.Ed.2d 490 (1983). Section 514(a) routinely preempts "state law claims that affect the structuring of ERISA plans, or that purport to determine the substantive rights and duties among parties to its creation and administration."*Rice v. Panchal,* 65 F.3d 637, 645 (7th Cir.1995). The statute's preemption extends to state common law tort and contract claims.*Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 48, 120 S.Ct. 1549, 1553, 95 L.Ed.2d 39 (1987).

*6 In this case, plaintiff's state law claims are preempted by ERISA. Plaintiff alleges in Count III that the Plan is a contract that was breached by the defendants. Such a claim clearly relates to an ERISA plan and is preempted. Count IV alleges that the Plan has been unjustly enriched by the retention of the plaintiff's benefits and seeks the recovery of benefits under the Plan. The claim is preempted by ERISA because it purports to determine the sub-

stantive rights and duties of the parties to the Plan. Count V alleges that defendant Morris tortiously interfered with plaintiff's right to benefits under the Plan. Again, the claim is preempted by ERISA as it relates to an ERISA plan. In Count VI, plaintiff alleges that the defendants converted plaintiff's benefits under the Plan to their own benefit and plaintiff seeks to recover those benefits. Count VI is preempted by ERISA as recovery of Plan benefits certainly falls within ERISA preemptive reach. Finally, Count VII alleges a claim for breach of fiduciary duty under state law. Plaintiff alleges that the defendants had a duty to provide the plaintiff with the documents and information she requested to calculate her benefits under the Plan. Plaintiff also alleges that the defendants breached their fiduciary duty to the plaintiff when they failed to distribute her benefits under the Plan. Again, such rights and duties are governed by ERISA, and the claim is thus preempted. Plaintiff's state law claims are dismissed.

B. The Defendants' Motion to Strike

The defendants' motion to strike the plaintiff's jury demand and claim for punitive damages is governed by Rule 12(f) of the Federal Rules of Civil Procedure. "Rule 12(f)... allows the court to 'order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter.' ' *Sabay v. Reno,* No. 95 C 2325, 1996 WL 167332 (N.D.Ill.1996) (quoting *Baker v. Westinghouse Electric Corp.,* 830 F.Supp. 1161, 1168 ( N.D.Ind.1993)). "The court possesses considerable discretion in disposing of a motion to strike redundant, impertinent, immaterial or scandalous matter." 5A C. Wright and A. Miller, Federal Practice & Procedure: Civil § 1382, at 683 (2d ed.1990). The plaintiff's jury demand must be stricken because the Seventh Circuit has held that there is no right to a jury trial in actions brought under Section 502 of ERISA. *See Wardle v. Central States, Southeast and Southwest Areas Pension Fund,* 627 F.2d 820 (7th Cir.1980), *cert. denied,*449 U.S. 1112, 101 S.Ct. 922, 66 L.Ed.2d 841 (1981).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 299434 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1998 WL 299434 (N.D.Ill.))**

Plaintiff's claim for punitive damages must be stricken as well. The Seventh Circuit in *Harsh v. Eisenberg,* 956 F.2d 651, 660-661 (7th Cir.), *cert. denied,* 506 U.S. 818, 113 S.Ct. 61, 121 L.Ed.2d 29 (1992), held that punitive damages are not recoverable under section 502(a)(1)(B) and section 502(a)(3), and explained that the Supreme Court's decision in *Russell* supports the conclusion that punitive damages are unavailable under section 502(a)(2). Consequently, this court must dismiss the plaintiff's claim for punitive damages.

C. Plaintiff's Petition for Attorney's Fees

**\*7** Plaintiff has filed a petition for attorney's fees for time expended in preparing her motion for default judgment and objection to the defendants' motion to extend time to answer or otherwise plead. Defendants object to the petition. The court has reviewed the petition and the defendants' objections and will not award the plaintiff her attorney's fees. Plaintiff filed her complaint in September, 1997, and this court dismissed the case for want of prosecution in November, 1997. Plaintiff then sought to reinstate the case in January, 1998. This court reinstated the case and the defendants were served in mid-January. Plaintiff then moved for default judgment on March 3, 1998 and defendants responded with a motion to extend time to answer the complaint. There is no compelling reason for the court to award the plaintiff attorney's fees. Plaintiff delayed four months before prosecuting her case and now seeks fees for a motion that she filed because the defendants had not responded to the complaint in six weeks. The defendants' delay does not warrant sanctions in light of the plaintiff's own considerable delay. Accordingly, the court denies the petition.

CONCLUSION

For the reasons set forth above, the defendants' motion to dismiss is granted in part and denied in part. The defendants' motion to strike is granted and the

plaintiff's petition for attorney's fees is denied.

N.D.Ill.,1998.
Benjamin v. Marshal P. Morris, Ltd. Profit Sharing Plan and Trust
Not Reported in F.Supp., 1998 WL 299434 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 603890 (N.D.Ill.)
(Cite as: Not Reported in F.Supp., 1997 WL 603890 (N.D.Ill.))

Page 1

**H**

Sophie v. Lincoln Nat. Life Ins. Co.
N.D.Ill.,1997.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois.
Ray SOPHIE and Jean Sophie, Plaintiffs,
v.
LINCOLN NATIONAL LIFE INSURANCE COM-
PANY and Employers Health Insurance Company,
Defendants.
No. 95 C 2274.

Sept. 24, 1997.

### MEMORANDUM OPINION AND ORDER

COAR, J.
*1 Before the court is defendants Lincoln National
Life Insurance Company's ("LNLIC") and Employ-
ers Health Insurance Company's ("EHI,")
(collectively, "Defendants") motion for summary
judgment on the counts remaining in plaintiffs Ray
Sophie's and Jean Sophie's (collectively,
"Plaintiffs") complaint alleging denial of benefits
under the Employment Retirement Income Security
Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* For the
following reasons, the motion will be GRANTED.

### I. Facts

On June 1, 1991, Great White North, Inc.
(hereinafter "GWN") established an employee wel-
fare benefit plan for its eligible employees and their
dependents as participants in a group policy issued
by defendant Lincoln to the South Trust Bank of
Alabama, N.A., as the policy holder and trustee of
the Employers Health Insurance Benefits Trust,
with claims administration by defendant EHI.[FN1]
(12(N) Stmt., ¶ 1.) The group policy was issued and
delivered in the state of Alabama and includes a
forum-selection clause which specifically states
that the group policy "is issued in the above named
state (Alabama) and is subject to the laws of that

jurisdiction." (12(M) Stmt., ¶ 3.) [FN2] All eligible
employees of GWN and their eligible dependents,
could receive insurance coverage from the group
policy, subject to all terms, conditions, and limita-
tions contained in the group policy and the Certific-
ate of Insurance and to any exclusion riders at-
tached to the Certificate. (12(M) Stmt., ¶ 4; 12(N)
Stmt., ¶ 4.) Eligible employees of GWN, including
Ray Sophie, received a Group Insurance Certificate
of Insurance which outlined the terms of their plan
coverage; the Certificate was also subject to the ad-
dition of exclusion riders. (12(M) Stmt., ¶ 6; 12(N)
Stmt., ¶ 6.) Plaintiff Ray Sophie enrolled in the
group policy on September 16, 1991; the plaintiffs
and their dependents subsequently became covered
under the group policy, subject to all group policy
terms, conditions, and limitations, and to any exclu-
sion riders attached to the Certificate of Insurance.
(12(M) Stmt., ¶ 5-a; 12(N) Stmt., ¶ 5-a).[FN3]

> FN1. Plaintiffs argue that EHI was also the
> plan underwriter. (12(N) Stmt., ¶ 1). While
> this fact is disputed, it is not material, as
> discussed *infra.*

> FN2. Plaintiffs, rather than disputing the
> facts concerning the forum-selection
> clause, challenge them "to the extent that
> the Group Policy is not subject to the laws
> of other jurisdictions wherein defendants
> provide group coverage certificates...."
> (12(N) Stmt., ¶ 3). This is argument, which
> is impermissible under Rule 12(N)(3) and,
> as such, will not be considered by the
> court. Additionally, the only relevant refer-
> ence to the 12(N)(I) submission is to the
> forum-selection clause cited by defendants.
> (12(N) Stmt., ¶ 3, citing Plf.'s Exh. 10.)
> Thus, the facts regarding the forum-se-
> lection clause shall be deemed admitted.

> FN3. The defendants misnumbered their
> 12(m)(3) statement, adding an additional 5
> and 6. This court will refer to the addition-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 603890 (N.D.Ill.)
(Cite as: Not Reported in F.Supp., 1997 WL 603890 (N.D.Ill.))

al 5 and 6 as "5-a" and "6-a," as did the plaintiffs in their 12(n) statement.

The Plan provided, in pertinent part:

MEDICAL BENEFITS-LIMITATIONS AND EX-CLUSIONS

This policy does NOT provide benefits for:

(3) sex change operations, artificial insemination, reversal of voluntary sterilization;

(20) services not Medically Necessary for diagnosis and treatment of a Bodily Injury or Sickness;

*DEFINITIONS*

Medically Necessary is defined as:

The extent of services required to diagnose or treat a Bodily Injury or Sickness which is known to be safe and effective by most Qualified Practitioners who are licensed to diagnose or treat that Bodily Injury or Sickness. Such services must be performed in the least costly setting required by the patient's condition, and must not be provided primarily for the convenience of the patient or the Qualified Practitioner.

A Sickness is defined as:

A disturbance in function or structure of Your body which causes physical signs and or symptoms and which, if left untreated, will result in a deterioration of the health state of the structure or system(s) of Your body.

**\*2** (12(M) Stmt., ¶ 6-a.) These provisions are contained in a section headered by an INDEX; the Plaintiffs contend that this section was not attached to the plaintiffs' Group Coverage Certificate or made available to the plaintiffs prior to the defendants' refusal to pay for plaintiff Jean Sophie's infertility treatment. (12(N) Stmt., ¶ 6-a.) [FN4]

FN4. The question of whether the plaintiffs

received the section containing these provisions is a disputed fact. As the discussion *infra* shows, that fact is not material.

On September 27, 1991, the defendants placed two exclusion riders on the plaintiffs' certificate of insurance, stating that no coverage whatsoever is provided for ... Jean Sophie" for "[t]reatment for infertility including testing" or for "[e]ndometriosis or any desease [sic] or disorder of the abdominal or pelvic organs due to endometriosis, including complication thereof." (Plfs' Exh. 1.) These riders were removed on March 19, 1992, effective October 1, 1991; the letters regarding the rider removal restated the language of the riders and stated "WE WERE HAPPY TO REVIEW THE RIDER PLACED ON YOUR CERTIFICATE. THE RIDER WILL BE REMOVED AS OF OCTOBER 01, 1991." (Plfs' Exh. 1.) Jean Sophie then began a course of treatments and procedures, including two rounds of artificial insemination, to become pregnant. (12(M) Stmt., ¶ 8-10; 12(N) Stmt., ¶ 8.) [FN5] The defendants, after paying for some of the initial treatments, ceased reimbursing for the treatments because reimbursement was precluded both by the Plan's specific exclusion of reimbursement for artificial insemination and by its general exclusion of reimbursement for treatments that are not "medically necessary." (12(M) Stmt., ¶ 8-10.) [FN6] The defendants informed plaintiffs on March 23, 1993 that the treatments were excluded under the express terms of the Plan. (12(M) Stmt., ¶ 11.) The plaintiffs ceased Jean Sophie's infertility treatments as of February 1993. (12(N)(3)(b) Stmt., at. 2.)

FN5. The plaintiffs attempt to claim that the treatment was not for the purpose of achieving pregnancy but instead were for the purpose of achieving pregnancy while "prevent[ing] miscarriage." (12(N) Stmt., ¶ 8.) They also point to a letter written by their fertility doctor where he states that "Jean Sophie is currently a patient under my professional care for the treatment of dysmenorrhea, pelvic pain, history of mis-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 3
Not Reported in F.Supp., 1997 WL 603890 (N.D.Ill.)
(Cite as: Not Reported in F.Supp., 1997 WL 603890 (N.D.Ill.))

carriage, and a hormonal imbalance." (Plfs' Exh. 19.) However, the plaintiffs have made several binding admissions that *the* purpose for the course of treatment at issue was to achieve pregnancy. *See, e.g.,* plaintiffs' First Amended Complaint, ¶ 13, attached as Dfts' Exh. 1 ("plaintiff JEAN SOPHIE ... began a course of various treatments and procedures to achieve pregnancy..."); 12(N)(2) Memorandum of Law, p. 2 ("plaintiff RS and his employer requested that these exclusion riders be removed because the plaintiffs desired to have a third child."); 12(N)(2) Memorandum of Law, p. 3 ("plaintiff JEAN SOPHIE was then referred to Dr. Jacobs to begin a course of infertility treatments ... to achieve pregnancy without miscarriage."); Deposition of Jean Sophie, attached as Dfts' Exh. 6, p. 53 ("Q. But was any of the treatment that you received from Dr. Jacobs this time related to anything other than achieving pregnancy. A. No."); Deposition of Ray Sophie, attached as Plf.'s Exh. 7, p. 54 ("Q. This treatment that your wife was receiving in December of 1992 and January of 1993, was that for the purposes of achieving pregnancy? A. I believe so, yes."); *id.* at 56 ("The goal was to achieve pregnancy."). The plaintiffs' attempts to distinguish between "achieving pregnancy" and achieving pregnancy" while "prevent[ing] miscarriage" fail. There are no facts to indicate that Jean Sophie achieved pregnancy and, thus, needed care to avoid miscarriage. At a more basic level, the plentiful binding admissions by the plaintiffs indicate that the goal at the outset was to achieve pregnancy. *Keller v. United States,* 58 F.3d 1194, 1198 n. 8 (7th Cir.1995) (stating that admissions in pleadings are binding judicial admissions).

FN6. The plaintiffs challenge the defendants' statements regarding artificial insem-

ination on the grounds that the artificial insemination claims "only represent a small fraction of the infertility claims" at issue in their complaint. (12(N) Stmt. ¶ 9 .) If the only provision at issue was the "artificial insemination" claim, the court would have to consider in detail whether the Plan only excludes reimbursement for artificial insemination or whether it excludes treatments related to artificial insemination; the court would also have to consider what treatments are "related to" artificial insemination. However, because the general exclusion of treatments not "medically necessary" to treat a bodily injury or sickness, as defined in the Plan, covers the entire course of treatment, the court need not engage in the difficult process of sorting through the plaintiffs' medical claims. *See* Dfts' Exh. 7, ¶ 8 (statement by plaintiffs' doctor that the course of treatment was not " 'medically necessary' to treat a bodily injury or sickness). The plaintiffs dispute the claim that these treatments were not medically necessary to prevent miscarriage, but as noted *infra,* this argument presents a distinction without a difference.

On October 1, 1993, Ray Sophie was terminated from his employment with GWN, and no further payments were paid by or on behalf of the plaintiffs after October 1, 1993. 912(M) Stmt., ¶ 14.) Thus, the plaintiffs' insurance coverage with the defendants terminated as of October 1, 1993. (12(M) Stmt., ¶ 12,15.) FN7 The plaintiffs' former employer, GWN, discontinued the Group Policy as of March 1, 1996, which terminated all insurance coverage for all of its eligible employees or their dependents. (12(M) Stmt., ¶ 17.)

> FN7. The plaintiffs assert that they would have elected COBRA coverage under the Plan if the plaintiffs had not denied infertility coverage. (12(N) Stmt., ¶ 14-16.) However, the plaintiffs have offered no ex-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 603890 (N.D.Ill.)
(Cite as: Not Reported in F.Supp., 1997 WL 603890 (N.D.Ill.))

Page 4

planation as to why this is a material fact.

## II. Standards for Review

### A. Summary Judgment

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed.R.Civ.P.* 56(c); *Cox v. Acme Health Serv., Inc.,* 55 F.3d 1304, 1308 (7th Cir.1995). A genuine issue of material fact exists for trial when, in viewing the record and all reasonable inferences drawn from it in a light most favorable to the non-movant, a reasonable jury could return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Hedberg v. Indiana Bell Tel. Co.,* 47 F.3d 928, 931 (7th Cir.1995). The movant has the burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 202 (1986); *Hedberg v. Indiana Bell Tel. Co.,* 47 F.3d 928, 931 (7th Cir.1995). If the movant meets this burden, the non-movant must set forth specific facts that demonstrate the existence of a genuine issue for trial. *Fed.R.Civ.P.* 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. *Rule 56(c)* mandates the entry of summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552-53. A scintilla of evidence in support of the non-movant's position is not sufficient to oppose successfully a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

*3 Summary judgment is especially appropriate in cases involving contract interpretation. *Murphy v.*

*Keystone Steel & Wire Co.,* 61 F.3d 560, 564-65 (7th Cir.1995); *Frendreis v. Blue Cross Blue Shield of Michigan,* 873 F.Supp. 1153, 1156 (N.D.Ill.1995) ("The construction of insurance policies presents questions of law to be decided by the court."). In the context of contract interpretation, summary judgment is appropriate "where there is no material dispute regarding the underlying facts. *Jandek v. AT & T Corp.,* 1996 WL 147919, *1 (N.D.Ill.1996).

### B. ERISA: Federal Common Law Rules for Contract Interpretation

"Federal common law rules of contract interpretation determine the meaning of the terms of an employee benefit plan." *Andersen v. Chrysler Corp.,* 99 F.3d 846, 857 (7th Cir.1996). Thus, the court will "interpret the terms of a policy in an ordinary and popular sense, as would a person of average intelligence and experience." *Cannon v. Wittek Co.,* 60 F.3d 1282, 1284 (7th Cir.1995). If the terms of the policy are unambiguous, it should interpret the contract as a matter of law. *Murphy,* 61 F.3d at 565. The policy is ambiguous "only if both parties were reasonable in adopting their different interpretations of the contract." *Id.* The burden is on the party claiming that the policy is ambiguous to "produce objective facts, not subjective and self-serving testimony" to show that the policy is ambiguous. *Id.*

## III. Analysis

### A. Contract Interpretation

If the Exclusions and Limitations section of the plaintiffs' insurance policy is controlling, then the defendants plainly should receive summary judgment. The plain terms of the Plan state that the plaintiffs' policy "does NOT provide benefits for" artificial insemination. (Dfts' Exh. 2.) More than a third of the disputed claims are for two artificial insemination treatments. (Plfs' Exh. 2 .) If the Plan

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 603890 (N.D.Ill.)
(Cite as: Not Reported in F.Supp., 1997 WL 603890 (N.D.Ill.))

Page 5

did not include a general exclusion, namely that the policy "does NOT provide benefits for: ... services not Medically Necessary for diagnosis and treatment of a Bodily Injury or Sickness," the court would have to engage in the difficult analysis of whether the entirety of the plaintiffs' claims are precluded by the exclusion on artificial insemination claims. (Dfts' Exh. 2 at 22.) However, because the policy does include this general exclusion, and because the definition of the terms at issue unambiguously show that Jean Sophie's treatment was not "medically necessary" to treat a "sickness" under the terms of the Plan, the court need not engage in that exercise. For Jean Sophie's treatment to be covered it must have been medically necessary in treating "a disturbance in function or structure of [her] body which causes physical signs and or symptoms and which, if left untreated, will result in a deterioration of the health state of the structure or system(s) of [her] body." (Dfts' Exh. 2, p. 1, 3A.) The plaintiffs have put forth no evidence showing that, absent the treatment at issue, "the health state of the structure or system(s)" of Jean Sophie's body would have deteriorated.

*4 The plaintiffs have offered an affidavit by expert Steven A. Kooperman, M.D., which states that "[t]he continual problem of pregnancy loss and procedures to remove such pregnancy from the uterus would do nothing but lead to mental and physical damage to the patient." (Plfs' Exh. 3.) However, the plaintiffs have offered no evidence that, absent the treatment at issue, *any* pregnancy would have ensued. Dr. Kooperman's statement noted that Jean Sophie "had difficulty with conceiving." (Plfs' Exh. 3.) Additionally, Jean Sophie's doctor, Laurence A. Jacobs, M.D., stated in an affidavit that the treatments at issue "were necessary for Jean Sophie to conceive" but that "this treatment could not be deemed 'medically necessary' to treat a bodily injury or sickness.[FN8] Specifically, the services that were provided did not treat a sickness that, if left, would result in a deterioration of the health state of the structure or systems of Jean Sophie's body." (Dfts' Exh. 7, ¶ 8.) [FN9] In short, the purpose of the

procedures at issue was not to prevent the miscarriage of an existing pregnancy but to achieve pregnancy-and, thus, is excluded by the Plan. *See Kraut v. Wisconsin Laborers Health Fund,* 992 F.2d 113, 118 (7th Cir.1993) (where plan excluded cosmetic surgery, plaintiff's reconstructive surgery was not covered despite plaintiff's claim that the surgery was not for purely "aesthetic" purposes); *Murphy v. National Automatic Sprinkler Industry Welfare Fund,* 1994 WL 446865, *2 (E.D.Pa.1994) (refusing coverage for tubal ligation expressly excluded by insurance policy despite plaintiff's claim that the surgery was necessary to cure her depression).

> FN8. The plaintiffs claim that infertility is a sickness, and cite to several cases analyzing the ADA, the Rehabilitation Act, and other group health plans. But, none of this is relevant to the interpretation of this contract. The text of the policy is clear and unambiguous, and extrinsic evidence regarding unrelated policies or laws should not be used to try to render the policy ambiguous. *See Jandek,* 1996 WL 147919 at *1 ("Extrinsic evidence should not be used where the contract is unambiguous.").

> FN9. The plaintiffs have challenged the reliability and credibility of Dr. Jacobs' affidavit on the grounds that "it is inconsistent with his prior written statement of May 3, 1993, wherein he opines that 'Jean Sophie is under my professional care for the treatment of dysmenorrhea, pelvic pain, history of miscarriage, and a hormonal imbalance." (12(N) Stmt., ¶ 8.) But this is not inconsistent with Dr. Jacobs' statement that the *treatments at issue* were necessary for Jean Sophie to conceive but were not medically necessary under the definition of the Plan. Additionally and conclusively, the plaintiffs have consistently stated throughout their pleadings that "the course of various treatments and procedures" at

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                                    Page 6
Not Reported in F.Supp., 1997 WL 603890 (N.D.Ill.)
(Cite as: Not Reported in F.Supp., 1997 WL 603890 (N.D.Ill.))

issue in this case were done "to achieve pregnancy." *See, e.g.,* Plaintiff's complaint, ¶ 13; *id.* at ¶ 34-36; *id.* at 44; *id.* at 63-64; *id.* at 107. These statements are judicially binding admissions, which are "formal concessions in the pleadings ... that are binding upon the party making them." *Keller v. United States,* 58 F.3d 1194, 1198 n. 8 (7th Cir.1995). This is a "well-settled rule," and "judicial efficiency demands that a party not be allowed to controvert what it has already unequivocally told a court by the most formal and considered means possible." *Soo Line Railroad Co. v. St. Louis Southwestern Railway Co.,* 125 F.3d 481, 1997 WL 557887 (7th Cir .1997).

The plaintiffs, however, argue that the attachment and subsequent removal of the two exclusion riders from Jean Sophie's policy has special significance. But the letters won't bear the meaning that the plaintiffs place on them. The plaintiffs state that the defendants' letters removing the exclusion riders did two things: remove the exclusion riders *and* provide coverage for infertility. (12(N)(2) Memorandum of Law, p. 6.) Thus, the plaintiffs argue that "under the express terms of the policy, plaintiffs were covered for all of the infertility treatments and procedures" at issue. (12(N)(2) Memorandum of Law, p. 6.) However, the "express terms" of the letters removing the exclusion riders simply state that the rider "will be removed." (Plf.'s Exh. 1.) The removal was curious, but standing alone, cannot lead a reasonable trier of fact to conclude that by removing the riders, the treatments at issue become covered. The removal of the exclusion riders restored the status quo *ex ante* the attachment of the exclusion riders; the plaintiffs can point to no language in the letters which manifests an intention on the defendants' part that the attachment and subsequent removal of the exclusion riders expand their insurance coverage beyond what Jean Sophie would have had without the mistaken attachment of the exclusion riders. Finally, the Plan contains a

Modification of Policy provision stating that "No modification will be valid unless approved by our President or Secretary. The approval must be endorsed on or attached to the Policy. No agent has authority to modify the Policy or waive any of the Policy provisions, to extend the time for premium payment, or bind us by making any promise or representation." (Dfts' Exh. 4.) The plaintiffs have not shown that the alleged promise to provide coverage for infertility treatment was made in accordance with this provision.

**B. Failure to include exclusions and limitations in Summary Plan Description**

**\*5** The plaintiffs, however, argue that these exclusions should not bar their claim because they allegedly did not receive the exclusions at issue. (12(N) Stmt. ¶ 6-a.) Thus, with the defendants claiming that the exclusions and limitations are part of the Plan and the plaintiffs claiming that they were not part of the copy that the plaintiffs received, there is a fact in dispute. However, this disputed fact is not material for three reasons. First, the responsibility for delivering complete summary plan descriptions of ERISA plans to the covered employees belongs to the plan administrator, which, under the express terms of the insurance contract issue, is the plaintiffs' former employer. *See Williams v. Humana Health Plan, Inc.,* 957 F.Supp. 1029, 1030 (N.D.Ill.1997) (under ERISA, the plan administrator is responsible for providing all covered employees with the summary plan description; under ERISA, the plan administrator is the person designated in the plan contract or, in absence of such designation, the default is the plan sponsor, who is the employer in the case of a plan maintained by a single employer). *See also Klosterman v. Western General Management, Inc.,* 32 F.3d 1119 (7th Cir.1994) (holding that claim administration company was not the "plan administrator," and thus not responsible for incomplete summary plan description). The Plan designates to the "Participating Employer" the responsibility to deliver to each employee the Certificate of Insur-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1997 WL 603890 (N.D.Ill.)

(Cite as: Not Reported in F.Supp., 1997 WL 603890 (N.D.Ill.))

Page 7

ance, which states the insurance protection to which the employees and their dependents are entitled. (Dfts' Exh. 4 .) The plaintiffs have made no claim against Ray Sophie's former employer, who was the party responsible for ensuring that the proper materials regarding insurance coverage got to Ray Sophie. *Cf. Solo v. Pan-American Life Insurance Co.,* 1992 WL 280501 (N.D.Ill.1992) ("Any suggestion of impropriety in that fact [that summary plan description was not given to plaintiff would seem to go to plaintiff's former employer's failure rather than to any failure on the part of either defendant."), *aff'd,*13 F.3d 239 (7th Cir.1994). In fact, the plaintiffs allege no facts tending to show that there was any wrongdoing by the defendants in regard to the alleged incompleteness of the Certificate.

Second, even if the defendants *were* responsible for delivering the Certificate of Insurance to the plaintiffs, "ERISA does not require [the defendants] to verify that the participant actually receive the documents." *Aiello v. Midwest Operating Engineers Health and Welfare Fund,* 1993 WL 81437, *3 (N.D.Ill.1993). In *Aiello,* there was a similar dispute regarding whether the plaintiff had received the entire packet of coverage materials: the plaintiff's decedent allegedly received the original summary plan description, which would have covered his surgery, but allegedly did not receive amendments to the insurance, which expressly excluded his surgery. *Id.* Despite claims that the decedent relied on the materials that he had received, the court refused to reverse the insurer's denial of benefits. *Id. See also Heil v. Midwest Operating Engineers Health and Welfare Fund,* 1993 WL 226303, *5 (N.D.Ill.1993) (applying amendments to coverage to the plaintiff despite plaintiff's claim that he never received the amendments). Here, the plaintiffs cannot even claim that they relied on the absence of exclusions or limitations from the plan, because they both admit that they did not read the Plan. (Plfs' Exh. 7, p. 65 (deposition of Ray Sophie) ("Q. Did you ever review the certificate when you received it? A. Not really, no. Not in great detail."));

Dfts' Exh. 6, p. 60 (deposition of Jean Sophie) .) "An administrator's failure to provide the summary plan description will not result in unenforceability or waiver of unfavorable terms of the benefit plan." *Rucker v. Regit Sponsored Group Long Term Disability-Insurance Plan,* 1994 WL 10019, *3 (N.D.Ill.1994). In the absence of objective facts tending to show that the defendants "acted in bad faith, actively concealed the benefit plan, or otherwise prejudiced [the plaintiffs] by inducing their reliance on a faulty plan summary," there will be no recovery. *Kreutzer v. A.O. Smith Corp.,* 951 F.2d 739, 743 (7th Cir.1992). Instead of offering such evidence of active wrongdoing by the defendants, the plaintiffs have stated that the defendants have not proven that the index including the provisions was tendered to plaintiffs or plaintiffs' employer." (12(N) Stmt., ¶ 6-b.) But that does not meet the requirements stated by *Kreutzer.*

**\*6** Third, even if the plaintiffs did not receive the entire Certificate, including the exclusions and limitations portion, they were put on notice that the materials that they had received were incomplete. The first page of the "Schedule of Medical Benefits" specifically states that "A more detailed explanation of Your coverage, limitations and exclusions are provided in Your Certificate." (Plfs' Exh. 4.) However, the materials that the plaintiffs submitted as the exact copy of what they received for their insurance policy does not include a Certificate with the detailed explanation of coverage, limitations, or exclusions. Additionally, the materials that the plaintiffs submitted are the Schedule of Medical Benefits, a Replacement provision, and a set of Riders to the Certificate. (Plfs' Exh. 4.) Finally, a number of the riders specifically state that "Nothing in this Rider will increase benefits to cover services not Medically Necessary or otherwise not covered under the Policy." (*See. e.g.,* Plfs' Exh. 4, Preferred Facility Rider.) Thus, if the plaintiffs had read materials that they received, they would have realized that significant sections of the policy-including explanations of their benefits and of the exclusions

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                              Page 8
Not Reported in F.Supp., 1997 WL 603890 (N.D.Ill.)
(Cite as: Not Reported in F.Supp., 1997 WL 603890 (N.D.Ill.))

and limitations on their insurance coverage were missing.[FN10]

> FN10. The defendants argue that this violates a legal duty to read the Certificate of Insurance. The Seventh Circuit has held that "basic contract law establishes a duty to read the contract,"*Heller v. Financial, Inc. v. Midwhey Powder Co., Inc.,* 883 F.2d 1286, 1292 (7th Cir.1989), and, if the plaintiffs had read the contract, they would have had notice of the existence of exclusions and limitations.

### C. Plaintiffs' estoppel claim

This court rejects the plaintiffs' attempt to raise an estoppel claim at this time. First, the estoppel issue is not properly before this court because the plaintiffs did not raise it in their Amended Complaint. *Marshall v. Clark Equipment Co.,* 1995 WL 443954, *4 (N.D.Ill.1995); *Etherington v. Bankers Life & Casualty Co.,* 747 F.Supp. 1269, 1280 (N.D.Ill.1990), *aff'd without reported opinion,*968 F.2d 1218 (7th Cir.1992). Second, the plaintiffs cannot meet the requirements for an estoppel theory. The Seventh Circuit in *Krawczyk v. Harnischfeger Corp.* stated that plaintiffs must prove the following elements for an estoppel claim: that "(1) the opposing party knowingly misrepresented or concealed a material fact; (2) the complaining party, not knowing the truth, reasonably relied on that misrepresentation or concealment; (3) the complaining party suffered detriment; and (4) the complaining party had no knowledge or convenient means of ascertaining the true facts which would have prompted it to react otherwise." 41 F.3d 276, 280 (7th Cir.1994). The plaintiffs have not shown that the defendants knowingly misrepresented a material fact. Instead, the defendants merely stated that an exclusion rider that was mistakenly placed on Jean Sophie's policy would be removed.

The plaintiffs also had the means to ascertain the true facts. The riders that the plaintiffs rely on offer Pat Tamburrino's name and phone number as someone that the plaintiffs could call about the decision to remove the exclusion riders from their policy. (Plfs' Exh. 1.) Also, the insurance policy that the plaintiffs submitted to the court includes a phone number for employees to call if they have any questions about their plan. (Plfs' Exh. 4.) The plaintiffs could have called the insurance company to determine what, if any, infertility treatments were covered by their policy. *See Marshall,* 1995 WL 443954 at 4 (finding that plaintiff had the means to ascertain the true facts by reading the policy or by asking the defendants).

### D. Breach of contract claim

*7 The plaintiffs next claim that the letters removing the riders form a separate contract between defendant EHI and the plaintiffs. Again, this was not in the Amended Complaint and, thus, is not properly before this court. *Marshall,* 1995 WL 443954 at *4; *Etherington,* 747 F.Supp. at 1280. The court notes that the state law breach of contract claim was not in the Amended Complaint because this court has previously ordered that all state law claims filed by the plaintiffs were to be dismissed because of ERISA preemption. The plaintiffs have sought, without factual or legal basis, to resurrect one of those claims here,[FN11] and this court rejects their attempt to bypass its previous ruling.

> FN11. The plaintiffs assert that "Ms. Tamburrino had the authority or apparent authority to create a separate contract and bind EHI in its capacity as the underwriting company." (12(N)(2) Memorandum of Law, p. 10.) The plaintiffs offer no support for this allegation, and this claim is directly contrary to the express terms of the policy as stated in its Modifications section: "No agent has authority to modify the policy ... or bind us by many any promise or representation." (Dfts' Exh. 4.) The plaintiffs cite *Sprague v. General Motors Corp.,* 768 F.Supp. 605, 612 (E.D.Mich.1991), *aff'd in part, rev'd in*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 603890 (N.D.Ill.)
(Cite as: Not Reported in F.Supp., 1997 WL 603890 (N.D.Ill.))

Page 9

*part,* 92 F.3d 1425 (6th Cir.), *vacated and reh'g en banc granted,* 102 F.3d 204 (6th Cir.1996), in support of their claim, but the holding to *Sprague* is limited to cases "where ... an employer allegedly agrees, apart from its regular plan, to provide a discrete group of employees with vested health care benefits in exchange for defined consideration." *Id.* The plaintiffs gave no consideration for the alleged contract and cannot meet this exception.

### E. Breach of Fiduciary Duty

The plaintiffs again assert a new grounds for their claim, and it again is not properly before this court. *Marshall,* 1995 WL 443954 at *4; *Etherington,* 747 F.Supp. at 1280. Beyond that, the plaintiffs have no legal basis for their claims, as they have not shown that Ms. Tamburrino was acting as a fiduciary under ERISA when she allegedly misrepresented their coverage, *Klosterman,* 32 F.3d at 1122, 1125 (noting that ERISA fiduciary must use or have discretionary authority, control, or responsibility; "a person deemed to be a fiduciary is not a fiduciary for every purpose but only to the extent that he performs one of the described functions"), and because their claim amounts to impermissible "bootstrapping" of a denial of benefits claim into a fiduciary duty claim. *See Perlman v. Swiss Bank Corporation Comprehensive Disability Protection Plan,* 916 F.Supp. 843, 844 (N.D.Ill.1996); *Lister v. Stark,* 1989 WL 88241, *5-6 (N.D.Ill.1989) (noting that ERISA breach of fiduciary duty claim focuses on harm to the plan, not to individual participants, is distinct from denial of benefits claim, and does not allow for damages to an individual participant).

### F. State of Illinois mandate: 215 ILCS 5/356(m)

The plaintiffs also argue that they are entitled to coverage for infertility treatment under 215 ILCS 5/356(m) (1996). However, the plaintiffs' group policy was issued and delivered in the State of Alabama, and is not subject to the State of Illinois' mandate in § 356(m). *See Kubes v. American Medical Security, Inc.,* 895 F.Supp. 212, 216-17 (S.D.Ill.1995).[FN12]

> FN12. The instant situation is stronger than in *Kubes,* where the forum-selection clause was ambiguous. 895 F.Supp. at 215-16. Here, the forum-selection clause is unambiguous.

### G. Arguments regarding post-termination damages

Because the court is granting the defendants summary judgment, all arguments regarding post-termination and extra-contractual damages are moot.

### IV. Conclusion

WHEREFORE, for the foregoing reasons, defendants' motion for summary judgment is granted. Because the plaintiffs' entire case is now dismissed, all pending motions in the case are moot.

N.D.Ill.,1997.
Sophie v. Lincoln Nat. Life Ins. Co.
Not Reported in F.Supp., 1997 WL 603890 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 88241 (N.D.Ill.), 11 Employee Benefits Cas. 1611
**(Cite as: Not Reported in F.Supp., 1989 WL 88241 (N.D.Ill.))**

**H**
Lister v. Stark
N.D.Ill.,1989.

United States District Court, N.D. Illinois, Eastern
Division.
Arthur LISTER and Harold Quick, Plaintiffs,
v.
H. Allan STARK, James Nugent, Sun Electric Cor-
poration and Sun Electric Pension Trust, Defend-
ants.
No. 88 C 9801.

Aug. 1, 1989.

MEMORANDUM OPINION AND ORDER

ZAGEL, District Judge.

I

*1 The facts are essentially undisputed. The follow-
ing statement is adopted from the Statement of Un-
disputed Material Facts filed by defendants along
with certain additions suggested by plaintiffs.

*The Plan*

The Sun Electric Corporation Pension Plan (the
"Plan") is a defined benefit retirement plan for em-
ployees of Sun Electric Corporation ("Sun"). The
Plan is subject to the Employee Retirement Income
Security Act of 1974, as amended (ERISA). The
Plan document, as amended and restated effective
July 1, 1981, governs the benefits of those parti-
cipants and beneficiaries whose employment with
Sun terminated on or after July 1, 1981, but before
January 1, 1984.

*The Defendants*

Sun is a corporation whose principal place of busi-
ness is Crystal Lake, Illinois. Sun is engaged, *inter*
*alia,* in the design, manufacture, marketing and ser-
vice of electronic equipment. Sun is the sponsor of
the Plan.

H. Allan Stark ("Stark") is the Vice-President and
General Counsel of Sun, and, as a member of the
Committee (described below), a fiduciary of the
Plan. (Stark Aff. secs. 1, 6.)

James Nugent ("Nugent") is Personnel Manager of
Sun. Nugent is neither a Trustee of the Plan nor a
member of the Committee though he did speak to
both plaintiffs when they sought information re-
garding the Plan and their benefits under it.

*The Plaintiffs*

Arthur Lister ("Lister") was employed by Sun from
January 1971 to August 1982, when he was forced
into early retirement. He also previously had been
employed by Sun between June 1964 and March
1970. From March 1975 until his termination of
employment, Lister was a regional sales manager
for Sun. In that capacity, he supervised the work of
Sun salesmen in a defined region. Sun claims he
did not have the responsibility to sell Sun's
products himself. Lister contends he did have re-
sponsibility for selling Sun Electric's products when
he was regional sales manager. He was frequently
contacted by customers directly in which case he
effected the sale. He further had responsibility for
introducing his salesmen to his customers in the re-
gion. Finally he had responsibility for coordinating
sales to customers that expanded beyond his region
alone. For example, if a customer had facilities at
four or five locations and these fell in regions in ad-
dition to Lister's, it was his responsibility to co-
ordinate and make the sales outside of his region.

Harold Quick ("Quick") was employed by Sun
from November 1962 to August 1983, when he was
forced into early retirement. From 1973 until his
termination of employment, Quick was a regional
sales manager for Sun. In that capacity he super-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 88241 (N.D.Ill.), 11 Employee Benefits Cas. 1611
(Cite as: Not Reported in F.Supp., 1989 WL 88241 (N.D.Ill.))

vised the work of some of Sun's salesmen in a defined region. Quick and the defendants offer differing descriptions of his sales duties of the same sort that exist with respect to Lister.

While Lister and Quick were regional sales managers, they were paid a salary by Sun. Each also received a bonus, calculated as a percentage of yearly net profit attributable to the region for which he was sales manager. There is disagreement over the terminology ("bonus" vs. "commission") but there is no dispute that plaintiffs received sums that were calculated as a percentage of net monthly sales for their regions. They were also paid sums of yearly net profits attributable to the regions for which they were sales managers. Plaintiffs state that these sums were identified as "commissions" by the company on forms such as their Employee Status Change forms which they received every year. Lister has produced one such form.

*2 Sun's salesmen receive no salary. They are paid instead on commission.

### Retirement Benefits and Their Determination

A Plan beneficiary's Accrued Benefit, his retirement benefit at age 65, is calculated on the basis of his Average Monthly Compensation. In relevant part, "Average Monthly Compensation" is defined as:

[One-thirty-sixth (1/36) of a person's Compensation for his highest thirty-six (36) consecutive-month period within the one-hundred and twenty (120) month period ending with the earliest of his Normal Retirement Date, ... or the date he ceases to be an Employee....

"Compensation" is defined, in relevant respects, as:

[R]egular basic compensation, including salary and ordinary commissions ... excluding bonuses, overtime and other additional compensation.

In calculating retirement benefits for regional sales

managers, salary is used to determine Compensation. Pursuant to the terms of the Plan, the sums paid measured by yearly net sales and profit attributable to a region is excluded from the determination of Compensation. Again plaintiffs say their compensation was made of three elements: A base salary, a monthly commission based on net monthly sales for the region, and an annual commission based upon yearly profitability for the region.

The only "ordinary commissions" that the Plan has ever used in determining Compensation for Sun employees are the commissions paid to salesmen in lieu of a salary.

In determining Accrued Benefit, a reduction is made by a factor dependent on the beneficiary's Social Security benefit.

Normal retirement under the Plan is 65. However, the Plan permits a beneficiary to receive early retirement benefits, at a reduced level from normal retirement benefits, at age 55 or above. The applicable provision follows:

4.2 *Early Retirement.* A person who has at least ten (10) years of Benefit Service shall become eligible for an early retirement pension on the first day of any calendar month following his 55th birthday and prior to his Normal Retirement Date in an amount equal to his Accrued Benefit determined as of his Termination of Employment and reduced by 5/9 of 1% for each of the first sixty (60) months and 5/18% of 1% for each of the second sixty (60) months between the date his monthly benefit payments commence and his Normal Retirement Date. Such pension shall commence with the first day of the first full calendar month of retirement, if application for benefits is made in accordance with Section 8.1, not earlier than 90 days prior to retirement, and not later than the close of the month preceding the first full calendar month of retirement; otherwise, it shall commence with any subsequent calendar month following the month in which such application is made.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 3
Not Reported in F.Supp., 1989 WL 88241 (N.D.Ill.), 11 Employee Benefits Cas. 1611
**(Cite as: Not Reported in F.Supp., 1989 WL 88241 (N.D.Ill.))**

The Summary Plan Description which plaintiffs do not ever recall seeing or receiving provides the following example of calculation of early retirement benefits:

For example, benefits paid to a person beginning at age 62 will be permanently reduced by 20% (6 2/3 % for each of three years) to take into account that benefits will be payable for three additional years.

**\*3** And states further:

The smaller amount payable for the longer period of time is expected to have approximately the same value as the full amount paid starting at age 65.

### Quick's Receipt of Benefits

In January 1986, Quick advised Nugent that he wished to begin receiving retirement benefits. On January 31, 1986, Sun sent Quick a summary of benefits, calculated on the basis of retirement at Quick's then-current age of 59, and on the basis of monthly Social Security benefits of $794. Nugent also sent Quick forms to be completed in order for him to begin receiving pension benefits. On February 3, 1986, Quick sent Nugent the completed forms needed to commence payment of benefits. Nugent immediately sent the forms to the benefit processor for the Plan. Quick's first benefit payment was made by check and was sent to him by Nugent on March 20, 1986.

Quick never made any claim for additional benefits from the Plan or in any way availed himself of the Plan's claim procedures. He believed it pointless to do so in light of Lister's experience.

Quick continues to receive his retirement benefits from the Plan.

### The Plan's Claim Procedure

The Plan provides for its administration by a Committee. The members of the Committee at the time of the hearings described below were D.B. Davis,

Chairman of Sun; S.E. Evey, Treasurer of Sun; C.A. Loomis, Sun's Senior Vice President for U.S. Automotive Operations; P.T. Shukas, Sun's Vice-President for Personnel; Stark; and Z.A. Zudyk, Sun's Controller. They are also the Plan trustees. Among the duties for the Committee are the duties to construe the Plan and to administer the Plan's claims procedure.

The Plan's claims procedure is as follows:

8.1 *Initial Claim for Benefits.* Each person entitled to benefits under this Plan (a "Claimant") shall sign and submit his claim for benefits to the Committee (or to such other person or persons as may be designated by the Committee) in writing in such form as is provided or approved by the Committee, which claim shall designate the date upon which the Claimant desires his benefits to commence. A Claimant shall have no right to seek review of a denial of benefits, or to bring any action in any court to enforce a claim for benefits prior to his filing a claim for benefits and exhausting his rights to review under Sections 8.1 and 8.2.

When a claim for benefits has been filed properly, such claim for benefits shall be evaluated and the Claimant shall be notified of its approval or denial within ninety (90) days after the receipt of such claim unless special circumstances require an extension of time for processing the claim. If such an extension of time for processing is required, written notice of the extension shall be furnished to the Claimant prior to the termination of the initial ninety (90) day period which shall specify the special circumstances requiring an extension and the date by which a final decision will be reached (which date shall not be later than one hundred and eighty (180) days after the date on which the claim was filed). A Claimant shall be given a written notice in which the Claimant shall be advised as to whether the claim is granted or denied, in whole or in part. If a claim is denied, in whole or in part, the Claimant shall be given written notice which shall contain (1) the specific reasons for the denial, (2) references to pertinent plan provisions upon which

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 88241 (N.D.Ill.), 11 Employee Benefits Cas. 1611
(Cite as: Not Reported in F.Supp., 1989 WL 88241 (N.D.Ill.))

Page 4

the denial is based, (3) a description of any additional material or information necessary to perfect the claim and any explanation of why such material or information is necessary, and (4) the Claimant's rights to seek review of the denial.

*4 *8.2 Review of Claim Denial.* If a claim is denied, in whole or in part, (or if within the time periods prescribed in Section 8.1, the Committee has not furnished the Claimant with a denial and the claim is therefor deemed denied) the Claimant shall have the right to request that the Committee review the denial, provided that the Claimant files a written request for review with the Committee within sixty (60) days after the date on which the Claimant received written notification of the denial. A Claimant (or his duly authorized representative) may review pertinent documents and submit issues and comments in writing to the Committee. Within sixty (60) days after a request for review is received, the review shall be made and the Claimant shall be advised in writing of the decision on review, unless special circumstances require an extension of time for processing the review, in which case the Claimant shall be given a written notification within such initial sixty (60) day period specifying the reasons for the extension and when such review shall be completed (provided that such review shall be completed within one hundred and twenty (120) days after the date on which the request for review was filed). The decision on review shall be forwarded to the Claimant in writing and shall include specific reasons for the decision and references to Plan provisions upon which the decision is based. A decision on review shall be final and binding on all persons for all purposes. If a Claimant shall fail to file a request for review in accordance with the procedures described in Sections 8.1 and 8.2, such Claimant shall have no right to review and shall have no right to bring action in any court and the denial of the claim shall become final and binding on all persons for all purposes.

*Lister's Claim for Benefits*

On February 5, 1987, Lister wrote to Nugent, stating that he wished to begin receipt of pension benefits beginning April 1987, and requesting the appropriate forms to complete. On March 6, 1987, Nugent wrote to Lister, enclosing a benefits summary assuming early retirement in March 1987, as well as the forms to be completed in order for him to begin receipt of benefits. The benefits calculation used Lister's salary as his Compensation for purposes of determining his benefits, and did not include in his Compensation the sums based on his region's performance.

On August 11, 1987, Lister wrote to Stark, stating that he did not agree with the summary of pension benefits that had been sent to him in March. One basis for disagreement was that, in Lister's view, "[t]he amounts of income that were used to compute my average monthly compensation ... should be much higher." Lister asked for a "review" by the Committee. On August 18, 1987, Stark wrote to Lister, stating that the Committee had determined to treat Lister's August 11 letter as an initial claim for benefits under paragraph 8.1 of the Plan document. Stark further wrote:

*5 If you have information, other than what is already on file with the company, you would like the Trustees to consider prior to making a formal decision regarding your claim, please provide me with the same prior to October 1, 1987.

On August 27, 1987, Lister wrote to say that he had no additional information to provide. Lister believed Sun had all his records. Lister explained his position to Stark in a telephone conversation. (Stark Aff. sec. 13 & Ex. 5.) On behalf of the Committee, Stark reviewed Lister's personnel file, the computer-generated records of his earnings, and the benefits calculation made by Nugent. He asked Nugent to recalculate Lister's retirement benefit to ensure that the March 1987 calculation was accurate. He determined that the benefits calculation was correct. Stark reported his findings to the Committee. The Committee thereupon voted to deny Lister's claim for additional benefits.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 88241 (N.D.Ill.), 11 Employee Benefits Cas. 1611
(Cite as: Not Reported in F.Supp., 1989 WL 88241 (N.D.Ill.))

On November 9, 1987, Stark wrote to Lister stating that the Committee had determined to deny the claim for additional benefits. Stark explained that "a check of the compensation figures used to calculate your estimated retirement benefit conforms to Paragraphs 2.12 and 2.5 of the Plan" [which define "Compensation" and "Average Monthly Compensation"]. Stark further informed Lister that he had the right to a review of the denial, and enclosed a copy of the portion of the Plan document which specified the procedure. On November 12, 1987, Lister wrote to the Committee asking for a review of the denial of the claim. After requesting a final review by the Committee, Lister took no further steps to assist the Committee's deliberations. Although the Plan document granted him such a right, he declined to "review pertinent documents" and failed to "submit issues and comments in writing to the Committee." The Committee again reviewed Lister's claim. On January 12, 1988, the Committee denied the claim for the express reasons that "Mr. Lister has not set out any additional facts which would warrant a modification of the Trustees' initial denial of this claim."

On January 12, 1988, Stark notified Lister of the denial of the claim. As Stark explained:

The reason for such denial is that no additional facts have been presented to the Trustees which would warrant a modification of their initial determination of your claim.

## II

Lister and Quick filed a state law claim (Count II) which is, plaintiffs agree, preempted by ERISA and accordingly dismissed defendant's motion. *Pilot Life Insurance Co. v. Dedeaux,* 481 U.S. 41 (1987); *Metropolitan Life Insurance Co. v. Taylor,* 481 U.S. 58 (1987).

Another claim of theirs, Count III, is that they were victims of a breach of fiduciary duty (29 U.S.C. sec. 502(a)(2) or (3)). This sort of claim is directed

against a harm committed against the plan. It is different from a claim that actions of the plan administrators rendered harm to a beneficiary of the plan. The fiduciary duty lawsuit seeks repair of harm to the plan by securing injunctive relief or damages to benefit the plan. A suit for improper denial of benefits (29 U.S.C. sec. 1132(a)(1)(B)) seeks payments of benefits to the plaintiffs. *See Mass. Mutual Life Ins. Co. v. Russell,* 473 U.S. 134 (1985). Lister and Quick seek only the payment of benefits for themselves and the class they represent.[FN1] The complaint filed here is, in truth, a simple claim that benefits were wrongly denied. If a simple, but incorrect, denial of benefits constituted breach of fiduciary duties then there is no reason for Congress to have enacted a law which provides two very different remedies for the same wrongful act. A denial of benefits is reviewed by a court under a standard requiring exhaustion of administrative procedures, at least some deference to the plan's actions, and relief is payment of benefits. A breach of fiduciary duty requires no exhaustion of administrative procedures, no deference to plan administrators and relief is given in the form of injunctions and/or damages for the benefit of the plan.

**\*6** Other courts have refused to permit a denial of benefits claim to be bootstrapped into a fiduciary duty claim and so do I. *See Placzek v. Strong,* 868 F.2d 1013 (8th Cir.1989); *Revello v. Metropolitan Insurance Co.,* 5 E.B.C. 2314, 2315 (S.D.N.Y.1984). Compare *Meagher v. IAM Pension Plan,* 856 F.2d 1418, 1422-23 (9th Cir.1988) (breach may occur where plan provision applied despite court order invalidating it). The plaintiff's claim is that, because of an incorrect interpretation of a plan provision, they were denied benefits. To breach one's fiduciary duty, an ERISA trustee must do more (and worse) than wrongfully construing the plan provisions. No such facts are alleged or shown here, and Count III is dismissed.

## III

The heart of the case is the denial of benefits and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                           Page 6
Not Reported in F.Supp., 1989 WL 88241 (N.D.Ill.), 11 Employee Benefits Cas. 1611
**(Cite as: Not Reported in F.Supp., 1989 WL 88241 (N.D.Ill.))**

defendants seek summary judgment. The plaintiffs argue summary judgment is inappropriate because of the absence of discovery. Defendants say that, in effect, discovery will not lead to evidence relevant to resolution of the case, and its conduct would result in an unnecessary and pointless expense.

The force of defendants' argument inheres in the nature of benefit denial claims. The defendants' actions are taken under the authority of a written document and, usually, a court must accord some deference to the defendant's interpretation of plan provisions. The rule used to be that a court had merely to determine whether an action was "arbitrary and capricious"; the plaintiff prevailed if a court found the challenged interpretation completely unreasonable. *Van Boxel v. Journal Company Emp. Pen. Tr.,* 836 F.2d 1048, 1050 (7th Cir.1987). Discovery seems unnecessary since the court did not have to decide whether the defendants' interpretation was the correct, or the best, interpretation, merely that it is not capricious. Indeed, even if judicial review was directed to whether the interpretation in question is the best possible one, there is no reason for discovery beyond production of the Plan document and the administrator's rulings.

The term "arbitrary and capricious" action is no longer in use. In *Firestone Tire & Rubber Co. v. Bruch,* 109 S.Ct. 948 (1989) the Supreme Court stated the rule, to wit, where the plan document gives the fiduciary "discretionary authority to determine eligibility for benefits or to construe the terms of the plan" (109 S.Ct. at 956), the common law rule regarding trustees is applicable and the exercise of discretionary authority " 'is not subject to control by the court except to prevent an abuse by the trustee of his discretion' ", 109 S.Ct. at 954 (quoting Restatement 2nd Trusts, Sec. 187). I leave to another day the difference, if any, between an "abuse of discretion" standard and an "arbitrary and capricious" standard; the Court did say a plan administrator's "interpretation will not be disturbed if reasonable", 109 S.Ct. at 954.

This deferential standard for review of plan actions

depends upon whether its administrators have discretion to determine eligibility and to construe the plan's terms. *See, e.g., Hoffa v. Fitzsimmons,* 673 F.2d 1345, 1354-55 (D.C.Cir.1982). This Plan does provide discretion:

*7 7.4 *Committee Duties.* The Committee shall enforce the Plan in accordance with the terms of the Plan and the Trust Agreement and shall have all powers necessary to accomplish that purpose, including but not by way of limitation, the following:

(b) To construe the Plan and Trust Agreement;

(c) To determine all questions arising in its administration, including those relating to the eligibility of persons to become Participants; the rights of Participants, former Participants, Pensioners and Beneficiaries, and Employer Contributions; and its decision thereon shall be final and binding upon all persons hereunder; ...

There seems little doubt that the interpretations defendants adopted are reasonable. In essence the decision that a sales manager's compensation for purposes of the Plan was his base salary finds support in the Plan language. Even if one characterized the additional manager payments as a commission, the Committee could regard them as different from "ordinary commissions" paid to salesmen in lieu of salary. Characterized as a bonus, these payments are, of course, excluded from the benefit formula. Even the evidence that the additional sums were "commissions" supports the claim they were also called "bonuses." It is undenied that the Committee always treated such payments as excluded from regular basic compensation. It is not the only reasonable interpretation, but it is one reasonable interpretation. The fact that company employees may have referred to the payments as commissions does not bind the administrators of the Plan.

So too the construction of the early retirement provision is reasonable. It is clearly one logical way to read the provision and is consistent with the Plan

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 88241 (N.D.Ill.), 11 Employee Benefits Cas. 1611
(Cite as: Not Reported in F.Supp., 1989 WL 88241 (N.D.Ill.))

Page 7

summary. An argument may be made that the construction is actuarially unsound and defeats the purpose of reducing payments to equalize them over time. Even if this is true the given interpretation is not unreasonable. The most plaintiffs have shown, and I do not hold that they have yet done so, is that the adopted reading is the second best-this is not enough. There can be no claim, and I believe none is made, that the Plan interpretation is unreason- able.

There is no showing of abuse of discretion in the procedures used by the Committee to determine Lister's claim. Nothing is wrong with assigning a person to investigate Lister's claims; nothing is wrong with consideration of Lister's records, his letters and the Plan document. The Committee followed reasonable procedures. It is to be noted that Lister's written claims mentioned neither his commission payment nor his early retirement theories. Quick, of course, did not exhaust his administrative remedies. He never sought review of his claim. This is fatal to this suit. *Kross v. Western Electric Co.*, 701 F.2d 1238, 1244 (7th Cir.1983). His claim that this would have been futile, in light of what occurred to Lister, is unconvincing. Considering the rather skeletal way in which Lister presented his claims, Quick should not be excused from pursuing plan remedies (assuming, *arguendo*, that such excuse is legally permissible).

**8** Plaintiffs say, in the end, that all these rules respecting the discretion of the fiduciary (the Committee) are to be discounted to some degree where the fiduciary is not independent as, for example, may be the case where the plan is not funded. *See Firestone Tire & Rubber Co. v. Bruch*, 109 S.Ct. at 9452; *Van Boxel v. Journal Co. Employees Pension Trust*, 836 F.2d at 1053. Here, plaintiffs argue, all Committee members are part of company management who hold their positions at the will of the company directors. Discovery may show that Committee members' compensation is tied to corporate profits which in turn may be affected by company contribution to the Plan. If this is so, it is argued

Committee decisions are not entitled to deference.

There is no reason to assume conflict of interest from the fact that Plan administrators are company officials. The structure of ERISA shows why this is so. The Act allows company employees to be fiduciaries-it permits a plan sponsor (employer) to fund and administer the plan. If the plan document does not name an administrator, the employer fills the role. Regular employer contributions to plans are envisioned by the Act. If management administration of the plan were to create conflict of interest this would mean that the administrator's decisions were in many cases to be subject to *de novo* review. This result seems at odds with the Act and the judicial gloss, which contemplate a narrow scope of review of benefit denials in the vast majority of cases. I hold that management control of plan administration does not create a conflict of interest sufficient to change the standard of review.

Here the plaintiff suggests a more narrow ground for conflict, *i.e.*, that the specific form of compensation the Committee members receive from the company means that the grant of benefit here will reduce their personal compensation. To learn if this is so, the plaintiffs seek discovery. I express no view on whether, if plaintiffs' hypothesis is true, there is a conflict of interest sufficient to raise valid doubt as to the exercise of the Committee's discretion. The question should not, however, be decided in the abstract. The plaintiffs are therefore entitled to discover

(1) Whether granting of benefits to the class of plaintiffs here would require contributions by Sun to the Plan within the next two years;

(2) If the answer to the above question is yes, the plaintiffs may discover whether and to what degree the compensation of any Committee member would be reduced in the next two years by such contributions;

(3) If the granting of benefits to the plaintiff class would have a substantial effect upon compensation

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of a majority of Committee members, then discovery may proceed as to whether the members were aware of such effects.

By permitting discovery, I do not wish to imply that either plaintiffs or defendants would prevail under a *de novo* review standard.

For the reasons stated above, Counts II and III are dismissed. The motion for summary judgment is entered and continued as to the remainder of the complaint. The limited discovery I have permitted is to be completed by August 15, 1989. Further status in this matter is set for 9:30 a.m. August 16, 1989.

> FN1. Plaintiffs sought class certification for a class defined as:
>
> All persons who are or were covered by the Sun Electric Corporation Pension Plan as amended and restated July 1, 1981, (the "Plan") who:
>
> (a) received as part of their compensation, in addition to their base salary, commissions based on either sales made by any Sun Electric employees subordinate to them, or sales performance of the Company or any of its regions, divisions, units or subsidiaries, or
>
> (b) elected to take, or will elect in the future, early retirement benefits less than 120 months before the "Normal Retirement Date" of 65 as defined in the Plan.
>
> Defendants did not object to this certification and seeing no grounds to deny certification, I granted the motion.

N.D.Ill.,1989.
Lister v. Stark
Not Reported in F.Supp., 1989 WL 88241 (N.D.Ill.), 11 Employee Benefits Cas. 1611

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                          Page 1
Not Reported in F.Supp., 1989 WL 31056 (N.D.Ill.)
(Cite as: Not Reported in F.Supp., 1989 WL 31056 (N.D.Ill.))

**H**

Lister v. Stark

N.D.Ill.,1989.

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern
Division.

Arthur LISTER, Plaintiff,

v.

H. Allan STARK, James Nugent, Sun Electric Cor-
poration and Sun Electric Pension Trust, Defend-
ants.

No. 88 C 10616.

March 27, 1989.

*MEMORANDUM OPINION AND ORDER*

MAROVICH, District Judge.

*1 Plaintiff Arthur Lister ("Lister") brought this ac-
tion in Illinois Circuit Court of McHenry County
seeking a declaratory judgment that he is entitled to
additional benefits under the Sun Electric Corporate
Pension Plan. The defendants, H. Allan Stark,
James Nugent, Sun Electric Corporation, and Sun
Electric Pension Trust, then removed the action to
this court.

Presently before this court are defendants' motion
to dismiss and Lister's motion to remand. For the
reasons stated herein, defendants' motion to dismiss
is granted and Lister's motion to remand is denied.

*I. Statement of Facts*

For purposes of the motions to remand and dismiss,
the court accepts the factual allegations of the com-
plaint, along with all reasonable inferences there-
from, as true. *Armbruster v. Benefit Trust Life Ins.
Co.,* 687 F.Supp. 403, 404 (N.D.Ill.1988), citing
*Meriwether v. Faulkner,* 821 F.2d 408, 410 7 th
Cir.1987).

Arthur Lister's employment for Sun Electric Cor-

poration ("Sun Electric") began in July, 1964. He
worked as a salesman for the company until April,
1970. At that time, Lister left the employ of Sun
Electric and started working for another company.

Several months later, on January 1, 1971, Lister re-
turned to work at Sun Electric after the company
promised that, with respect to employment benefits,
he would receive credit for uninterrupted service
for the prior 6 years with the company. He was also
promised that he would not be treated as a new em-
ployee upon his return. Lister was later promoted to
regional sales manager in 1975.

Lister remained at Sun Electric until he was forced
to retire on August 15, 1982. On August 11, 1987,
Lister contacted Sun Electric for a preliminary de-
termination of his pension plan benefits. In Novem-
ber 1987, the company denied his claim for credit
of uninterrupted service.

*II. Discussion*

Lister filed this two count breach of contract and
fraud claims in state court. Defendants removed
this action to this court and now seek dismissal.
Both the removal and the motion to dismiss are
based on a single contention: that Lister's state law
breach of contract and fraud claims are pre-empted
by the Employment Retirement Income Security
Act of 1974 ("ERISA"), 9514(a), 29 Section
1144(a). Lister opposes the motion to dismiss on
the ground that the state law claims do not chal-
lenge either the terms of the pension plan or its ad-
ministration. Rather, the complaint seeks damages
from Sun Electric for the service credit he was
promised but did not receive. Lister contends that
because the claims do not relate to the plan in any
meaningful way, the motion to dismiss should be
denied and this case remanded to state court.

Section 514 of ERISA provides:

[T]he provisions of [ERISA] ... shall supersede any

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 2
Not Reported in F.Supp., 1989 WL 31056 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1989 WL 31056 (N.D.Ill.))**

and all state laws insofar as they may now or here-after *relate to* any employee benefit plan ...

29 U.S.C. Section 1144(a) (emphasis added). The scope of this pre-emption provision is very broad. *See Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 45-46 (1987) ("the express pre-emption provisions of ERISA are deliberately expansive and designed to 'establish pension plan regulation as exclusively a federal concern.' ") (quoting *Alessi v. Raybestos-Manhattan, Inc.,* 451 U.S. 504, 523 (1981)).

**\*2** The Supreme Court stated in *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 96-97 (1982), that "a law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has connection with or reference to such a plan." The court then emphasized that the pre-emption is not limited to "state laws specifically designed to affect employee benefit plans." *Id.* at 98.

In *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41 (1987), and *Metropolitan Life Ins. Co. v. Taylor,* 481 U.S. 58 (1987), the Supreme Court held that state common law tort and contract actions asserting improper processing of a claim for benefits under an employee benefits plan are pre-empted by ERISA.

Other circuits have found that the state law claims in question are pre-empted by ERISA. In *Jackson v. Martin Marietta Corp.,* 805 F.2d 1498 (11th Cir.1986), the plaintiff, as in this case, claimed that his employer had promised retroactive service credits which the plan later failed to provide when calculating his benefits. The plaintiff brought a state law claim for breach of contract, rather than ERISA. The Court held that the state law claim directly impacted the administration of an employee benefit plan and, thus, was pre-empted by ERISA. *Id.* at 1500. *See also Straub v. Western Union Telegraph Co.,* 851 F.2d 1262 (10th Cir.1988) (State law breach of contract and misrepresentation claims against employer, for promised benefit increases not granted by plan, pre-empted); *Anderson v. John Morrell & Co.,* 830 F.2d 872 (8th Cir.1987)

(ERISA preempted breach of contract action against employer for benefit increases not granted by plan); *Nevill v. Shell Oil Co.,* 835 F.2d 209 (9th Cir.1987) (breach of contract, fraud and other state claims pre-empted).

In this suit, Lister filed not only against Sun Electric but also two trustees of the pension plan as well as the pension trust itself. Lister contends that the plan erred when it denied his claim for more service credits than the plan initially determined he had accrued. Lister seeks a declaration that he is entitled to:

uninterrupted service credit for the period from July, 1964 to January, 1971 for the purpose of calculating his pension benefits. (Complaint, prayer for relief, ¶ (a))

Moreover, Lister attaches the plan document as an exhibit to the complaint, and alleges that he has "exhausted [his] available intra-plan remedies." *Id.* at ¶ 14. Clearly, Lister's complaint which seeks payment of benefits, on its face, "relate to" an employee benefit plan and, therefore, falls under ERISA's pre-emption clause.

Lister primarily relies on *Greenblatt v. Budd Co.,* 666 F.Supp. 735 (E.D.Pa.1987); and *Totten v. New York Life Ins. Co.,* 682 F.Supp. 731 (D.Conn.1987), to support his position that ERISA does not pre-empt the state law claims at issue here.[FN1]

We decline to follow these cases in light of the Supreme Court's decisions in *Pilot Life* and *Metropolitan Life Ins. Co.* as well as the overwhelming appellate court opinions to the contrary. Accordingly, the action was properly removed to this court and defendants' motion to dismiss is granted. *See Armbruster, supra,* 687 F.Supp. at 405, n. 1 ("... plaintiffs must properly plead their claim under ERISA before the relief requested is available in any court").

III. *Conclusion*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**\*3** For the reasons stated above, defendants' motion to dismiss is granted and plaintiff's motion to remand is denied.

> FN1. In *Fort Halifax Packing Co., Inc. v. Coyne,* --- U.S. ----,107 S.Ct. 2211 (1987) the Supreme Court held that a state law claim based on a Maine statute that required employees to provide one time severance payment to employees in the event of plant closings was not pre-empted by ERISA. The Supreme Court found that ERISA did not pre-empt the Maine statute because ERISA was only designed to pre-empt state laws which related to employee benefit *plans,* rather than to employee *benefits.*

> Noting the distinction drawn in *Fort Halifax,* the courts in *Greenblatt,* 666 F.Supp. 735 (E.D.Pa.1987), and *Totten,* 682 F.Supp. 731 (D.Conn.1987), refused to pre-empt state law claims because the claims did not impact upon an employee pension benefit *plan.* In *Greenblatt,* plaintiff brought a common law fraud action against his former employee, claiming that the company misrepresented to him that his pension benefits would be the same as that received by another group of employees. In *Totten,* former employees brought a wrongful discharge action against their former employer. As stated in this opinion, we decline to follow these two lower court opinions in view of the overwhelming opinions to the contrary.

N.D.Ill.,1989.
Lister v. Stark
Not Reported in F.Supp., 1989 WL 31056 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                              Page 1
Not Reported in F.Supp., 1997 WL 323827 (N.D.Ill.), 3 Wage & Hour Cas.2d (BNA) 1710
**(Cite as: Not Reported in F.Supp., 1997 WL 323827 (N.D.Ill.))**

▷
Krieger v. Adler, Kaplan & Begy
N.D.Ill.,1997.

United States District Court,N.D. Illinois.
Roy W. KRIEGER, Plaintiff,
v.
ADLER, KAPLAN & BEGY, (a partnership), Defendant.
**No. 94 C 7809.**

June 11, 1997.

*MEMORANDUM OPINION AND ORDER*

LEINENWEBER

**\*1** Plaintiff Roy Krieger ("Krieger") sues defendant Adler, Kaplan & Begy ("AKB"), a Chicago law firm that terminated his employment as an associate. Although Krieger filed a fifteen-count complaint, ten of those counts were dismissed by this court on January 5, 1996. *Krieger v. Adler, Kaplan & Begy,* No. 94 C 7809, 1996 WL 6540 (N.D.Ill. Jan. 5, 1996). Remaining are claims of fraud, breach of contract, violations of the Illinois Wage Payment and Collection Act, 820 ILCS 115/1*et seq.* (West 1993 & Supp.1997), and unfair competition, as well as a claim for an accounting under Illinois law. Defendant now moves for summary judgment. For the following reasons, defendant's motion is granted in part and denied in part.

*BACKGROUND*

The facts of this case are spelled out in the court's opinion on defendant's motion to dismiss. *Krieger,* 1996 WL 6540. Therefore, the court will confine itself to a short statement of facts.

As of early 1991, Krieger, who worked as a "resident partner" for the law firm of Kroll & Tract ("Kroll"), and AKB were competitors in the field of aviation law. However, in August, 1991, plaintiff's employment with Kroll was terminated, apparently because Krieger refused to relocate to New York. Krieger contacted Fred C. Begy, III ("Begy"), one of the name partners at AKB, to discuss the possibility of joining AKB and opening a Washington, D.C. office. Krieger mentioned that he had just received a $60,000 retainer from Executive Credit Corporation ("ECC") in connection with a fraud case that he could bring to the firm. Begy rejected the notion of opening a Washington, D.C. office, but offered to discuss the possibility of Krieger joining the Chicago office of AKB.

Plaintiff discussed this possibility with Begy in a series of conversations in August, 1991. According to plaintiff, during these negotiations, Begy told him that AKB was a well-managed, stable law firm that would provide plaintiff with client introductions and assist him in developing new business and his professional reputation. Plaintiff asserts that Begy also told him that, while he could not immediately make plaintiff a partner, the firm had an established partnership track and plaintiff would become a partner a short time after joining AKB. Until then, the firm would create a separate category of "Senior Trial Attorney" in order to show the professional world that Krieger held a status higher than "associate." Begy stated that AKB planned to promote four additional associates to this title in order to preserve its partnership track. Plaintiff also contends that Begy promised to pay him $85,000 per year plus a bonus of 10% on all fees collected from business brought to the firm by plaintiff. Begy also agreed to accept the ECC case and transfer of the $60,000 retainer.

At the time, plaintiff, who lived and was licensed to practice law in Washington, D.C., had an offer to join the D.C.-based Pension Benefit Guarantee Corporation ("PBGC"), contingent upon approval from the Office of Management and Budget ("OMB"). However, based upon the negotiations with Begy, plaintiff declined to pursue this offer, moving instead to Chicago to join AKB. In doing so, Krieger

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 323827 (N.D.Ill.), 3 Wage & Hour Cas.2d (BNA) 1710
**(Cite as: Not Reported in F.Supp., 1997 WL 323827 (N.D.Ill.))**

canceled his Criminal Justice Act eligibility status in the District of Columbia.

**\*2** Prior to plaintiff's August 27, 1991 start date, James Bragg, AKB's Business Manager, sent plaintiff a letter outlining the terms of the employment agreement. Krieger contends that the letter changed certain material terms and omitted others. The letter states that plaintiff will be joining AKB's "associate staff" in the position of "senior trial attorney," at a salary of $85,000. Additionally, a "discretionary" bonus, not less than 10% of the fees received from new clients plaintiff brought to the firm, would be paid at the end of 1991. Furthermore, AKB agreed to consider Krieger for "non-equity partner" within two years. Because plaintiff was on vacation, however, he did not receive this letter until several weeks after joining AKB. Though the letter conflicted with plaintiff's understanding of the agreement in numerous material ways, according to plaintiff, he did not formally object to the contents of the letter so as to not "disaffect Defendant." Pl.'s Resp. at 14.

The year-and-a-half relationship was rocky from the beginning. Rather than holding plaintiff out as a "Senior Trial Attorney," Krieger's name continued to be listed on firm letterhead under the heading of "associate"; the firm also listed him as an associate in the *Martindale-Hubbell Law Directory.* In late 1991 and early 1992, Krieger traveled to London in connection with an aviation case and to deliver a keynote address at an aviation insurance convention. On the first trip, AKB told Krieger to concentrate on existing firm business and not use the trip to call on his contacts. After the second trip, Krieger told the firm about a possible client with whom he had met and who had potential business for the firm, but the firm decided not to follow-up on the lead. According to plaintiff, by not allowing Krieger to cultivate his contacts, his opportunities for generating business and increasing his value professionally were stymied.

Over the following year, plaintiff and defendant disagreed over travel reimbursements and the hand-

ling of cases. In November, 1992, Krieger was invited to deliver another presentation in London, but AKB refused to pay for the trip. Krieger, therefore, traveled to London at his own expense, though he did entertain some firm clients while in London.

On February 2, 1993, Krieger was informed that AKB planned to discharge him. Several checks were offered to Krieger representing a $250.00 bonus for 1992 and reimbursement for various expenses. Plaintiff declined to accept most of these checks for fear of waiving his right to contest the amounts owed to him. For instance, Krieger believes he was entitled to a much larger bonus in 1992 from fees generated in the ECC litigation.

On March 3, 1993, Begy informed Krieger that he would be terminated at noon the next day, although he would be paid through March 5, 1993. Though ECC decided to continue having their case handled by AKB, they demanded that Krieger take two depositions scheduled to be held in California the week of March 8, 1997. Krieger agreed to take these depositions despite the fact that AKB agreed to pay only his plane fare and not his salary for the week.

*SUMMARY JUDGMENT*

**\*3** According to Rule 56, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). Therefore, "[a] plaintiff cannot rest on mere allegations of a claim without any significant probative evidence which supports his complaint." *Bond v. American Med. Assoc.,* 764 F.Supp. 122, 123 (N.D.Ill.1991) (citations omitted); *see also*FED.R.CIV.P. 56(e). Once a defendant brings a summary judgment motion, a nonmoving plaintiff who will ultimately bear the burden of proof on an issue at trial, must go beyond the pleadings, depositions, answers to inter-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 3
Not Reported in F.Supp., 1997 WL 323827 (N.D.Ill.), 3 Wage & Hour Cas.2d (BNA) 1710
**(Cite as: Not Reported in F.Supp., 1997 WL 323827 (N.D.Ill.))**

rogatories, and admission, and through affidavits or other competent evidence, show that there is a genuine issue of material fact to be resolved at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553 (1986). Additionally, the court is not obligated to search exhaustively through the record for evidence that will defeat a defendant's summary judgment motion; the court must rely on the plaintiff to point to the evidence upon which he or she relies. *Bombard v. Fort Wayne Newspapers, Inc.,* 92 F.3d 560, 562 (7th Cir.1996). The evidence relied upon must be competent evidence which would be admissible at trial. *Id.*

### FRAUDULENT INDUCEMENT

Under Count I, Krieger argues that defendant made material, factual misrepresentations aimed at luring him into accepting employment with AKB. There are two categories of statements to which plaintiff refers. The first category includes statements related to defendant's stability and existing structure. The second category includes express promises made to Krieger as to the conditions of his employment.

Turning to the first category of statements, Krieger accuses Begy of having falsely represented, during negotiations, that "Defendant had excellent established relations with aviation insurers worldwide, including AIG Aviation and other of Plaintiff's client contacts, [and] that Defendant was a reputable, well managed, stable law firm, providing ethical practice of law, and proper staffing, management and supervision of matters in litigation." Pl.'s 12(N) ¶ 81; *see also* Krieger Dep. at 321. Plaintiff alleges that defendant made these statements knowing that they were false in order to induce plaintiff into accepting employment with AKB. Pl.'s Resp. Mem. at 23.

"Under Illinois law, to succeed in an action for fraud a plaintiff must prove: (1) that the defendant made false statements of material fact, (2) knowing that they were false, and (3) intending that the

plaintiff would rely on them; (4) that plaintiff did rely, (5) that this reliance was justified, and that (6) plaintiff suffered damage as a result." *General Motors Acceptance Corp. v. Central Nat'l Bank of Mattoon,* 773 F.2d 771, 778 (7th Cir.1985). Plaintiff, however, cannot prove the first or the fifth elements.

**\*4** A statement that merely expresses an opinion is generally not actionable misrepresentation. *Peterson Indus. v. Lake View Trust & Sav. Bank,* 584 F.2d 166, 169 (7th Cir.1978). "[A] representation is one of opinion rather than fact if it only expresses the speaker's belief, without certainty, as to the existence of a fact." *Lagen v. Balcor Co.,* 210 Ill.Dec. 773, 778, 653 N.E.2d 968, 973 (Ill.App.Ct.1995) (quoting *Marino v. United Bank of Ill.,* 92 Ill.Dec. 204, 484 N.E.2d 935)). For instance, financial projections are usually considered to be statements of opinion. *Id.* Similarly, statements that recommend a seller's product are considered to be statements of opinion by the seller and do not constitute fraud. *Sandy Creek Condominium Assoc. v. Stolt and Egner, Inc.,* 204 Ill.Dec. 709, 715, 642 N.E.2d 171, 177 (Ill.App.Ct.1994). In determining whether a statement is one of fact or opinion, the court looks to the surrounding facts and circumstances. *LaScola v. U.S. Sprint Communications,* 946 F.2d 559, 568 (7th Cir.1991). Specifically, the court must:

focus on the circumstances surrounding the representation[s] to determine whether the plaintiff may have justifiably relied on the opinion as though it were a statement of fact. Among the relevant factors in such a case are the access of the parties to outside information and the relative sophistication of the parties.

*Id.* (quoting *West v. Western Cas. and Sur. Co.,* 846 F.2d 387, 393 (7th Cir.1988)).

In the present case, even if defendant did make statements that touted the quality and reputation of AKB, such statements were made in the process of recruiting Krieger. As the Seventh Circuit noted in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 323827 (N.D.Ill.), 3 Wage & Hour Cas.2d (BNA) 1710
(Cite as: Not Reported in F.Supp., 1997 WL 323827 (N.D.Ill.))

Page 4

*LaScola,* such puffery is common between a pro-spective employer and employee and are "merely statements of opinion [that] 'cannot qualify as fraudulent misrepresentations.' " 946 F.2d at 56 (quoting *Spiegel v. Sharp Elecs. Corp.,* 81 Ill.Dec. 238, 242, 466 N.E.2d 1040, 1044 (Ill.App.Ct.1984)). Plaintiff could not have justifi-ably relied on such obvious self-touting. This is es-pecially true in the present case, where Krieger was an experienced aviation lawyer who could have called his contacts, as well as former employees of AKB, to inquire as to whether AKB was, in fact, a stable, well-respected firm. *See Peterson,* 584 F.2d at 169. Although it might, for example, be argued that had Begy specifically stated that relations with AIG, a large and important underwriter, were good, that would have been a statement of fact rather than opinion, plaintiff admits that Begy never specific-ally mentioned relations with AIG. Krieger Dep. at 322.

Plaintiff also contends that defendant concealed facts indicating its internal instability, such as its excessive turnover in attorneys, its discharge of an attorney for her refusal to conceal evidence, its poor administration, its lack of an established part-nership track, and its poor rate of promoting asso-ciates to partner, having promoted only one asso-ciate to partner in its four year existence. As to these claims, the court similarly finds that no reas-onable jury could find that such omissions consti-tuted fraud. For the same reasons that Krieger could not have justifiably relied on affirmative represent-ations of defendant's quality and reputation, Krieger could not reasonably have expected AKB to point to all the negative aspects of the firm when in the process of recruiting him. While it is true that Illinois does not create a general duty of reasonable care by victims of deliberate frauds, a victim that ignores a known or obvious risk cannot recover. *AMPAT/Midwest, Inc. v. Illinois Tool Works Inc.,* 896 F.2d 1035, 1041-42 (7th Cir.1990). It is obvi-ous that, during negotiations, a potential employer will stress only the positive aspects of its firm. Krieger was an experienced attorney who should

have recognized this danger and who could have easily done a background check on AKB. Looking at the past few years of the *Martindale-Hubbell Law Directory,* for instance, would have shown the high turnaround at AKB, as well as the fact that only one associate had made partner in four years. The rest of the alleged concealed facts could easily have been discovered with a few phone calls to col-leagues and past employees at AKB. It is not un-reasonable to expect plaintiff to make some small effort to investigate the firm he is considering join-ing.

**\*5** Additionally, in order to prove fraud through concealment of material facts, plaintiff must show that defendant had a duty to disclose. *In re Mar-riage of Broday,* 195 ill. dec. 326, 331, 628 N.E.2d 790, 795 (Ill.App.Ct.1994). During negotiations there was no fiduciary relationship between plaintiff and defendant and, therefore, no such duty existed. Thus, under the facts of this case, the al-leged concealment cannot constitute fraud.

Finally, as to whether defendant fraudulently mis-represented that AKB had an established partner-ship track, it is unclear to the court whether plaintiff is alleging that defendant lied by stating that such a set structure existed, or that defendant fraudulently concealed the fact that there was no partnership track, or both. In arguing these claims, plaintiff mainly points to the fact that only one AKB associate was promoted to partner in four years. Such evidence does not lead to the conclu-sion that a partnership track did not exist. Defend-ant may very well have had a partnership track, of which only one person met the requirements. In fact, plaintiff points to a statement made by Begy at his deposition in which Begy asserts that the firm did have a partnership track at the time he talked with plaintiff in August, 1991. Begy Dep. at 100. However, plaintiff does offer the testimony of James E. Beckley, apparently a former partner at AKB who left the firm just prior to plaintiff's ar-rival. Beckley states in his deposition that he did not know of a written policy on the promotion of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                    Page 5
Not Reported in F.Supp., 1997 WL 323827 (N.D.Ill.), 3 Wage & Hour Cas.2d (BNA) 1710
**(Cite as: Not Reported in F.Supp., 1997 WL 323827 (N.D.Ill.))**

non-partners to partners. Beckley Dep. at 17. When asked if he was aware of an established partnership track, Beckley responded, "Hell if I know." *Id.* Beckley's ignorance of any established partnership track is suspicious. Thus, the court finds that there is a genuine issue of material fact as to whether such a track did exist and, if it did, whether Krieger was justified in relying on Begy's assertion that there was such a policy.

The court next turns to the alleged promises made to plaintiff regarding the plaintiff's conditions of employment. Plaintiff asserts that Begy represented to him that defendant would: (1) pay him an annual bonus of not less than 10% of fees collected from new clients plaintiff brought to the firm; (2) make plaintiff a partner soon after Krieger joined the firm; (3) provide client introductions; (4) assist plaintiff in developing his professional reputation and support plaintiff's efforts to develop business from which he would receive the bonus; and (5) provide plaintiff with the title of "Senior Trial Attorney," hold him out as such, and create a separate class of attorneys so designated. Pl.'s 12(N) ¶ 81. Plaintiff argues that these promises were not kept and that he was defrauded into rejecting another job offer in reliance on the promises. Defendant claims that summary judgment is warranted as the alleged representations were only statements of future intent and plaintiff has not produced evidence that defendant did not intend to keep its alleged promises at the time they were made. Def.'s Reply Mem. at 4.

**\*6** Promissory fraud is not actionable in Illinois unless the false promise or representation of intended future conduct is part of a "scheme" to defraud. *J.H. Desnick. M.D. v. American Broadcasting Cos., Inc.,* 44 F.3d 1345, 1354 (7th Cir.1995) (citing Illinois law). The "scheme" exception applies whenever "a party makes a promise of performance, not intending to keep the promise but intending for another party to rely on it, and where the other party relies on it to his detriment." *Bower v. Jones,* 978 F.2d 1004, 1011 (7th Cir.1992) (quoting *Concord Indus., Inc. v. Marvel Indus. Corp.,* 78

Ill.Dec. 898, 901, 462 N.E.2d 1252, 1255 (Ill.App.Ct.1984)). However, "[p]romissory fraud is a disfavored cause of action in Illinois because fraud is easy to allege and difficult to prove or disprove." *Bower,* 978 F.2d at 1012 (citing *Hollymatic Corp. v. Holly Systems, Inc.,* 620 F.Supp. 1366, 1369 (N.D.Ill.1985)). The limitation on such actions reflects an interest in preventing every breach of contract claim from becoming a suit for fraud. *J.H. Desnick,* 44 F.3d at 1354. Therefore, the plaintiff has a high burden.

In order to survive the pleading stage, a claimant must be able to point to specific, objective manifestations of fraudulent intent-a scheme or device. If he cannot, it is in effect presumed that he cannot prove facts at trial entitling him to relief. If the rule were otherwise, anyone with a breach of contract claim could open the door to tort damages by alleging that the promises broken were never intended to be performed. Presumably, it is this result that the Illinois rule seeks to avoid.

*Bower,* 978 F.2d at 1012 (quoting *Hollymatic,* 620 F.Supp. at 1369).

Turning first to the alleged promise to pay Krieger not less than 10% of the fees collected from new clients plaintiff brought to the firm, the court finds summary judgment warranted. While plaintiff may or may not have a valid claim against AKB for breach of contract, there is no evidence in the record that AKB did not intend to pay Krieger this bonus at the time the representation was made. In fact, plaintiff admits that defendant did pay him the proper bonus in 1991. Pl.'s Resp. Mem. at 28. Without any evidence of a fraudulent intent, there is no genuine issue of material fact.

Turning next to the alleged promise that plaintiff would be made a partner soon after joining the firm, the court finds no credible evidence leading to the conclusion that such a promise was fraudulently made. While defendant may or may not have told Krieger that the firm had a partnership track, the direct evidence plaintiff points to in order to prove

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 6
Not Reported in F.Supp., 1997 WL 323827 (N.D.Ill.), 3 Wage & Hour Cas.2d (BNA) 1710
(Cite as: Not Reported in F.Supp., 1997 WL 323827 (N.D.Ill.))

the promise of imminent partnership is quite weak. Plaintiff asserts that Begy told him during negotiations that the firm could not make Krieger "a deal on the front end," but could make him "a deal on the back end." Krieger Dep. at 376. According to Krieger, these words conveyed that partnership would be imminent. "He told me that I would be a partner within a short period of time. I don't know if he specifically said two years at that point in time during that conversation." *Id.* at 366.

*7 As for the statement that a deal could only be made "on the back end," such a statement is too vague to be considered a false statement of material fact. Such a statement could have a host of different interpretations and plaintiff certainly could not have justifiably relied on such a statement as a promise of future partnership. Furthermore, even if Begy had told plaintiff that he would be made a partner within "a short time," plaintiff cannot point to any specific time frame in which Begy promised partnership. *Id.* Such a promise is, therefore, too indefinite to be relied upon. There is no evidence in the record that at the time such a statement was made, Begy did not intend to make Krieger a partner within a few years. Obviously, the relationship deteriorated quickly; it is quite possible that Begy changed his mind. Thus, there is no genuine issue of material fact that this statement was fraudulently made.

As to the alleged promises that defendant would provide client introductions, assist plaintiff in developing his professional reputation, and support plaintiff's efforts to develop business from which he would receive the bonus, the court finds that there are no genuine issues of material fact. Plaintiff argues that defendant promised to support his "efforts to develop business through providing trips to London," Pl.'s 12(M) ¶ 41, but that, while sending him to London twice, defendant prevented plaintiff from taking advantage of such contacts. Plaintiff points first to the December, 1991 trip, in which plaintiff was sent to London on firm business, but was instructed by Begy to focus only on the specific case

the firm was in London to work on and not to meet with contacts. Begy Dep. at 156. Next, Krieger points to the second London trip in February, 1992, in which plaintiff traveled to London to give a speech. According to plaintiff, an adjuster in the Lloyd's claims office, Bob Chapman, contacted plaintiff after the speech to discuss whether AKB would be interested in assisting him in the litigation of the Nation Air crash in Saudi Arabia. Begy Dep. at 187. However, after Krieger told Begy of this conversation, Begy did not make any effort to contact Chapman. *Id.* at 189. According to Begy, defendant had previously had conversations with Belmont & Sons, the London firm litigating the case for Chapman, about assisting in the case, and Begy felt there was no opportunity for AKB to get involved in the case. *Id.*

Even if the court assumes that the above facts are true, with all inferences given to plaintiff, Krieger has not provided any evidence of fraudulent intent. At the time Begy represented to defendant that AKB would support plaintiff's development of business with trips to London, he may very well have intended to provide these trips. Plaintiff admits that on his second trip to London he was allowed to contact clients. More importantly, however, by providing plaintiff with two trips to London, defendant did expose Krieger to the London market. By allowing Krieger to interact with London clients and by paying for him to travel to London to give a speech, defendant assisted plaintiff in fostering contacts. The assistance may not have been to the extent plaintiff wished or even to the extent required by the alleged oral agreement, however, no reasonable jury could find that when Begy offered such assistance, he did so with the intention of fraudulently inducing plaintiff into accepting employment.

*8 Finally, turning to the alleged promises that defendant would provide plaintiff with the title of "Senior Trial Attorney," would hold him out as such, and would create a separate class of attorneys so designated, the court finds that genuine issues of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 323827 (N.D.Ill.), 3 Wage & Hour Cas.2d (BNA) 1710
(Cite as: Not Reported in F.Supp., 1997 WL 323827 (N.D.Ill.))

Page 7

material fact do exist, making summary judgment inappropriate. Plaintiff asserts that during negotiations, without any intention of following through, Begy made these promises in order to lure plaintiff into employment. Begy argues that he told Krieger only that plaintiff could hold himself out as a "Senior Trial Attorney," not that a separate category of attorneys would be created or that the firm would hold him out as such. Begy Dep. at 101-02. Giving plaintiff the benefit of the doubt, the court cannot say at this time that defendant did not make the alleged representations. In fact, the August 19, 1991 letter sent to Krieger by AKB business manager James R. Bragg, specifically states that AKB is "pleased that [Krieger] has accepted the position of senior trial attorney" with AKB, Krieger Dep. Ex. 8, although it also states the Krieger will be joining AKB's "associate staff." *Id.* Given the fact that the letter was sent soon after Begy made the alleged promise, and the fact that within a matter of months it became apparent that AKB had no intention of holding Krieger out as anything but an "associate," a reasonable jury could find that Begy made an express promise that he never had an intention of keeping. Additionally, a reasonable jury could find that plaintiff relied on this promise in moving to Chicago and in rejecting another job offer.[FN1]

### BREACH OF CONTRACT

In Count III of plaintiff's Amended Complaint, Krieger asserts that the two parties entered into an oral contract that included the following terms: (1) AKB would employ plaintiff as a "Senior Trial Attorney," and hold him out as such; (2) AKB would grant plaintiff partnership imminently; (3) AKB would permanently employ plaintiff; (4) AKB would pay plaintiff $85,000/year plus an annual bonus of not less than 10% of the fees collected from new clients brought in by plaintiff; (5) AKB would promote plaintiff; and (6) AKB would support plaintiff's efforts to develop business and would introduce plaintiff to new clients. Defendant moves for summary judgment arguing that the oral con-

tract is barred by the statute of frauds and that the alleged terms are not clear and definite.

The Illinois Statute of Frauds reads as follows:

No action shall be brought ... upon any agreement that is not to be performed within the space of one year from the making thereof, unless the promise or agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or some other person thereunto by him lawfully authorized.

740 ILCS 80/1 (West 1993). The Illinois courts have interpreted this statute to mean that a contract must be put in writing if it is not capable of being performed within a year. *Lamaster v. Chicago & N.E. Ill. Dist. Council of Carpenters Apprentice and Trainee Program,* 766 F.Supp. 1497, 1507 (N.D.Ill.1991). The question the court faces, therefore, is whether the oral contract, as alleged by Krieger, is capable of being performed within a year.

*9 Krieger's amended complaint states that Begy required plaintiff to agree never to leave the employment of AKB. Am Compl. ¶ 18. In its January 5, 1996 ruling, the court ruled that such a requirement did not create an implied promise of permanent employment. Therefore, plaintiff was an at-will employee with no claim to permanent employment. *Krieger,* 1996 WL 6540, at *6. Although there is a striking absence of recent case law on this subject, the court finds that an oral contract for at-will employment is outside the scope of the Statute of Frauds. *See Balstad v. Solem Machine Co.,* 168 N.E.2d 732, 734 (Ill.App.Ct.1960) (concluding that an at-will employment contract is outside the scope of the Statute of Frauds); *see also Lamaster,* 766 F.Supp. at 1506-09 (discussing history of Illinois Statute of Frauds extensively). Since neither party was required to continue performance of the contract for any specific length of time, plaintiff's resignation or defendant's termination of the contract within a year would have caused the contract

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 323827 (N.D.Ill.), 3 Wage & Hour Cas.2d (BNA) 1710
**(Cite as: Not Reported in F.Supp., 1997 WL 323827 (N.D.Ill.))**

to be performed within one year of contracting. Therefore, the alleged oral contract is outside the scope of the statute of frauds.

Additionally, defendant asks the court to find the alleged contract term for a 1992 bonus barred by the Statute of Frauds since, under the terms of the alleged contract, the 1992 bonus would not be paid until well beyond a year from the date of contracting. To so hold, the court would have to find that the 1992 bonus term is an agreement separate from the 1991 bonus term. Defendant has cited no case law supporting the concept of breaking a contract into individual terms for Statute of Frauds purposes and the court declines to do so here. The entire contract could have been performed within a year of contracting and, therefore, the annual bonus term is not barred by the Statute of Frauds.

Defendant argues in the alternative that the alleged terms were not clear and definite and are, therefore, barred under Illinois law. Under Illinois law, the terms of an employment contract must be clear and definite. *Duldulao v. Saint Mary of Nazareth Hosp. Ctr.,* 106 Ill.Dec. 8, 12, 505 N.E.2d 314, 318 (Ill.1987). The question of whether the alleged promises in the oral contract are clear and definite is a question of law to be determined by the court. *Mansourou v. John Crane, Inc.,* 188 Ill.Dec. 119, 122, 618 N.E.2d 689, 692 (Ill.App.Ct.1993).

The court has already found that defendant did not offer permanent employment and, therefore, will not discuss this alleged term. It is evident that the promise to employ plaintiff as a "Senior Trial Attorney" and to hold him out as such is clear and definite, as are the salary terms, including the bonus. Additionally, the court finds that the alleged promise to promote defendant and to support plaintiff's development of business, while open to different interpretations, could be considered to be an offer. However, as to the alleged promise to make Krieger a partner within "a short period of time," such a term is too vague to be considered an offer. Plaintiff asserts that Begy told him that, while he could not make him a partner immediately, he could make him "a deal on the back end." Such a statement is also too vague to be considered a definite term. Therefore, the court finds that defendant's alleged promise to make plaintiff a partner is too indefinite to be considered a term of the contract and grants summary judgment as to this issue. In addition, since the court has already ruled that the contract did not contain a promise of permanent employment, summary judgment is appropriate as to this alleged contract term as well. The remainder of the terms are all that can be considered to be part of the alleged oral contract.[FN2]

## ILLINOIS WAGE PAYMENT AND COLLECTION ACT

**\*10** In Count 11, Krieger claims that unreimbursed costs for hotels, meals, transportation, and other expenses, as well as unpaid bonus money and the salary he never received for the week of March 8, 1993, constitute amounts owed to him as "final compensation" under the Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS 115/1*et seq.* (West 1993 & Supp.1997). Specifically, plaintiff claims the following amounts are unpaid: (1) cost of hotel, meals, transportation and incidentals from the ECC deposition at Riverside, California; (2) mobile telephone and airphone charges incurred during attendance at a continuing legal education program; (3) Krieger's salary for the week of March 8-12, 1993; (4) expenses from his November, 1992 London visit; (5) the Value Added Tax ("VAT") refund plaintiff requested during his November, 1992 London visit; (6) his bonus of at least 10% of ECC fees earned in 1992; and (7) two weeks earned vacation. Am. Compl. ¶ 79. Since the first two of these expenses have now been paid to plaintiff, Pl.'s Resp. Mem. at 35, the court dismisses these allegations as moot. The court will discuss the remainder of the charges in turn.

Krieger alleges that he should be paid for the time he spent working on the ECC case during the week of March 8-12, 1993. During that week, plaintiff took two depositions in Riverside, California at the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                     Page 9
Not Reported in F.Supp., 1997 WL 323827 (N.D.Ill.), 3 Wage & Hour Cas.2d (BNA) 1710
(Cite as: Not Reported in F.Supp., 1997 WL 323827 (N.D.Ill.))

insistence of ECC, who did not want an attorney unfamiliar with the case to conduct the depositions. *Id.* at 35 n. 60.Plaintiff admits that at the time he took these depositions, defendant had not agreed to pay his salary for the week. *Id.*

As a preliminary issue, the court must determine whether plaintiff's claim for additional salary falls within the IWPCA. Under the IWPCA, an employer must pay the employee his "final compensation" at the time of separation. 820 ILCS 115/5 (West 1993). "Final compensation" includes "wages, salaries, earned commissions, earned bonuses, and the monetary equivalent of earned vacation and earned holidays, and any other compensation owed the employee by the employer pursuant to an employment contract or agreement between the 2 parties." 820 ILCS 115/2 (West Supp.1996). Since plaintiff admits defendant had not agreed to pay his salary for the additional week, it is important for the court to determine whether "salary," as defined in the IWPCA, must be pursuant to a contract or agreement.

Unfortunately, because of the awkward way the definition of "final compensation" is written, it is unclear from the text whether the words "an employment contract or agreement" modify every prior term in the sentence or only "any other compensation." The history of the statute sheds some light on this issue. In the original statute, the definition of "final compensation" read as follows: "wages, salaries, earned commissions, earned bonuses, and the monetary equivalent of earned vacation and earned holidays." P.A. 78-914, § 2 (1974). In 1984, the Illinois legislature added the words "and any other compensation owed the employee by the employer pursuant to an employment contract or agreement between the 2 parties." P.A. 83-198, § 1 (1984). In doing so, the legislature did not strike the word "and" found prior to "and the monetary equivalent." Therefore, it appears that the clause added in 1984 stands alone and does not modify the earlier terms. Nevertheless, the court notes that the Illinois legislature had to modify the term "other

compensation" by the requirement that it be found in an employment contract or agreement, since "other compensation" standing alone would be too broad. To the contrary, the term "salary" can stand alone and a natural reading of the statute prior to 1984 would have required "salary" to be found in an employment contract or agreement. Therefore, the court finds that in order to state a claim for "salary" under the IWPCA, the salary must be part of an employment contract or agreement. Since the at-will contract between Krieger and AKB was terminated as of March 5, 1993, the work plaintiff did during the week of March 8, 1993 was not part of a contract or agreement and cannot be considered "salary" under the terms of the IWPCA.[FN3] As such, plaintiff has no claim for salary under the IWPCA.

**\*11** Additionally, plaintiff cannot recover for the work done March 8-12, 1993 under a theory of *quantum meruit. Quantum meruit*"describes the extent of liability on a contract implied by law, and is predicated on the reasonable value of services performed; the basis of recovery is the receipt by a defendant from a plaintiff of a benefit which is unjust for him to retain without paying for it." *Paradise v. Augustana Hosp. and Health Care Ctr.,* 165 Ill.Dec. 147, 150, 584 N.E.2d 326, 329 (Ill.App.Ct.1991). A plaintiff cannot recover under this doctrine, however, if there was "no expectation that defendant would pay for the services rendered." *Id.* Krieger admits that he took the depositions knowing there was no agreement to pay his salary. Pl.'s Resp. Mem. at 35 n. 60. As such, plaintiff cannot seek relief under the doctrine of *quantum meruit.*

As to the expenses plaintiff incurred while in London in November, 1992, the court finds that genuine issues of material fact exist. Defendant claims that plaintiff was not entitled to reimbursement for the expenses since the trip to London was not authorized by the firm. Furthermore, defendant argues that "[p]laintiff never submitted any request for reimbursement." Pl.'s Memo. at 22. Plaintiff,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 10
Not Reported in F.Supp., 1997 WL 323827 (N.D.Ill.), 3 Wage & Hour Cas.2d (BNA) 1710
(Cite as: Not Reported in F.Supp., 1997 WL 323827 (N.D.Ill.))

however, claims that he was entitled to the reimbursement since, while in London, he entertained clients on behalf of the firm. He additionally claims that he did request reimbursement upon returning from London.

At this juncture, there is not enough evidence in the record for the court to determine whether plaintiff is entitled to reimbursement. First, while plaintiff did state in his deposition that he did not submit a voucher for his London expenses "because I was told the firm wasn't going to pay for it," Krieger Dep. at 270-71, it appears from a March 10, 1993 AKB memorandum that plaintiff did, in fact, request reimbursement. According to the memorandum, which was sent by AKB partner Larry Kaplan and addressed to the firm's Managing Partner, James Bragg, Kaplan had offered Krieger a check for $1,103.20 to cover the London expenses Krieger claimed in a December 28, 1992 memorandum, Pl.'s Resp. Mem., Ex. 12, but Krieger rejected the check. Therefore, it appears that Kaplan either believed Krieger was entitled to these funds or had some other unknown reason for offering to pay the expenses. Summary judgment on this issue is denied.

The court turns next to plaintiff's claim for reimbursement of a VAT refund plaintiff requested during his November, 1992 London visit. Plaintiff claimed the VAT refund from a company called FEXCO Tax Reclaim. The refund was for either $146.03 or for $140.03 and was made out to AKB. FEXCO sent the refund check to AKB per the attention of Krieger. Pl.'s Resp. Mem., Ex. 8. Plaintiff claims that the check arrived at AKB after he had already been terminated and that AKB improperly opened the envelope, which was addressed to Krieger, and deposited the check without reimbursing Krieger. Defendant, however, argues that Krieger was never entitled to the check and that AKB, therefore, properly returned the money to FEXCO.

*12 The VAT refund was available only for expenses incurred for "business purposes." Def.'s Mem., Ex. C. If plaintiff could show that the expenses for which plaintiff claimed the refund were incurred entertaining clients, he might be able to prove his claim. However, plaintiff has offered no evidence showing that the expenses were incurred for business purposes. As such the court finds that plaintiff improperly used AKB's business identification number and was not entitled to the refund. Additionally, the court finds that such a refund is not "final compensation" under the IWCPA. Furthermore, plaintiff's claim that defendant illegally opened his mail is not actionable under the IWPCA. Summary judgment is granted as to this issue.

The court next turns to the claim that defendant did not pay Krieger bonus money owed to him in 1992. According to plaintiff, he was entitled to 10% of all fees that were collected from any new client that he brought to the firm. Krieger Dep. at 492. Defendant does not deny this fact. However, the two sides disagree over whether any money from the $56,345.00 retainer that Krieger brought to AKB for use in the ECC case was "collected" in 1992.[FN4] It is defendant's contention that money in the retainer was required to be used first to pay expenses; anything left over would be applied to fees from which plaintiff was to be paid a bonus. Furthermore, defendant argues that it collected $24,500.00 in fees in 1991 from the retainer (for which Krieger was paid a $2,400.00 bonus), but that expenses and costs in 1992 in the ECC cases exceeded the $31,845.00 left in the retainer; therefore, no bonus money was due Krieger. Bragg Aff. ¶¶ 5, 6. Krieger responds by pointing to a document, the source of which the court cannot decipher at this time, which shows that by the end of 1992, expenses in the ECC case totaled $19,997.45. Pl.'s Resp. Mem., Ex. 7. According to plaintiff, this would leave $36,347.55 from which he should have been paid a bonus in 1991 and 1992. Thus, plaintiff claims he should have received a total of $3,634.76 rather than just $2,400.00. There is a genuine issue of material fact to be resolved at trial as to the actual accounting system used to "collect" fees from the retainer and how much in fees was actually "collected" in 1992.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 323827 (N.D.Ill.), 3 Wage & Hour Cas.2d (BNA) 1710
(Cite as: Not Reported in F.Supp., 1997 WL 323827 (N.D.Ill.))

Finally, the court looks to the issue of whether plaintiff should have been paid for two weeks earned vacation and finds that material issues of fact exist. As a preliminary matter, plaintiff claims the firm had an informal policy of two weeks vacation per year, but that an employee could take more time if he or she was billing a lot of hours. *Krieger* Dep. at 279-80. Plaintiff, however, cannot point to a written policy. *Id.* at 280. Therefore, the exact amount of time plaintiff was entitled to per year is an open question. The court notes, however, that plaintiff would only be entitled to a *pro rata* share of vacation time in 1993. *See Mueller Co. v. Dep't of Labor*, 135 Ill.Dec. 135, 137, 543 N.E.2d 518, 520 (Ill.App.Ct.1989). A trial is also needed to determine exactly how much vacation plaintiff took during his tumultuous stint at AKB, as plaintiff would only be entitled to vacation time that he did not actually take.

### ATTORNEY'S FEES IN WAGE ACTIONS

**\*13** Plaintiff asserts that he is entitled to attorney's fees under the Illinois Attorneys Fees in Wage Actions Act (the "Fees Act"), 705 ILCS 225/.01-1 (West 1992). Under the Fees Act, an employee who brings an action for wages earned and due and owing is entitled to "a reasonable attorney fee" if they can prove "that the amount for which he or she has brought the action is justly due and owing, and that a demand was made in writing at least 3 days before the action was brought, for a sum not exceeding the amount so found due and owing." 705 ILCS 225/1. Illinois courts have strictly construed this statute, *Scoby v. Civil Serv. Comm'n of the City of East St. Louis*, 191 Ill.Dec. 590, 591, 624 N.E.2d 439, 440 (Ill.App.Ct.1993), denying attorney's fees when a plaintiff has not made a written demand for the sum owed. *Shramuk v. Snyder*, 215 Ill.Dec. 457, 461, 663 N.E.2d 468, 472 (Ill.App.Ct.1996); *Swanson v. Village of Lake in the Hills*, 174 Ill.Dec. 233, 239-40, 598 N.E.2d 430, 436-37 (Ill.App.Ct.1992). Plaintiff has not pointed to any evidence showing that such a demand was made and, therefore, regardless of whether plaintiff is ultimately success-

ful on his wage claims, he cannot recover attorney's fees. Defendant's motion for summary judgment is granted as to this issue.

### UNFAIR COMPETITION

In Count 13, plaintiff alleges that defendant violated the law of "unfair competition" by misappropriating the benefit of plaintiff's attributes through fraud. Am. Compl. 146. Specifically, plaintiff argues that defendant misappropriated "[p]laintiff's client contacts, name recognition, professional reputation, skill, expertise, know how and ECC retainer,"*id.* ¶ 147, each of which was unique to plaintiff. In ruling on defendant's motion to dismiss, the court decided not to dismiss this count finding that defendant had not sufficiently addressed the "misappropriation of competitive advantage" issue. *Krieger,* 1996 WL 6540, at *17. However, after reviewing the evidence and the law of "unfair competition," the court now grants summary judgment as to this claim.

Unfair competition is a tort recognized in Illinois. *Board of Trade v. Dow Jones & Co., Inc.,* 64 Ill.Dec. 275, 281, 439 N.E.2d 526, 532 (Ill.App.Ct.1982), *aff'd,*74 Ill.Dec. 582, 456 N.E.2d 84 (Ill.1983). It is based on the principle that property rights having commercial value should be protected from unfair invasion regardless of whether there is direct competition between the parties. *Id.* at 282,439 N.E.2d at 533. Furthermore, in misappropriation cases, "[t]he controlling question ... is whether the commercial practice at issue is fair or unfair,"*id.* at 286, 439 N.E.2d at 537 (citing New York law), and, therefore, the doctrine encompasses "any form of commercial immorality." *Id.* (citing New York law).

However, in looking at Illinois and New York law, *id.* at 281, 439 N.E.2d at 532 ("[A]ny discussion of the doctrine must make repeated reference to the law of other jurisdictions, particularly New York, where the doctrine has been most fully delineated."), the court has been unable, after exhaustive

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                      Page 12
Not Reported in F.Supp., 1997 WL 323827 (N.D.Ill.), 3 Wage & Hour Cas.2d (BNA) 1710
(Cite as: Not Reported in F.Supp., 1997 WL 323827 (N.D.Ill.))

search, to find any case based on misappropriation that resembles this case. "The essence of an unfair competition claim ... is that the defendant has misappropriated the labors and expenditures of another." *Coors Brewing Co. v. Anheuser-Busch Cos., Inc.*, 802 F.Supp. 965, 975 (S.D.N.Y.1992) (quoting *Saratoga Vichy Spring Co. v. Lehman,* 625 F.2d 1037, 1044 (2d Cir.1980)). In the present case, defendant has not "misappropriated" Krieger's labors; defendant paid plaintiff in order to obtain the benefit of his name, labors, and client contacts. While plaintiff alleges that his employment was garnered by fraud, plaintiff was an at-will employee able to quit at any time. As soon as plaintiff discovered that the firm was not holding him out as a "Senior Trial Attorney," and that Krieger and other associates were not being placed on a partnership track, the only two fraud allegations still standing, plaintiff had the option of leaving. It is even possible that a quick departure would not have resulted in the loss to Krieger of the ECC retainer. In any case, the court finds that in a situation as this, where two parties, experienced in business, negotiate an employment contract, unfair competition is not an appropriate claim. Plaintiff has an adequate remedy through his claims for fraud and breach of contract.

### CONCLUSION

*14 In conclusion, defendant's motion for summary judgment is granted in part and denied in part.

IT IS SO ORDERED.

> FN1. Defendant argues that the PBGC offer was not a firm offer, as the appointment still had to be approved by OMB. There are not enough facts in the record for the court to determine whether the PBGC offer was a firm offer, with OMB review a mere *pro forma* step, or whether the OMB review was such that the PBGC offer was truly contingent.

> FN2. Plaintiff asserts an alternate theory of promissory estoppel for the first time in his Reply Memorandum. However, this district and the Seventh Circuit have been reluctant to apply promissory estoppel in the employment context. *Birks v. First Evergreen Corp.,* 1994 WL 36884, at *5 (N.D.Ill.1994). Furthermore, promissory estoppel requires an unambiguous promise, *id.,* and, therefore, the court would have used the same analysis for a promissory estoppel claim as it has for the breach of contract claim.

> FN3. The work done during the week of March 8, 1993 also cannot be called "wages" since the IWPCA defines wages as including compensation owed pursuant to a contract or agreement. 820 ILCS 115/2.

> FN4. Though the retainer was originally $60,000.00, plaintiff's old firm retained $3,655.00.

N.D.Ill.,1997.
Krieger v. Adler, Kaplan & Begy
Not Reported in F.Supp., 1997 WL 323827 (N.D.Ill.), 3 Wage & Hour Cas.2d (BNA) 1710

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 2002 WL 31496240 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 31496240 (N.D.Ill.))**

**H**

Hach v. Laidlaw Transit, Inc.
N.D.Ill.,2002.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
Robert E. HACH, Plaintiff,
v.
LAIDLAW TRANSIT, INC., d/b/a Laidlaw Educa-
tion Services, Peter Widdrington and John R.
Grainger, Defendants.
**No. 02 C 996.**

Nov. 7, 2002.

ORDER

GRADY, J.
*1 The defendants' motion to dismiss the complaint
[ ] is granted in part and denied in part, as follows:
The motion is granted as to Count I, and Count I is
dismissed to all defendants; the motion to dismiss
Count II is denied as to the defendants Laidlaw
Transit, Inc. and John R. Grainger; the motion is al-
lowed as to the defendant Peter Widdrington, and
Count II is dismissed as to Widdrington; the motion
to dismiss Counts III and IV is denied; and the mo-
tion to dismiss Count V is granted; the defendant
Laidlaw Transit, Inc., is dropped from Count III.

This case is set for status on December 11, 2002 at
10:30 a.m.

Plaintiff's motion to strike an exhibit attached to de-
fendants' reply memorandum [ ] is granted. (The
court did not rely on this exhibit in ruling on the
motion to dismiss, and the motion to strike is gran-
ted not on the merits but as a means of avoiding an
unnecessary issue.)

*MEMORANDUM OPINION*

Robert E. Hach, the plaintiff in this diversity case,

sues his former employer, Laidlaw Transit, Inc.,
and two individuals, Peter Widdrington and John R.
Grainger, alleging defamation, intentional interfer-
ence with reasonable business expectancy, and
breach of implied contract.

The defendant Laidlaw Transit, Inc. is a wholly
owned subsidiary of Laidlaw, Inc., a Canadian Cor-
poration that is presently in bankruptcy.

*2 Beginning in the early 1990s, Hach was em-
ployed in a series of executive positions with Laid-
law Education Services ("Laidlaw Education"), a
division of Laidlaw Transit, Inc. Laidlaw Education
is the largest provider of school business transport-
ation services in North America. Neither Laidlaw
Transit, Inc. nor Laidlaw Education is in bank-
ruptcy.

The defendant John R. Grainger served in various
executive positions with Laidlaw, Inc. and served
on its board of directors as well as the board of
Laidlaw Transit, Inc. The defendant Peter Wid-
drington served as chairman of the boards of direct-
ors of both Laidlaw, Inc. and Laidlaw Transit, Inc.

The complaint alleges that when Laidlaw, Inc. went
bankrupt, Grainger and Widdrington conspired with
each other to oust plaintiff from his position as
president and chief executive officer of Laidlaw
Education and to obtain the position for Grainger.
This was allegedly accomplished by a series of de-
famatory statements that Grainger made about
plaintiff at the October 12, 2001 meeting of the
Laidlaw, Inc. board of directors. The complaint al-
leges that Grainger told the directors on that occa-
sion:

(i) that Hach's management posture and attitude
was that of a victim and not that of a winner;

(ii) that the operating results of Laidlaw Education
under Hach's management were dwindling;

(iii) that Hach's management opinions and estim-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31496240 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 31496240 (N.D.Ill.))**

ates as to Laidlaw Education's future performance were fragile and weak;

(iv) that Hach's management of his subordinates caused disruption over the issue of centralization of operations at Laidlaw Education;

(v) that Hach's management destroyed the previously healthy working relationship between Laidlaw Education and the Company personnel located in Burlington, Ontario; and

(vi) that because of Hach's failing management Hach should be terminated as President and Chief Executive Officer of Laidlaw Education and that Grainger should take said positions.

(Complaint, ¶ 26). The complaint alleges that Widdrington was present at the meeting and, "by his silence, affirmed Grainger's false utterances to the members of the Board of Directors of Laidlaw, Inc."*Id.* at ¶ 28.

As a result of these statements by Grainger, the Laidlaw, Inc. board of directors terminated Hach as president and chief executive officer of Laidlaw Education and replaced him with Grainger.

The complaint alleges specifically why each of Grainger's statements to the board of directors was false, describing in detail Hach's outstanding performance throughout his employment with Laidlaw Education and specifically how the company prospered under his direction.

The defendants have filed a motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) arguing that none of the five counts states a claim upon which relief can be granted.

### The Defamation Counts

Count I sets forth the statements made by Grainger at the October 12 meeting and alleges that because they "falsely imputed a lack of ability on the part of Hach to perform, manage and engage in his profes-

sion and business," the statements were "defamatory *perse."*Complaint, ¶ 40.

*3 Certain categories of defamatory statements are considered to be so injurious to reputation that no proof of special damage is required. Damage is presumed. One of these categories of *"perse"* defamation is "words that prejudice a party, or impute lack of ability, in his or her trade, profession or business."*Bryson v. News America Publications, Inc.,* 672 N.E.2d 1207, 1215 (Ill.1996). The *perse* rule is subject to the companion rule that a statement "will not be found actionable *perse* if it is reasonably capable of an innocent construction."*Id.* Importantly, "[w]hether a statement is reasonably susceptible to an innocent interpretation is a question of law for the court to decide ."*Id.Bryson* dealt with a different category of *perse* defamation, imputation of fornication or adultery, and so is factually inapposite here. A case more useful on the facts is *Anderson v. Vanden Dorpel,* 667 N.E.2d 1296 (Ill.1996), which applied the innocent construction rule in an employment context. Plaintiff in that case brought suit against a former employer, alleging that defendant had defamed her by informing a prospective employer that she "did not follow up on assignments."*Id.* at 1298.The Illinois Supreme Court stated:

We believe that Vanden Dorpel's alleged comment regarding the plaintiff's failure to follow up on assignments may be innocently construed and hence may not form the basis for a *perse* action. We agree with the defendants that the remark, construed in context, may be understood to mean simply that the plaintiff did not fit in with the organization of the employer making the assessment and failed to perform well in that particular job setting, and not as a comment on her ability to perform in other, future positions.

*Id.* at 1302.The *Anderson* opinion discusses several other cases which had construed critical comment concerning a plaintiff's job performance as imputing simply a failure to perform satisfactorily in that particular job setting, not an inability to perform

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 3

Not Reported in F.Supp.2d, 2002 WL 31496240 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2002 WL 31496240 (N.D.Ill.))

that kind of job regardless of the setting. We are persuaded by the *Anderson* discussion that Count I of Hach's complaint does not allege defamation *perse.*Each of the statements allegedly made by Grainger is context-specific, and none of them imputes a general inability to perform comparable work in some other setting.

Accordingly, Count I will be dismissed for failure to state a claim for *perse* defamation.

### Count II-Defamation Per Quod

A different Latin name is used to describe a defamation action in which "the defamatory character of the statement is not apparent on its face, and extrinsic facts are required to explain the defamatory meaning."*Anderson* at 1303, citing *Kolegas v. Heftel Broad.,* 607 N.E.2d 201 (Ill.1992). Such an action is one for defamation *perquod.*In that kind of action, damages are not presumed but must be specially pleaded and proved. *Id.* Count II of Hach's complaint purports to allege defamation *perquod,* setting forth the statements made by Grainger, explaining why the statements were false and alleging that as a result of the defamatory statements plaintiff was discharged from his employment with Laidlaw Education, suffering a loss of income and other financial benefits.

*4 Defendants move to dismiss Count II on several grounds. First, they argue that special damages are not sufficiently pleaded. It is true that plaintiff cannot recover under Count II for his claimed "loss of his professional standing in the community," but the claimed "loss of his annual lucrative compensations, plus retirement and other benefits that, but for Grainger's, Widdrington's, and Laidlaw Transit, Inc.'s slanders, he would have received for many years," is clearly a sufficient allegation of special damage. [FN1]

> FN1. The defamation counts are brought against all three defendants, alleging that Grainger and Widdrington acted as

"agents" of Laidlaw, Inc. in making the defamatory statements. We are not clear how the interests of Laidlaw, Inc. were advanced by the discharge of Hach from the employ of Laidlaw Education, and we would question whether this "agency" can be proved. However, that factual issue is not before us at this time.

Another ground asserted by defendants for dismissal of Count II is that the statements made by Grainger were simply opinions, not statements of fact that can be shown to have been either true or false. Proof of defamation requires a showing of falsity (truth is a complete defense, *seeHaynes v. Alfred A. Knopf, Inc.,* 8 F.3d 1222, 1228 (7th Cir.1993)), and it is in the nature of an opinion that it is not demonstrably true or false.

Moreover, opinions, as opposed to statements of fact, enjoy First Amendment protection and are not actionable as defamation. *Quinn v.. Jewel Food Stores, Inc.,* 658 N.E.2d 1225, 1229-30 (Ill.App.Ct.1995).

Defendants argue that all of Grainger's statements were opinions; plaintiff counters that none of them were. We think some were and some were not. The assessment must be made in light of what the complaint alleges about Hach's accomplishments at Laidlaw Education and the alleged lack of any factual basis for finding fault with his performance. For purposes of this motion, we must assume the truth of these allegations.

Taking Grainger's alleged statements one at a time, our conclusions are as follows:

*Statement (i):*"That Hach's management posture and attitude was that of a victim and not that of a winner."

We think the words used in this statement are too vague to permit proof that the statement was true or false. What is a "posture?" An "attitude?" A "victim?" A "winner?" What did Grainger mean by

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31496240 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2002 WL 31496240 (N.D.Ill.))

these words, and what did each of the members of the board of directors understand each of the words to mean? It is difficult to imagine what kinds of evidence the parties would submit at trial, and in any event we doubt that a manageable issue could be framed for the jury.

*Statement (ii):*"That the operating results of Laidlaw Education under Hach's management were dwindling."

We have no problem with this as a statement that was either true or false (especially if, as alleged in the complaint, the profits of Laidlaw Education continually escalated under Hach's management). The jury can be given the dictionary definition of "dwindle" [FN2] and can be asked to find whether the statement was true or false. Cf. *Quinn,* 658 N.E.2d at 1231 (illustrating use of a dictionary in a defamation case).

> FN2."To become steadily less: diminish in size, amount, or quality: SHRINK."*Webster's Third New International Dictionary,* 706 (1971).

*Statement (iii):*"That Hach's management opinions and estimates as to Laidlaw Education's future performance were fragile and weak."

**\*5** Whether this can be regarded as a factual statement will depend upon what Hach's "management opinions and estimates" actually were and whether there is a factual basis upon which the jury could determine whether they were timid or, on the other hand, realistic or even optimistic in light of Laidlaw's actual prospects. This could turn out to be something that is not factually provable, but that remains to be seen.

*Statement (iv):*"That Hach's management of his subordinates caused disruption over the issue of centralization of operations at Laidlaw Education."

"Disruption" is somewhat vague, but what if the facts show there was no problem whatever, which is what we would assume to be true from the alleg-

ations of the complaint? If Hach's subordinates can be shown to have been content with the centralization of operations, and there was no commotion over the issue, this statement could be found to have been factually untrue.

*Statement (v):*"That Hach's management destroyed the previously healthy working relationship between Laidlaw Education and the Company personnel located in Burlington, Ontario."

The word "destroyed" is specific enough to be capable of proof or disproof.

*Statement (vi):*"That because of Hach's failing management, Hach should be terminated as President and Chief Executive Officer of Laidlaw Education and that Grainger should take said positions."

Everything here is an opinion except the introductory phrase "that because of Hach's failing management...." "Management" is a broad term, and its meaning in this specific context is problematic. And what is "failing" management? Apparently it would not need to be totally failing, but only sufficiently failing to justify Hach's replacement. How failing would that be? In sum, we think this is a statement that could not be shown in a trial to have been either true or false.

The motion to dismiss will be denied as to statements (ii), (iii), (iv) and (v) and granted as to statements (i) and (vi).

### The Defamation Claim Against the Defendant Widdrington

Widdrington is not alleged to have made the defamatory statements but simply to have been present when they were made, to have known they were false, and to have remained silent. He argues that this is not enough for liability, and we agree. Plaintiff has cited no authority for an affirmative duty to contradict a defamatory statement made by another. Count II alleges that Grainger and Widdrington had a "plan" to get rid of Hach, but it does

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31496240 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2002 WL 31496240 (N.D.Ill.))

Page 5

not specifically allege that the plan contemplated that Grainger would make the specific defamatory statements he allegedly made to the Board. Even if it did, it would be necessary to allege facts that would support some kind of aiding and abetting theory some assistance that Widdrington rendered that made Grainger's defamation more likely to be acted on by the Board, for instance.

The only authority plaintiff cites in support of Widdrington's liability is *Van Horne v. Muller,* 705 N.E.2d 898 (Ill.1998). The case is clearly distinguishable because the accomplice there, unlike Widdrington, actually joined the principal defendant in making the defamatory statements. *Id.* at 718, 720.

**\*6** Count II will be dismissed as to the defendant Widdrington for failure to state a claim.

*Count III-Intentional Interference With Hach's Reasonable Business Expectancy*

Count III alleges that the defendants, by means of the defamation alleged in the previous counts, caused Hach to lose what he reasonably expected would be continued employment with Laidlaw Education. All three defendants, including Laidlaw Transit, Inc., are named as defendants in the count, and, by reason of the incorporation of allegations from earlier portions of the complaint, Grainger and Widdrington are alleged to have acted as agents of Laidlaw Transit, Inc. Because of this, defendants have moved to dismiss, arguing that as a matter of law an employer cannot interfere with its own business relationship with its employees. Moreover, since the count alleges that Grainger and Widdrington were acting within the scope of their authority as agents of Laidlaw Transit, Inc., plaintiff cannot show that they were acting contrary to the interests of the corporation, a necessary allegation of an intentional interference claim.

In response, plaintiff states that the inclusion of Laidlaw Transit, Inc. in Count III was inadvertent and, in effect, asks that the corporation be dropped from Count III. It is clear from the allegations of Count III that plaintiff intends to allege that Grainger and Widdrington were not acting in the interest of Laidlaw Transit, Inc., but, rather, in the interest of Grainger: "[B]oth Widdrington and Grainger knew that the sole reason for getting rid of Hach and replacing Hach with Grainger as President and Chief Executive Officer of Laidlaw Education was not to benefit or further the corporation, nor for any reasonable and legitimate business reason, but solely to personally benefit Grainger...." Complaint, ¶ 64.

Laidlaw Transit, Inc, will be dropped from Count III, and the motion of the defendant Grainger to dismiss Count III will be denied.

The defendant Widdrington moves to dismiss Count III, again on the ground that his silence does not provide a basis for liability. We agree, and will dismiss Count III as to the defendant Widdrington.

*Count IV-Conspiracy to Interfere with Reasonable Business Expectancy*

Defendants move to dismiss this claim on the basis that there is no independent tort of civil conspiracy, but only an action for a conspiracy to commit an underlying substantive tort. Because defendants believe Count III fails to state a claim against any defendant, they argue that Count IV should be dismissed as well. However, since we have held that Count III does state a claim as to Grainger, we will allow Count IV to stand as to all three defendants, Grainger, Widdrington and Laidlaw Transit, Inc.FN3

> FN3. The parties have not briefed the question of whether Widdrington and Laidlaw Transit, Inc. can be liable as conspirators even though they are not liable on the substantive count, and we will not address the issue at this time.

*Count V-Breach of Implied Contract*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31496240 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2002 WL 31496240 (N.D.Ill.))

Page 6

Count V of the complaint, brought against Laidlaw Transit, Inc. only, is based upon a theory of a contract implied in fact. When Hach was discharged by Laidlaw Transit, Inc., he was tendered a severance agreement which included a 2-stage payment rather than a payment in one lump sum, and which also included a non-compete clause. He alleges in Count V that all other executives who left the employ of Laidlaw were given severance agreements providing for one lump-sum payment and containing no non-compete provisions. He alleges that this "policy" of Laidlaw Transit, Inc. amounted to a promise implied in fact by Laidlaw that, if and when Hach's turn came, he would be tendered the same kind of severance agreement.

*7 We agree with Laidlaw that the allegations of Count V fail to state a claim. Hach may have had reason to hope that he would be treated the same as the other executives, but we find no factual allegations which, if proved, would establish that Laidlaw Transit, Inc. had impliedly promised to do that.[FN4]

> FN4. Laidlaw Transit, Inc. argues that in fact the circumstances were different as to each of these other executives, but, for purposes of this motion, we will assume there were no material differences.

Count V will be dismissed for failure to state a claim upon which relief can be granted.

### Conclusion

In summary, the court's rulings on the defendants' motion to dismiss the complaint are as follows:

The motion is granted as to Count I, and Count I is dismissed as to all defendants.

The motion to dismiss Count II is granted in part and denied in part as to the defendants Laidlaw Transit, Inc. and John R. Grainger. The motion is granted as to the defendant Peter Widdrington, and Count II is dismissed as to Widdrington.

The motion to dismiss Count III is denied as to the defendant Grainger and granted as to the defendant Widdrington. The defendant Laidlaw Transit, Inc., is dropped from Count III.

The motion to dismiss Count IV is denied as to all defendants.

The motion to dismiss Count V is granted.

N.D.Ill.,2002.
Hach v. Laidlaw Transit, Inc.
Not Reported in F.Supp.2d, 2002 WL 31496240 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

234 F.3d 1273                                                                                    Page 1
234 F.3d 1273, 2000 WL 1681081 (C.A.7 (Ill.))
**(Cite as: 234 F.3d 1273, 2000 WL 1681081 (C.A.7 (Ill.)))**

**H**
Givon v. PPG Industries, Inc.
C.A.7 (Ill.),2000.
NOTICE: THIS IS AN UNPUBLISHED OPIN-
ION.(The Court's decision is referenced in a "Table
of Decisions Without Reported Opinions" appear-
ing in the Federal Reporter. Use FI CTA7 Rule 53
for rules regarding the citation of unpublished opin-
ions.)
    United States Court of Appeals, Seventh Circuit.
        Shlomo GIVON, Plaintiff-Appellant,
                        v.
    PPG INDUSTRIES, INCORPORATED and BASF
        Corporation, Defendants-Appellees.
                  **No. 99-3973.**

                Argued June 1, 2000.
                Decided Nov. 7, 2000.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division. No.
99 C 2712. James B. Zagel, Judge.

Before Hon. WILLIAM J. BAUER, Hon. FRANK
H. EASTERBROOK, and Hon. DANIEL A. MAN-
ION, Circuit Judges.


                      ORDER

**\*1** Shlomo Givon sued PPG Industries and BASF
Corporation for breach of contract, alleging the de-
fendants violated an oral agreement in which they
allegedly promised to allow Givon to be their ex-
clusive sales representative to customers in Israel.
Givon alternatively alleged claims based on
promissory estoppel and the procuring cause doc-
trine. The district court dismissed Givon's amended
complaint and he appeals. We affirm.


                  I. Background

Beginning in 1979, Shlomo Givon, a citizen of Is-
rael, entered into an agreement with Mazer Chemic-
al, Incorporated, a manufacturer of chemical
products, in which Givon agreed to act as a sales
representative in Israel for Mazer. In about 1989,
PPG Industries, Incorporated (PPG) acquired
Mazer. Shortly thereafter, Givon and PPG entered
into a new sales agent agreement dated December
12, 1996 ("1996 Contract"). Paragraph 1.2 of that
contract provided:

It is agreed that such appointment [of Givon] is
non-exclusive so that PPG, without any obligation
to pay REPRESENTATIVE any commission here-
under, may make direct sales of subject product to
customers in the subject country and/or appoint ad-
ditional independent representatives in the subject
country with respect to the sale of subject products.

1996 Contract at ¶ 1.2.

The 1996 Contract further provided that it would
expire on December 31, 1997 "unless extended by
the agreement of both parties, such agreement of
extension to be reduced to writing clearly indicat-
ing the new date of termination."

Sometime during 1997, BASF Corporation pur-
chased PPG. Neither BASF nor PPG entered into a
new written contract with Givon. Nonetheless, after
December 31, 1997, Givon continued to sell chem-
icals in Israel. Sometime in mid-1998, Givon real-
ized that BASF was directly contacting some of his
customers in Israel. In response, Givon sued both
PPG and BASF, alleging that the 1996 Contract had
been orally extended and that the defendants
breached that contract and tortiously interfered with
his contractual relations by directly contacting his
customers. The defendants moved to dismiss the
complaint and the district court granted their mo-
tion because the 1996 Contract explicitly provided
that Givon was not an exclusive sales representative
for PPG. Accordingly, the district court concluded
that even had the parties orally extended the con-
tract, Givon could not state a cause of action
against the defendants for contacting his customers.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

234 F.3d 1273
234 F.3d 1273, 2000 WL 1681081 (C.A.7 (Ill.))
**(Cite as: 234 F.3d 1273, 2000 WL 1681081 (C.A.7 (Ill.)))**

Page 2

Givon requested leave to file an amended complaint which the district court granted. In his amended complaint, Givon omitted any reliance on the written 1996 Contract, alleging instead that he had an oral contract with PPG and BASF under which he was entitled to be the exclusive sales representative for BASF in Israel. Givon also added claims based on promissory estoppel and tortious interference with prospective business advantage, and he sought commissions on sales made to his customers based on the procuring cause doctrine. The district court dismissed the amended complaint, once again concluding that Givon failed to properly allege an exclusive contract with the defendants. Givon ap- peals.

II. Analysis

**\*2** The district court dismissed Givon's amended complaint for failure to state a claim. We review such a dismissal de novo, *Crenshaw v. Baynerd,* 180 F.3d 866, 868 (7th Cir.2000). Dismissal is appropriate if there is no set of facts under which the plaintiff could recover. *Id.* With this standard in mind, we consider each of Givon's counts, beginning with his breach of oral contract claim.

In Count 1, Givon alleged that the defendants breached an oral agreement he entered into with BASF and PPG in the latter part of 1997, under which Givon was granted the right to act as the exclusive sales agent in 1998 for his customer base in Israel for BASF products manufactured in the United States, United Kingdom, and France. Specifically, Givon alleged in his complaint that:

oral statements and oral representations made to him by PPG and BASF before December 31, 1997 that he was to *conduct business as usual after* December 31, 1997 caused him to agree to continue for the calendar year 1998 to sell, service and develop his Israeli customer base for BASF chemical products manufactured in the United States, the United Kingdom, and France.

(Emphasis added.) Thus, according to Givon himself, the oral agreement merely mirrored the terms of the 1996 Contract, which explicitly stated that Givon was a "non-exclusive" representative and that additional independent representatives could make sales to Givon's customers for which Givon would not earn commission. The 1996 Contract also expressly allowed the manufacturer to bypass Givon and make direct sales to his customers without paying him a commission. Accordingly, "business as usual" meant that Givon was to continue as a non-exclusive representative of BASF. Because Givon did not have an exclusive right to sell the defendants' products, their alleged conduct, i.e. directly contacting and selling to Givon's Israel customer base, could not constitute a breach of contract. *See, e.g., Holman v. Indiana,* 211 F.3d 399, 406 (7th Cir.2000) (a party can plead himself out of court by alleging facts which demonstrate he has no legal claims). Therefore, the district court properly dismissed Count 1.

In Count 2, Givon sought commissions for sales made to his customer base after 1997, arguing that he was the procuring cause of those sales and thus entitled to commissions. Under the procuring cause doctrine, "the general rule is that an agent or salesman in a position who is the procuring cause of a sale is entitled to commission notwithstanding the fact that the sale was consummated by the principal personally or through another agent." *Heuvelman v. Triplett Electrical Instrument Co.,* 161 N.E.2d 875, 878 (Ill.App.1959).[FN1] However, "when the parties' relationship is governed by a contract as here, the procuring cause rule is inapplicable: the terms of the contract control and it is not our function to rewrite them according to our own notions of fairness." *Dresser Indust. v.. Pyrrhus Agee,* 936 F.2d 921, 933 (7th Cir.1991).*See also Technical Representative Inc. v. Richardson Merrell Inc.,* 438 N.E.2d 599, 602 (Ill.App.1982) ("The [procuring cause] rule applies, however, only if the contract does not expressly provide when commissions will be paid."); *Solo Sales Inc. v. North Am. OMG, Inc.,* 702 N.E.2d 652, 653 (Ill.App.1998) (procuring

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

cause rule does not apply where a contract governs the payment of commissions).

> FN1. While the contract provided that Pennsylvania law governed any contract disputes, both parties cited Illinois law to the district court, and the district court therefore deemed the application of Pennsylvania law waived. Accordingly, we too will apply Illinois law.

*3 In this case, Givon alleged that PPG and BASF told him "to conduct business as usual" after December 31, 1997. As noted, business as usual meant as defined in the 1996 Contract. That contract specifically provided when commissions were to be paid and the amount of commissions to which Givon was entitled. Specifically, paragraph 1.2 of the 1996 Contract provided that Givon was not entitled to commissions for sales the company made directly to customers or sales made through other sales representatives. Thus, according to the contract, Givon was only entitled to commissions on sales that he personally made and completed. Because the 1996 Contract expressly defined Givon's right to commissions, the procuring cause doctrine is inapplicable. Therefore, the district court properly dismissed this count as well.

Alternatively, Givon sought to hold the defendants liable based on the theory of promissory estoppel. However, assuming that an oral contract existed, as Givon alleged, he cannot maintain a claim based on promissory estoppel because

when there is an express contract governing the relationship out of which the promise emerged, and no issue of consideration, there is no gap in the remedial system for promissory estoppel to fill. To allow it to be invoked becomes in those circumstances a gratuitous duplication or, worse, circumvention of carefully designed rules of contract law.... Promissory estoppel is not a doctrine designed to give a party ... a second bite at the apple in the event it fails to prove a breach of contract.

*Alltech Telecom Inc. v. Amway,* 174 F.3d 862, 869 (7th Cir.1999) (internal quotations omitted). In this case, because Givon alleges the existence of an express oral contract, his promissory estoppel theory cannot survive.

Moreover, even ignoring the alleged oral contract, Givon still fails to state a claim for promissory estoppel. Promissory estoppel requires that one party reasonably rely, to his detriment, on a promise by another party. *Principal Mutual Life Insur. Co. v. Charter Barclay Hospital,* 81 F.3d 53, 57 (7th Cir.1996). The promise must be clear, definite and unambiguous. *Phillips v. Britton,* 516 N.E.2d 692, 700 (Ill.Ap.1987). In this case, Givon alleged that he was told to "conduct business as usual." This was not a definite and specific promise, and thus a promissory estoppel claim could not be based on it. Moreover, it would be unreasonable for Givon to believe that he had an exclusive sales relationship, given that in the past his relationship was non-exclusive, and he was told to conduct business as usual.

Finally, Givon sought to allege a claim for tortious interference with a prospective business relation. To state such a claim a plaintiff must allege "a reasonable expectation of entering into a valid business relationship with a third party," *Anderson v. Van den Dorpel,* 667 N.E.2d 1296, 1299 (Ill.App.1996), and "an intentional and unjustified interference by the defendant that induced or caused a breach or termination of the expectation."*Id* . The defendants' alleged conduct in this case-contacting its customers directly rather than through Givon-was justified because the 1996 Contract specifically allowed for such conduct. And the alleged oral agreement for Givon to continue to act as the defendants' agent was to conduct "business as usual." Thus, the defendants were still justified in contacting customers directly after the 1996 Contract expired. Because the defendants' conduct was justified, Givon cannot state a claim for tortious interference with prospective business relations.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

234 F.3d 1273
234 F.3d 1273, 2000 WL 1681081 (C.A.7 (Ill.))
**(Cite as: 234 F.3d 1273, 2000 WL 1681081 (C.A.7 (Ill.)))**

Page 4

### III. Conclusion

**\*4** In sum, Givon pleaded himself out of court by alleging that the oral agreement between him and the defendants was to "conduct business as usual." Business as usual meant that Givon would continue as a non-exclusive representative of the defendants. Accordingly, the defendants did not breach any contract with Givon or interfere with any prospective relations by directly dealing with Givon's customers in Israel. Nor did the defendants owe Givon commissions for those sales. Likewise, Givon's promissory estoppel claim fails because a contract governed the relationship between Givon and the defendants, at least according to Givon's allegations. And in any event, the alleged promise was too vague and indefinite to support a promissory estoppel claim. We therefore AFFIRM.

C.A.7 (Ill.),2000.
Givon v. PPG Industries, Inc.
234 F.3d 1273, 2000 WL 1681081 (C.A.7 (Ill.))

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 1888758 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 1888758 (N.D.Ill.))

C
Giard v. Powers
N.D.Ill.,2003.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
Edward GIARD, Plaintiff,
v.
William F. POWERS, II, Defendant.
No. 00 C 5337.

April 15, 2003.

*MEMORANDUM OPINION AND ORDER*

LEINENWEBER, J.
**\*1** Plaintiff Edward Giard ("Giard" or "Plaintiff"),
a resident of Vermont, filed a three-count amended
complaint against Defendant William F. Powers, II
("Powers" or "Defendant"), an Illinois resident, al-
leging breach of contract, fraud, and promissory es-
toppel. Before the Court are Powers's Motion for
Summary Judgment on all counts and Giard's
Cross-Motion for Summary Judgment on the
promissory estoppel count. For the following reas-
ons, the Court grants Powers's motion in part,
denies it in part, and denies Giard's motion.

*BACKGROUND*

Except as noted, the following facts are undisputed
for purposes of summary judgment. In January
1988, Powers incorporated Profile by Design
("Profile" or "the Company"), a company that de-
signed and manufactured aerodynamic bicycle
handlebars and other bicycle components. Powers
recruited Giard, a college friend, to help him with
the company and in the spring or early summer of
1988, Giard joined Profile. The two men developed
a partnership, with Giard focusing primarily on
product design and manufacture while Powers
handled the financial side of the business. Powers,
who was the sole shareholder of Profile at incorpor-

ation, eventually issued additional stock and gave
Giard 10,000 shares as repayment for a $10,000
loan he made to the Company. Powers retained
80,000 shares.

Profile struggled somewhat in its nascent years.
The parties dispute Profile's exact earnings figures,
but it appears from tax returns that while Profile's
sales increased quickly, the company lost money in
1989, enjoyed some income in 1990, and lost
money in 1991. In 1991, Giard and Powers con-
sidered selling Profile and its assets. In light of the
potential sale, Giard and Powers had heated conver-
sations about the amount that Giard would receive
if they did sell Profile. Finally, in mid-1991,
Powers presented Giard with a handwritten note, at-
tached to Giard's amended complaint as Exhibit A
("Exhibit A"), which reads as follows:

Ed,

You are right-the signature below makes it official
in writing. This paper supercedes any contracts on
ownership signed. Edward H. Giard will receive
*[sic]* 20% of the proceeds from the sales of Profile
for Speed, Inc.

*[signed]* William F. Powers, II President

Despite discussions with several potential pur-
chasers, Giard and Powers failed to sell Profile, and
on December 31, 1991, Giard resigned from the
Company. He retained his shares, and continued to
perform consulting work for Profile for a limited
period of time.

In a deal with Colvin Hsiao that began in March
1998 and concluded in July 1999, Powers eventu-
ally sold his 80,000 shares of Profile for a purchase
price of $2,180,000.00. On May 11, 1998, Giard
entered into an agreement with Mark Pikula
("Pikula") regarding his 10,000 shares of Profile
stock. While Giard did not technically sell his
stock, he agreed to deliver the certificates to Pikula,
to vote his stock as Pikula directed, to transfer any

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 2
Not Reported in F.Supp.2d, 2003 WL 1888758 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 1888758 (N.D.Ill.))

dividends to Pikula, and to refrain from assigning or encumbering the stock. Pikula paid Giard $50,000 for these rights, and retained the option to purchase the stock for an additional $100. A year later, however, Pikula exercised his right to rescind the deal, and on June 23, 1999, Giard repaid Pikula $50,000. As a result, Giard currently owns his shares of Profile. Neither Giard nor Powers ever shared the profits of their respective agreements with the other party.

**\*2** Powers' failure to share the profits of his stock sale with Giard forms the basis of Giard's lawsuit. At the heart of the dispute lies Exhibit A, the 1991 note from Powers to Giard. Giard claims that Exhibit A constitutes an agreement that entitles him to twenty percent of Powers's proceeds from his sale of Profile stock. Giard asserts that Powers's failure to provide him with any portion of such proceeds is a breach of contract and grounds for fraud and promissory estoppel actions. Powers, in turn, argues that the circumstances surrounding Exhibit A demonstrate that it was only intended to govern sales of stock in 1991, when Powers and Giard were actively negotiating the sale of the business. Powers contends that Giard ignored Exhibit A in his own business dealings, and only raises it now that Powers has rebuilt the Company and sold it for a substantial profit. Powers has now filed a motion for summary judgment on all counts while Giard has filed a cross-motion for summary judgment on Count Three, Promissory Estoppel. It should be noted, however, that Powers's motion for summary judgment erroneously references Plaintiff's original complaint, not his amended complaint. Accordingly, this Court will only address those of Powers's arguments that relate to existing counts.

*DISCUSSION*

*Summary Judgment*

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admis-

sions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."FED. R. CIV. P. 56(c). A fact is "material" if it could affect the outcome of the suit under the governing law; a dispute is "genuine" where the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

The burden is initially upon the movant to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). In assessing the movant's claim, the court must view all the evidence and any reasonable inferences that may be drawn from that evidence in the light most favorable to the nonmovant. *Miller v. Am. Family Mut. Ins. Co.,* 203 F.3d 997, 1003 (7th Cir.2000). Once the moving party has met its burden, the nonmoving party "may not rest upon the mere allegations" contained in its pleading, but rather "must set forth specific facts showing that there is a genuine issue for trial."FED. R. CIV. P. 56(e); *Becker v. Tenenbaum-Hill Assoc., Inc.,* 914 F.2d 107, 110 (7th Cir.1990); *Schroeder v. Lufthansa German Airlines,* 875 F.2d 613, 620 (7th Cir.1989). It "must do more than simply show that there is some metaphysical doubt as to the material facts."*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

*Count One-Breach of Contract*

**\*3** In Count One of his amended complaint, Giard alleges that Powers breached the terms of their 1991 agreement when Powers sold his Profile stock without providing Giard with any portion of the profits. In his motion for summary judgment, Powers contends that Giard provided no consideration for the 1991 agreement and that, therefore, the agreement does not constitute a valid contract. Both Powers and Giard agree that the original consideration for the agreement was the work Giard had performed prior to the agreement and the work he

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                     Page 3
Not Reported in F.Supp.2d, 2003 WL 1888758 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 1888758 (N.D.Ill.))**

would perform going forward. The parties also agree that the work Giard did for Profile prior to the agreement may not serve as consideration for the promises set forth in Exhibit A. *See Johnson v. Johnson,* 614 N.E.2d 348, 355 (Ill.App.Ct.1993) (explaining that where consideration was "conferred prior to the promise upon which alleged agreement is based, there is no valid contract.") Where the parties differ is on whether Giard's promise to continue to work for Profile was adequate consideration for a valid contract in light of his resignation several months after receiving Exhibit A. As this Court noted in its order striking Defendant's Affirmative Defense, the mere promise to perform future acts constitutes consideration for an agreement even if the party does not actually perform those acts. *See Gage v. Lewis,* 68 Ill. 604 (1873); *Keller v. Hyland Builders Corp.,* 186 N.E.2d 787, 789 (Ill.App.Ct.1962). Giard's promise to continue working for Profile was adequate consideration to support the agreement under Illinois law.

Powers makes no additional arguments in support of his motion on this claim. As a result, this Court would ordinarily deny his motion for summary judgment on the breach of contract claim. "The existence of a contract," however, "is a question of law for determination by the court."*Habighurst v. Edlong Corp.,* 568 N.E.2d 226, 229 (Ill.App.Ct.1991). Under basic principles of Illinois contract law, an enforceable contract must contain "definite and certain essential terms." *Acad. Chicago Publishers v. Cheever,* 578 N.E.2d 981, 983 (Ill.1991). In the instant case, Powers promised to provide Giard with twenty percent of the sales of Profile. In return for this agreement, Giard promised to continue his involvement in the company. As is discussed more fully below in the analysis of Giard's promissory estoppel claim, the term "sale" is neither definite nor certain. Furthermore, the contract is not at all clear as to what Giard was required to do to meet his end of the bargain. Indeed, the controversy between the parties centers precisely on this question. Did Giard satisfy the terms

of the contract by staying with Profile for a few months after receiving the contract or did the contract require his employment through the sale? Would Giard have fulfilled his contractual obligations had he stayed for one day after receiving the contract? Was he required to continue his involvement with the company until retirement? "[I]f the essential terms [of a contract] are so uncertain that there is no basis for deciding whether the agreement has been kept or broken, there is no contract."*Cheever,* 578 N.E.2d at 984.

**\*4** The uncertainty of the obligation is underscored by Giard's own concession in his motion for summary judgment that "the undisputed facts establish that no meeting of the minds occurred" on his obligations under the agreement (Pl.'s Mot. for Summ. J. at 2). While he abruptly argues in his reply brief that it is *disputed* whether the requisite meeting of the minds occurred, (Pl.'s Reply Br. at 1 n. 1), the facts support his earlier concession. Under Illinois law, a binding contract requires "a meeting of the minds or mutual assent as to all material terms."*Abbott Labs. v. Alpha Therapeutic Corp.,* 164 F.3d 385, 387 (7th Cir.1999). The agreement between Powers and Giard, therefore, is not a valid and enforceable contract.

This Court must proceed with special caution when granting summary judgment *sua sponte. Sawyer v. United States,* 831 F.2d 755, 759 (7th Cir.1987). If the opposing party has had the chance to be heard on the issue, however, a district court has the authority to grant summary judgment. *Id.* In light of Giard's concession that the parties reached no agreement on the meaning of "continued involvement," it is clear that the agreement in question is unenforceable and invalid. Therefore, granting summary judgment to Powers on the breach of contract claim is warranted.

### Count Two-Fraud

In Count II, Giard charges that Powers made false and untrue statements regarding Giard's receipt of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 1888758 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 1888758 (N.D.Ill.))

Page 4

proceeds from the sale of Profile. Giard argues that he relied upon these statements to his detriment and was denied the profits to which he was entitled under the agreement. Once again, Powers carelessly moves for summary judgment on Giard's original complaint and, therefore, his arguments are inapposite to Giard's actual allegations. Powers contends that Giard's complaint fails to identify a statement of material fact that is untrue and that Giard, therefore, fails to prove the first element of a fraud claim. In his amended complaint, however, Giard bases his allegations of fraud on entirely different statements from those contained in his original complaint. Powers utterly fails to meet his burden under *Celotex*, and as a result, his motion for summary judgment on the fraud claim is denied. *Celotex,* 477 U.S. at 323.

### Count Three-Promissory Estoppel

The parties file cross-motions for summary judgment on Giard's third court, which alleges promissory estoppel. The doctrine of promissory estoppel permits a plaintiff to recover in the absence of a contract. *Ill. Valley Asphalt, Inc. v. J.F. Edwards Constr. Co.,* 413 N.E.2d 209, 211 (Ill.App.Ct.1980). Given this Court's determination that no valid contract existed between these parties, Giard is free to argue this theory. The same problems of ambiguity and indefiniteness that sunk Giard's contract claim, however, are fatal to his promissory estoppel claim.

In order to prevail on a theory of promissory estoppel, Giard must establish that: (1) Powers made him an unambiguous promise; (2) he relied upon that promise; (3) Powers would have expected and foreseen Giard's reliance; and (4) he suffered an injury as a result of his reliance. *Id.* In determining whether a party has detrimentally relied upon a promise, the Court looks at the individual facts of each case. *Chicago Limousine Serv., Inc. v. City of Chicago,* 781 N.E.2d 421, 429 (Ill.Ct.App.2002).

*5 Giard contends that Exhibit A constituted an un-

ambiguous promise by Powers to provide Giard with twenty percent of the profits of the sale of Profile. In trusting this promise, Giard argues, he left Profile without securing his twenty percent ownership in the company and, therefore, has lost both his ownership stake in Profile and the profits he should have received from the sale of Profile stock.

This Court need not reach the issues of reliance or damages because Powers's promise does not meet the doctrine's prohibition against ambiguity. Exhibit A failed to constitute a valid contract because it failed to set forth any terms for Giard's compliance, making it impossible to determine whether Giard breached the contract by leaving Profile when he did. Similarly, the statement that Giard "will receive *[sic]* 20% of the proceeds from the sales of Profile for Speed, Inc." fails to define any of the relevant terms and, therefore, the promise itself is neither clear nor unambiguous.

First, the statement gives no definition of its most critical term, the word "sales." Due to the pluralization of the word sale ("twenty percent of the *sales* of Profile for Speed, Inc."), a plain reading of the promise suggests that it governs not the sale of the company, but product sales. Under this reading, Giard is entitled to twenty percent of the sales of Profile handlebars and bicycle parts but has no claim over proceeds from the sale of the company. Even if the Court reads the promise as pertaining to the sale of Profile, it is entirely unclear what constitutes a sale. A study of *Black's Law Dictionary* confirms that this word is not self-defining and is susceptible to many meanings. Indeed, *Black's* devotes several pages to the meaning of "sale." *Black's Law Dictionary* 1337-39 (6th ed.1990). One definition *Black's* provides is that a sale requires "the passing of the general and absolute title," *id.* at 1337, which, in the corporate context, would mean the sale of all of Profile's shares. "Sale," however, could also mean the conveyance of the majority interest in Profile. Powers even suggests that had Giard sold his shares, such a transaction would have constituted a "sale" under the promise, despite the fact

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that Giard only held an eleven percent interest. Under any definition, this would only hold true if "sale" meant sale of stock, however, it is impossible to ascertain from the promise whether stock sales are included in its scope. Indeed, "sale" could mean sale of Profile's assets, or even of just one asset. The parties' quibbling in their briefs about whether the sale of options was governed by the promise provides yet another possibility. When a promise allows for such a range of viable interpretations, the one thing it cannot be construed as is unambiguous.

Furthermore, the statement fails to provide any insight into the duration of the promise. In promissory estoppel cases in the employment context, courts have held that where the duration of a promise is a matter of speculation, the promise is ambiguous and fails to satisfy the requirements of promissory estoppel. *See, e.g ., Schoeneck v. Chicago Nat'l League Ball Club, Inc.,* 867 F.Supp. 696, 702-03 (N.D.Ill.1994); *James v. W. N.Y. Computing Sys., Inc .,* 710 N.Y.S.2d 740 (N.Y.App.Div.2000). In the absence of a specific expiration date, Giard is asking this Court to find Powers's promise to be enforceable indefinitely, or at least, to find it enforceable for almost nine years. The court in *Schoeneck* refused to interpret a lack of specificity as evidence that the promise in question stretched out for the entirety of the plaintiff's life. This Court rejects Giard's similar call for a speculative reading and, therefore, finds that Giard cannot satisfy the first element of his promissory estoppel claim. Accordingly, Giard's promissory estoppel claim must fail. Giard's motion for summary judgment is denied and Powers's motion on this claim is granted.

## CONCLUSION

*6 For the reasons set forth above, Defendant's Motion for Summary Judgment is GRANTED as to Count One, DENIED as to Count Two, and GRANTED as to Count Three. Defendant's Motion is DENIED AS MOOT as to the Breach of Fiduciary Duty claim, because Plaintiff does not raise such a claim in his amended complaint. Plaintiff's Motion for Summary Judgment is DENIED as to Count Three.

IT IS SO ORDERED.

N.D.Ill.,2003.
Giard v. Powers
Not Reported in F.Supp.2d, 2003 WL 1888758 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.