UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOHN W. COMRIE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 08 C 3060 |
| v. | ) |
| | ) Judge John W. Darrah |
| IPSCO INC.; IPSCO ENTERPRISES INC.; | ) |
| IPSCO ENTERPRISES INC. | ) |
| U.S. SUPPLEMENTAL EXECUTIVE | ) |
| RETIREMENT PLAN; and | ) |
| IPSCO INC. BENEFITS COMMITTEE, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff, John Comrie, filed suit against Ipsco Inc., Ipsco Enterprises Inc., the Ipsco Enterprises Inc. U.S. Supplemental Retirement Plan and the Ipsco Inc. Benefits Committee, alleging Plaintiff had not received retirement benefits to which he was entitled. Before the Court are Plaintiff's motion for partial summary judgment and Defendants' motion for summary judgment on all counts.

### BACKGROUND

*Comrie's Employment with Ipsco*

Prior to July 2007, Defendant Ipsco Inc. was a Canadian Corporation engaged in the production and sale of steel plate and coil. (Defs.' 56.1(a)(3) ¶ 2.) Defendant Ipsco Enterprises Inc. was a Delaware corporation with its principal place of business in Illinois.[1] (Defs.' 56.1(a)(3) ¶ 3.) Defendant Ipsco Enterprise Inc. U.S. Supplemental Executive Retirement Plan (the "SERP") is a non-qualified employee pension benefit plan under ERISA. (Defs.' 56.1(a)(3)

---

[1]Ipsco Enterprises Inc. was a wholly owned subsidiary of Ipsco Inc.

¶ 4.) Defendant Ipsco Inc. Benefits Committee ("Pension Benefits Committee" or "PBC") was the plan administrator of the SERP at the time Comrie made his claim for benefits under the SERP. (Defs.' 56.1(a)(3) ¶ 5.)

Comrie, a Canadian citizen, became an employee of Ipsco Inc. on July 15, 1980, at Ipsco Inc.'s corporate headquarters in Regina, Saskatchewan, Canada. (Pl.'s 56.1(b)(3) ¶ 1; Defs.' 56.1(a)(3) ¶ 8.) On or around May 24, 1999, Comrie immigrated to the United States in conjunction with Ipsco Inc.'s transfer of its operational headquarters to Lisle, Illinois. (Defs.' 56.1(a)(3) ¶ 8.) Prior to the move, in March and April of 1999, Comrie had several discussions with Edwin Tiefenbach, the then-Chief Financial Officer of Ipsco Inc. and Ipsco Enterprises Inc., and with Allan Harris, the then-Director of Compensation and Benefits for Ipsco Inc and Ipsco Enterprises Inc.,[2] about Comrie's relocation to the United States. (Pl.'s 56.1(b)(3) ¶ 4.) According to Comrie, Tiefenbach and Harris told Comrie that if he agreed to move to the United States, Comrie would not suffer any material reduction in his retirement benefits, he would get full credit for all his years of service (whether in the United States or Canada) and that there would be no material change in the security for his retirement benefits, i.e., Comrie's pension benefits would be secured by a letter of credit from a Canadian-chartered bank. (Pl.'s

---

[2]Defendants object to this statement on the basis that Comrie was not an employee of Ipsco Enterprises Inc. at the time of these meetings and, therefore, did not have personal knowledge of the titles held by Tiefenbach and Harris. (Defs.' Resp. to Pl.'s 56.1(a)(3) ¶ 4.) However, as Defendants do not actually dispute that the titles specified by Comrie are correct and the exact titles of Tiefenbach and Harris are not relevant to the resolution of the pending motions, the Court will assume Comrie's statement to be accurate in this regard.

56.1(b)(3) ¶ 5; Defs.' 56.1(a)(3) ¶ 69.)  According to Comrie, on April 23, 1999, Roger Phillips, President of Ipsco Inc. and Chairman of Ipsco Enterprises[3], met with Comrie and reaffirmed to Comrie that Ipsco Inc. would honor the prior assurances and promises made by Tiefenbach and Harris.  (Pl.'s 56.1(b)(3) ¶ 6.)

When Comrie was transferred to the United States, he remained a payroll employee of Ipsco Inc.  (Pl.'s 56.1(a)(3) ¶ 8.)  On August 1, 1999, Comrie also became a payroll employee of Ipsco Enterprises Inc.  (Pl.'s 56.1(a)(3) ¶ 8.)  This split payroll arrangement existed until the end of 2000, when Comrie began to receive his paychecks solely from Ipsco Enterprises Inc.  (Pl.'s 56.1(a)(3) ¶ 8.)  However, Comrie remained an officer of Ipsco Inc. throughout his entire employment.  (Pl.'s 56.1(a)(3) ¶ 8.)  From 2002 onwards, Comrie was an officer of Ipsco Inc. and Director of Trade Policy, Government Affairs and Communication.  (Pl.'s 56.1(a)(3) ¶ 6; Defs.' 56.1(a)(3) ¶ 13.)  Comrie claims that as Director of Trade Policy, Government Affairs and Communication, he reported to the CEO, David Sutherland.  (Defs.' 56.1(a)(3) ¶ 14.)

Beginning in June 2007, Comrie was part of an integration team working with SSAB Svenski Stal AB ("SSAB") in connection with its acquisition of Ipsco Inc. and its affiliate companies.  (Defs.' 56.1(a)(3) ¶ 15.)  Effective July 18, 2007, Ipsco Inc. and Ipsco Enterprises Inc. were acquired by SSAB.  (Defs.' 56.1(a)(3) ¶¶ 2, 3.)  In July 2007, John Tulloch, Executive Vice President, informed Comrie that following the SSAB acquisition, Comrie would report to Michele Klebuc-Simes, who was promoted over Comrie and made Vice President and General

---

[3]Defendants make the same objection with respect to Phillips' title that they did with respect to Tiefenbach and Harris.  The Court will again assume the title identified by Comrie is correct, as Defendants have not presented evidence to the contrary.

Counsel. (Defs.' 56.1(a)(3) ¶¶ 12, 16; Pl.'s 56.1(a)(3) ¶ 18; Pl.'s 56.1(b)(3) ¶ 36.) Tulloch also informed Comrie that Comrie would no longer participate in weekly and bi-monthly senior management meetings. (Pl.'s 56.1(b)(3) ¶ 36.)

Comrie resigned, effective July 31, 2007, by means of a letter to Tulloch. (Defs.' 56.1(a)(3) ¶ 19.) The letter stated that Comrie considered the changes that had been implemented by SSAB to be "unacceptable" and that he considered himself to be "involuntarily terminated." (Defs.' 56.1(a)(3) ¶ 19.)

## The SERP Benefits Awarded to Comrie

The SERP is a non-qualified employee benefit plan under ERISA. (Defs.' 56.1(a)(3) ¶ 5.) The SERP states that its purpose and intent is to "provid[e] pension supplements to senior executives and certain group executives." (Defs.' 56.1(a)(3) ¶ 33.) The SERP is maintained "primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." (Defs.' 56.1(a)(3) ¶ 33.)

On July 27, 2007, Comrie asked Ray Rarey, Vice President of Human Resources, by email, for a copy of the Ipsco Enterprises Inc. Retirement Savings and Profit Sharing Plan. (Pl.'s 56.1(a)(3) ¶ 20.) Minutes later, Rarey replied, "That is our 401(k) plan. Arla or Katie can give you a copy if you have misplaced yours." (Pl.'s 56.1(a)(3) ¶ 20.) Hours later, Arla Morrow of Ipsco's H.R. department emailed Comrie a copy of the Retirement and Profit Sharing Plan (401(k) Summary Plan Description) ("SPD"). (Pl.'s 56.1(a)(3) ¶ 20.) Upon further request, after Comrie left Ipsco, on or shortly after August 6, 2007, Comrie received a copy of the 2006 401(k) Adoption Agreement, which had been signed by Rarey. (Pl.'s 56.1(a)(3) ¶ 20.)

Comrie made a claim for benefits under the SERP by letter to Tulloch, dated August 1, 2007. (Defs.' 56.1(a)(3) ¶ 22.) Comrie supplemented his August 1, 2007 letter to Tulloch with a letter to Rarey, dated August 20, 2007, which enclosed a letter from Comrie's actuary, Neil Shore, "reviewing actuarial matters related to [Comrie's] pension." (Defs.' 56.1(a)(3) ¶ 23.) Also included in the August 20, 2007 letter was Comrie's calculation of pension benefits he was owed. (Pl.'s 56.1(a)(3) ¶ 22.)

The SPD that Comrie had received from H.R. explained the term "Compensation" as follows:

> For purposes of calculating contributions to the plan, your compensation includes the total pay you received from IPSCO during the plan year in which you were a participant.
>
> Total pay includes your base salary, bonuses, **incentive pay**, overtime and commissions . . . . (emphasis added)

(Pl.'s 56.1(a)(3) ¶¶ 13, 20.) Comrie's August 20, 2007 claim for pension benefits, therefore, included as earnings Comrie's base salary and incentive pay received by Comrie under the Management Incentive Program (MIP) and Long-Term Incentive Plan (LTIP). (Pl.'s 56.1(a)(3) ¶¶ 7, 22.) From 2002 through 2007, Comrie received the following compensation as base pay, MIP and LTIP:

|          | **2002** | **2003** | **2004** | **2005** | **2006** | **2007** |
|----------|----------|----------|----------|----------|----------|----------|
| Base Pay | 135,661  | 132,750  | 135,937  | 140,000  | 143,625  | 95,390   |
| MIP      | 4,800    | 0        | 7,700    | 109,484  | 129,080  | 126,967  |
| LTIP     | 2,111    | 0        | 77,513   | 851,792  | 145,350  | 561,621  |

(Pl.'s 56.1(a)(3) ¶ 7.)

On October 25, 2007, the PBC met to consider Comrie's claim for benefits under the SERP. (Defs.' 56.1(a)(3) ¶ 25.) Section 6(a) of the SERP provided that the "Amount of Benefit" was equal to 2% of Comrie's Final Earnings multiplied by Comrie's years of Continuous Service (including fractions for completed months) reduced by certain amounts not relevant here. (Defs.' 56.1(a)(3) ¶ 39; Pl.'s 56.1(a)(3) ¶ 16.) For executives such as Comrie, the applicable definition of "Final Earnings" is set out in Appendix A1 of the SERP, which provides:

> "Final Earnings . . . means the average annual Earnings of the Participant during the five consecutive calendar years of Continuous Service in which Earnings were highest, and shall mean the average annual Earnings during the actual period of Continuous Service if such service is less than five calendar years. For all purposes of this Appendix A1, and without regard to any provision of the Plan to the contrary, a Participant's Earnings shall not include any portion of compensation attributable to a bonus.

(Pl.'s 56.1(a)(3) ¶ 11; Defs.' 56.1(a)(3) ¶ 42.) "Earnings," in turn, is defined in § 109 of the SERP:

> "Earnings" means the "Compensation" for the calendar year (prorated for partial years) as defined under the IPSCO Enterprises Inc. Retirement Savings and Profit Sharing Plan but without adjustment for the maximum Compensation limit under Section 401(a)(17) of the Code, plus any amounts deferred in that year by the Participant under a deferred compensation arrangement maintained by the Company. Any non-US compensation shall be treated as US-source compensation for purposes of the Plan. In no event, however, shall Earnings include any compensation attributable to an annual incentive award, which was paid to the Participant prior to January 1, 2005.
>
> Notwithstanding the foregoing, unless the plan specifically provides otherwise, Earnings are limited to $160,000 (US) per year (pro-rated for partial years) (the "Earnings Limit") for a Participant whose Termination Date occurs prior to age 60. For a Participant whose Termination Date is on or after age 60, Earnings shall not be limited by the Earnings Limit.

6

(Pl.'s 56.1(a)(3) ¶ 12; Defs.' 56.1(a)(3) ¶ 46.) Section 1.29 of the IPSCO Enterprises Inc. Retirement Savings and Profit Sharing Plan (the "401(k) Plan") defines "Compensation" in pertinent part as follows:

> The term "Compensation" means, for each type of contribution, an Employee's Form W-2 Compensation, Code §3401 Compensation, Code §415 Safe Harbor Compensation or Code §415 Statutory Compensation, as elected by the Sponsoring Employer in the Adoption Agreement.

(Defs.' 56.1(a)(3) ¶ 47.)

Finally, Section 9 of the SERP provides:

> "[I]n the event of an Involuntary Termination of a Participant's employment within twenty-four (24) months following a change in Control . . . Earnings shall be determined without regard to the Earnings Limit . . . [and] Benefits payments shall commence upon the Participant's Involuntary Termination and shall not be reduced due to benefit payments commencing prior to any specified age . . . ."

(Defs.' 56.1(a)(3) ¶ 38.)

In determining Comrie's benefit, the PBC first found in Comrie's favor that he qualified for enhanced benefits under Section 9 of the SERP due to the change in control provision. (Defs.' 56.1(a)(3) ¶ 38.) The PBC then looked to Appendix A1 for the definition of Comrie's "Final Earnings." (Defs.' 56.1(a)(3) ¶¶ 42, 43.) As noted above, Appendix A1 states that a "Participant's Earnings shall not include any portion of compensation attributable to a bonus." (Defs.' 56.1(a)(3) ¶ 42.) The PBC interpreted "bonus," as used in Appendix A1, to "refer to payments earned in addition to base salary, including the Company's stock-based MIP and LTIP, or other performance awards." (Defs.' 56.1(a)(3) ¶ 43.)

7

As noted above, SERP § 109's definition of "Earnings" is dependent on the definition of "Compensation" found in the 401(k) Plan. (Pl.'s 56.1(a)(3) ¶ 12; Defs.' 56.1(a)(3) ¶ 46.) The 401(k) Plan defines compensation as one of four amounts, depending on the election of the Sponsoring Employer in the Adoption Agreement. (Defs.' 56.1(a)(3) ¶ 47.) The PBC reviewed a version of the 401(k) Plan Adoption Agreement ("Adoption Agreement") that had been signed by Rarey on December 21, 2006. (Defs.' 56.1(a)(3) ¶ 48.) However, the version of the Adoption Agreement that Rarey had signed lacked any check mark in any of the relevant boxes of Section 12 identifying which definition of Compensation was to be used. (Defs.' 56.1(a)(3) ¶ 48.) The PBC, therefore, reviewed the minutes of the Ipsco Inc. Management Resources and Compensation Committee ("MRCC") of the Board of Directors meeting of December 11, 2006, and determined that the version of the Adoption Agreement appended to the agenda for that meeting selects "Code § 415 Compensation (as defined in Reg. §1.415.2(d)(10))" as the definition of Compensation in Section 12.1(a). (Defs.' 56.1(a)(3) ¶ 49.) The meeting minutes for the December 11, 2006 MRCC meeting provide "RESOLVED, that the recommended changes to the IPSCO Enterprises Inc. Retirement and Savings Plan as presented to the Board are hereby approved and adopted." (Defs.' 56.1(a)(3) ¶ 50.) The PBC therefore concluded that "Code § 415 Compensation (as defined in Reg. §1.415.2(d)(10))" reflected the historical administration of the 401(k) Plan. (Defs.' 56.1(a)(3) ¶ 51.)

The PBC determined that Comrie's "Final Earnings" was "limited to base pay and excludes stock-based and long-term incentive compensation." (Defs.' 56.1(a)(3) ¶ 52.) The PBC calculated Comrie's Final Earnings to be $138,750. (Defs.' 56.1(a)(3) ¶ 56.)

With respect to "Continuous Service," the PBC looked to Section 1.08 of the SERP, which defines the term, and to Appendix A1, which provides that, for purposes of calculating SERP benefits, each complete month of service after January 1, 1991, performed in the United States is multiplied by the following factor:

$$\frac{\$5{,}000\ CAD + .05\ (monthly\ salary - \$5{,}000\ CAD)}{Monthly\ salary}$$

(Defs.' 56.1(a)(3) ¶¶ 58, 59.) Citing and relying on these definitions, the PBC determined that Comrie's "Continuous Service" was 23.3752 years, consisting of 18 years of Canadian Service and 5.3752 years of United States service. (Defs.' 56.1(a)(3) ¶ 59.)

Using these figures for Final Earnings and Continuous Service, the PBC determined that Comrie was entitled to a SERP benefit in the amount of $402,580.30. (Defs.' 56.1(a)(3) ¶¶ 25, 53, 59.)

On January 25, 2008, Comrie appealed the PBC's determination of his SERP benefits. (Defs.' 56.1(a)(3) ¶ 28.) At a May 23, 2008 meeting to review Comrie's appeal, the PBC determined that Comrie's benefits had been correctly calculated as $402,580.30 and denied Comrie's appeal. (Defs.' 56.1(a)(3) ¶ 30.)

## LEGAL STANDARD

Summary judgment is appropriate when there remains no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.*, 40 F.3d 146, 150 (7th Cir. 1994). Although the moving party is responsible for demonstrating to the court why there is no genuine issue of material fact, the nonmoving party must go beyond the face of the pleadings, affidavits,

9

depositions, answers to interrogatories, and admissions on file to demonstrate, through specific evidence, that there remains a genuine issue of material fact and show that a rational jury could return a verdict in the nonmoving party's favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-27 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254-56 (1986) (*Anderson*); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (*Matsushita*); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 923 (7th Cir. 1994).

Disputed facts are material when they might affect the outcome of the suit. *First Ind. Bank v. Baker*, 957 F.2d 506, 507-08 (7th Cir. 1992). When reviewing a motion for summary judgment, a court must view all inferences to be drawn from the facts in the light most favorable to the opposing party. *Anderson*, 477 U.S. at 247-48; *Popovits v. Circuit City Stores, Inc.*, 185 F.3d 726, 731 (7th Cir. 1999). However, a metaphysical doubt will not suffice. *Matsushita*, 475 U.S. at 586. If the evidence is merely colorable or is not significantly probative or is no more than a scintilla, summary judgment may be granted. *Anderson*, 477 U.S. at 249-50.

**ANALYSIS**

*ERISA Benefits under the SERP - Count I*

Both parties have moved for summary judgment with respect to Count I. Comrie argues that his incentive pay, specifically compensation he received through the MIP and LTIP, should have been included in his "compensation" that the PBC used in calculating his SERP benefits. Comrie points out that the SPD's definition of "compensation" includes "incentive pay." Comrie therefore concludes that his SERP benefits, correctly calculated, amount to over

$2 million more than the sum to which the PBC found he was entitled. Defendants counter that the SERP, not the SPD, determines the amount to which Comrie is entitled and that the PBC's determination is entitled to deference under the law.

As noted above, the administrator of the SERP, Ipsco Inc., delegated full authority to administer the plan to the PBC. Therefore, the PBC's determination of Comrie's benefits is entitled to deference and should be reversed "only if it lacks any rational support in the record." *Raybourne v. Cigna Life Ins. Co. of New York*, 576 F.3d 444, 449 (7th Cir. 2009) (*Raybourne*) (applying "arbitrary and capricious" or "abuse of discretion" standard to administrator's determination benefits). Thus, in reviewing the PBC's decision, the Court's "role is not to decide whether it would reach the same decision as the administrator." *Id*. Rather, the decision should be upheld, "as long as specific reasons for the denial are communicated to the claimant and supported by record evidence." *Id*. *See also Marrs v. Motorola, Inc.*, 577 F.3d 783, 786 (7th Cir. 2009) (quoting *Carr v. Gates Health Care Plan*, 195 F.3d 292, 294 (7th Cir.1999)) ("under the arbitrary and capricious standard, the administrator's decision will only be overturned if it is downright unreasonable"). Under this standard, the determination of benefits should be upheld "as long as (1) it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, (2) the decision is based on a reasonable explanation of relevant plan documents, or (3) the administrator has based its decision on a consideration of the relevant factors that encompass the important aspects of the problem." *Speciale v. Blue Cross and Blue Shield Ass'n*, 538 F.3d 615, 621 (7th Cir. 2008) (*Speciale*) (quoting *Sisto v. Ameritech Sickness & Accident Disability Benefit Plan*, 429 F.3d 698, 700 (7th Cir. 2005)).

Comrie makes several arguments as to why the PBC's decision was an abuse of discretion and should be rejected. Comrie argues that incentive pay, specifically income received as part of the LTIP or MIP, is not a type of "bonus" excluded by Appendix A1. Comrie points to ¶ 1.09 of the SERP, which states, "[i]n no event, however, shall Earnings include any compensation attributable to an annual incentive award, which was paid to the Participant prior to January 1, 2005." Comrie argues that because the SERP expressly excludes pre-2005 incentive pay, under the canon of *expressio unius*, incentive payments cannot be considered a bonus. This language, excluding pre-2005 incentive pay from Earnings, would be superfluous, Comrie argues, if all incentive pay is deemed a bonus.

Defendants counter that while the language is superfluous when applied to Comrie, who is covered under Appendix A1, it is not superfluous when applied to individuals covered in Appendices B through I, which, unlike Appendix A1, do not exclude bonus income from "Earnings." For those individuals, Section 1.09 excludes pre-2005 annual incentive awards and is the only provision in the SERP to do so. Thus, Defendants argue, the PBC's interpretation of "bonus" does not render the language in Section 1.09 meaningless.

Defendants' argument is persuasive, and Comrie has made no reply. Restated, the PBC's position is that Section 1.09 provides that pre-2005 incentive pay shall not be counted towards Earnings for any individual covered by the SERP. For individuals covered by Appendix A1, this provision turns out to be redundant because for such individuals, Appendix A1 excludes any bonus, not just pre-2005 incentive pay. But Section 1.09 has specific application for individuals not covered by Appendix A1, for whom bonuses may count towards Earnings. This interpretation of the SERP is internally consistent and reasonable.

Comrie next argues that the SPD to the 401(k) Plan supports his contention that incentive pay should count towards Earnings. As noted above, the SPD provides that Compensation "includes your base salary, bonuses, incentive pay, overtime and commissions . . ." Comrie points out that the SPD differentiates between bonuses and incentive pay. Therefore, Comrie argues, the two are not the same. Since Appendix A1 excludes compensation attributable to bonuses without mentioning incentive pay, the latter must be included in Compensation. However, as Defendants point out, the SPD to the 401(k) Plan is not incorporated by reference in the SERP; only the definition of "Compensation" in the 401(k) Plan itself is incorporated. Thus, the SPD to the 401(k) Plan does not control the terms of the SERP.

Finally, with respect to the term "bonus" as used in Appendix A1, Comrie argues that the term "would logically refer to payments other than incentive pay," for example "the Profit Sharing Bonus deposited in Comrie's 401(k) plan." (Pl. Mem. at 12.) But this definition of "bonus" renders the exclusion of bonuses in Appendix A1 meaningless. The sole non-incentive pay "bonus" that Comrie can point to is the Profit Sharing Bonus. However, the Profit Sharing Bonus is not W-2 income and would, therefore, not be included in "Compensation" no matter which definition of that term was selected from the 401(k) Plan.[4] Thus, the Appendix A1 exclusion of bonus would not exclude anything unless incentive pay is considered a bonus.

Furthermore, the PBC's definition of "bonus" is consistent with the plain meaning of the term. A bonus is "money or an equivalent given in addition to an employee's usual compensation." Merriam Webster Online Dictionary, http://www.merriam-

---

[4] W-2 income is the broadest possible definition of "Compensation" under the 401(k) Plan.

webster.com/dictionary/bonus. Even Comrie's actuarial expert testified that he "would have thought that [the MIP and the LTIP] would have constituted bonuses." (Van Wagner Dep. Tr. at 17.) *See also, e.g., Tatom v. Ameritech Corp.*, 305 F.3d 737, 739 (7th Cir. 2002) (referring to annual incentive awards as bonus compensation).

Comrie also makes several arguments based on the failure to check a box in Section 12 of the version of the Adoption Agreement that Rarey signed, identifying which definition of Compensation was to be used.[5] Comrie first argues that the PBC's action on October 25, 2007, in reviewing the minutes of the December 11, 2006, Ipsco Inc. MRCC meeting to determine which option for Compensation the Board of Directors had selected was an amendment of the Adoption Agreement. Comrie argues that the amendment was ineffective because the SERP prohibits amendments that reduce a participant's benefits retroactively.

Defendants dispute that the PBC's actions at the October 25, 2007 meeting amounted to an amendment to the 401(k) Plan's definition of Compensation. According to Defendants, the version of the Adoption Agreement that Rarey signed was not the operative version. Rather, the operative version of the Adoption Agreement was the version that had been presented to and approved by the Board in December 2006. That version of the Adoption Agreement has a completed Section 12 in which Code § 415 Compensation is selected. Rarey, Defendants argue, by signing a version of the Adoption Agreement that was at variance with the version the Board

---

[5]As previously stated, SERP § 109's definition of "Earnings" is dependent on the definition of "Compensation" found in the 401(k) Plan.

had adopted, could not unilaterally amend the 401(k) Plan. Defendants' argument is persuasive. Comrie offers no convincing explanation of how Rarey, by signing an incomplete version of the Adoption Agreement, could alter a decision made by the Board.

Furthermore, it is unclear how it would matter. Comrie argues that because no box was checked to specify which definition of Compensation had been selected, the Adoption Agreement "did not exclude W-2 income such as incentive pay." (Comrie Mem. at 8.) Comrie's argument is puzzling because "Form W-2 Compensation" is one of the options under Section 12. Thus, while no box was checked to exclude certain W-2 income from Compensation, neither was the box checked to *include* all W-2 income as Compensation. Comrie provides no explanation for why "Form W-2 Compensation" should be the default choice for Section 12. Finally, even if W-2 Compensation was selected in Section 12, Appendix A1 provides "*without regard to any provision of the Plan to the contrary*, a Participant's Earnings shall not include any portion of compensation attributable to a bonus." Thus, no matter the definition of Compensation, any compensation considered a bonus would not count towards Comrie's Final Earnings.

For the foregoing reasons, the Court finds that Defendants have "offer[ed] a reasoned explanation, based on the evidence," for the outcome reached by the PBC and that the PBC's decision is "based on a reasonable explanation of relevant plan documents." *See Speciale*, 538 F.3d at 621. Therefore, Comrie has not shown the decision to be arbitrary or capricious, and the decision will not be reversed.

Comrie's final argument against affirming the PBC's determination with respect to his SERP benefits is that the decision involved a conflict of interest. This argument is not persuasive. First, Comrie's evidence for the presence of a conflict of interest or prejudice against

15

him is not convincing. For example, Comrie argues that Klebuc-Simes, who was on the PBC, made up her mind against Comrie's claim within hours after Comrie submitted his claim. However, Klebuc-Simes testified that while she had formed a preliminary impression of Comrie's SERP claim, she had made no conclusions, as the matter was to be reviewed and determined by the PBC. Additionally, Klebuc-Simes reminded the PBC of its fiduciary duties prior to deciding Comrie's claim. Furthermore, as Defendants point out, to the extent that the members of the PBC had any bias in the case, it may well have been in favor of Comrie since a determination that LTIP and MIP compensation should be included in "Final Earnings" would have enhanced their own SERP benefits.

In any case, a conflict "is one factor among many that are relevant in the abuse-of-discretion analysis . . . and will 'act as a tiebreaker when the other factors are closely balanced.'" *Raybourne*, 576 F.3d at 449 (quoting *Metropolitan Life Ins. Co. v. Glenn*, 128 S.Ct. 2343, 2351-52 (2008)). A conflict will "tip the balance only [in] a borderline case." *Raybourne*, 576 F.3d at 450. This is not such a case. The PBC's interpretation of the relevant documents and conclusions drawn therefrom are clearly reasonable. Comrie cannot present a plausible interpretation of the relevant documents that would result in the benefits he claims.

For the foregoing reasons, Comrie's motion for partial summary judgment is denied. Defendants' motion for summary judgment is granted with respect to Count I.

*Breach of Contract and Promissory Estoppel - Counts II and III*

Comrie alleges that certain employees of Defendants made various promises to him in conjunction with his move from Canada to the United States. Specifically, Comrie alleges that he was promised that he would not suffer a material reduction in his benefits, that his pension

16

would be as secure as it had been in Canada and that he would receive full credit for his years of service regardless of whether he worked in the United States or Canada. Comrie brings Counts II and III under Canadian law. Defendants have moved for summary judgment on both counts.[6]

Defendants argue that Comrie's claims are barred by Illinois's five-year statute of limitations. *See* 735 ILCS 5/13-205 (breach of oral contract). Under Illinois choice-of-law principles, the Illinois statute of limitations governs Counts II and III because it is procedural and applies regardless of the substantive law controlling the underlying claims. *See Flavorchem Corp. v. Mission Flavors and Fragrances, Inc.*, 939 F.Supp. 593, 598 (N.D. Ill.1996). Defendants assert that Comrie knew in 1999 that his pension benefits were no longer secured as he had been promised and that Comrie knew or should have known in 2001 that he was not receiving year-for-year credit for his service in the United States. Comrie does not deny these assertions. "[A] cause of action accrues upon a clear and unequivocal repudiation of rights under the pension plan which has been made known to the beneficiary." *Daill v. Sheet Metal Workers' Local 73 Pension Fund*, 100 F.3d 62, 66 (7th Cir. 1996) (applying Illinois statute of limitations). Thus, Comrie's suit was filed outside of the relevant limitations period for Counts II and III.

Comrie argues that under the doctrine of anticipatory repudiation, it was his option to wait until the time of performance to sue. However, anticipatory repudiation concerns the repudiation of future obligations. *See Franconia Associates v. United States*, 536 U.S. 129, 139 (2002). And as Defendants argue, Defendants' obligations with respect to the promises to

---

[6]Defendants first argue that Counts II and III are preempted by ERISA. The Court has twice considered this argument in the context of ruling on Defendants' motions under Rule 12(b)(6). Because Defendants' statute of limitations argument is dispositive of these claims, it is unnecessary to address the preemption issue in ruling on the pending summary judgment motion.

Comrie were present, not future, obligations. The promise to secure Comrie's pension with a letter of credit was breached when Defendants failed to so secure the pension. Likewise, the promise to calculate Comrie's service on a year-for-year basis was breached when Defendants began giving Comrie less than full credit for his years of service in the United States. *See Turner v. Retirement Plan of Marathon Oil Co.*, 659 F.Supp. 534, 539-40 (N.D. Ohio 1987) (rejecting anticipatory repudiation argument on materially identical facts).

Therefore, Defendants' motion for summary judgment is granted with respect to Counts II and III.

*Severance Pay - Count IV*

Finally, Comrie alleges that, under Canadian law, he is entitled to receive severance pay due to his constructive dismissal. Defendants argue that Illinois substantive law applies to Comrie's claim. In the absence of a choice-of-law provision, Illinois courts apply the "most significant contacts" test. *See Costello v. Liberty Mut. Fire Ins. Co.*, 376 Ill. App. 3d 235, 240-41 (2007). While this Court has previously found that the alleged oral contracts at issue in Counts II and III had their most significant contacts with Canada, the analysis with respect to Count IV is different. Counts II and III dealt with promises allegedly made to Comrie in Canada, while he had only Canadian citizenship and by a Canadian company. Count IV concerns the termination of Comrie's employment in Illinois. By that time, Comrie had been working in Illinois for over eight years and had become a United States citizen. Furthermore, all communication between Comrie and various employees of Defendants regarding Comrie's leaving Defendants' employment occurred in Illinois. Therefore, for purposes of Count IV, Illinois has the most significant contact to Comrie's employment.

Under Illinois law, Comrie has no claim for the severance pay that he seeks in Count IV. *See Arado v. General Fire Extinguisher Corp.*, 626 F.Supp. 506, 509 (N.D. Ill. 1985) (absent contractual agreement, no severance pay required under Illinois law). Therefore, Defendants' motion for summary judgment is granted with respect to Count IV.

**CONCLUSION**

For the foregoing reasons, Plaintiff's motion for partial summary judgment is denied; Defendants' motion for summary judgment is granted.

Dated: 5/12/10

_____
JOHN W. DARRAH
United States District Court Judge